**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

NATIONAL ASSOCIATION OF TICKETING PROFESSIONALS,
430 Palisade Avenue, Unit 501, Jersey City, NJ 07307

ASC TICKET COMPANY,
408 Main Street, Gaithersburg, MD 20878

STAGE FRONT TICKETS, INC.,
10280 Old Columbia Road, Suite 220A,
Columbia, MD 21046

Plaintiffs,

v.

DISTRICT OF COLUMBIA,
1350 Pennsylvania Avenue, N.W.
Washington, D.C. 20004,

Defendant.

Case No. 26-cv-___________

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiffs National Association of Ticketing Professionals, ASC Ticket Company, and Stage Front Tickets, Inc. bring this Complaint for declaratory and injunctive relief against the District of Columbia. In support of the relief sought, Plaintiffs allege as follows:

## INTRODUCTION

1. This spring, the District of Columbia's Attorney General helped persuade a jury that dominant players in the primary ticketing market, Live Nation and Ticketmaster, operated an illegal monopoly and overcharged ticket buyers. Months later, the District's Council enacted a sweeping price control that shields primary ticketers in the District from resale competition—all while doing nothing to curtail primary-market practices that harm fans.

2. The Restricting Egregious Scalping Against Live Entertainment (RESALE) Amendment Act of 2026 (the "RESALE Act" or "Act"), D.C. Act 26-410 (codified at D.C. Code § 28-5501 *et seq.*), targets the secondary market for live-event tickets. Under the Act, no one can resell a ticket for a live event for more than 10% above its original price unless that event is a movie or a qualifying sporting event. While pushing that price control through the legislative process, the District's Council rebuffed efforts to limit what primary ticketers—*i.e.*, local venues and their ticketing partners—may charge. The Deputy Mayor for Planning and Economic Development warned that capping resale prices could increase fraud and "financial losses for consumers" by empowering "unregulated markets." After studying the legislation for months, the Council's own Committee on Public Works and Operations explained that the price cap risked "further consolidating monopoly power in the primary market" and invited price gouging. The Committee struck the cap.

3. But the District's Council was undeterred. Eight days later, with no study, no economic analysis, and no new evidence, two councilmembers moved to reinstate the cap. The amendment was necessary, they said, "to protect artists, venues, and consumers." The full Council subsequently passed the Act with the price cap. The sponsor thanked I.M.P.—the owner and manager of many of D.C.'s marquee venues—for supporting the legislation. I.M.P.'s position is not surprising. To operate its District venues, I.M.P. relies on the entities that the District sued for harming consumers: it uses Ticketmaster as its ticketing partner, and it gets access to major artists through Live Nation.

4. The sponsors of the amendment reinstituting the price cap emphasized that it would let ticket owners recover only "what they paid and break even." But break-even is not a business. The resellers the Act targets give fans a way into sold-out shows and a way out of tickets they can

no longer use. They regularly sell tickets for less than the tickets' original price, saving D.C. fans more than $6 million in 2024 alone. Yet the Act forces those resellers to choose between leaving the market and guessing at the reach of a price control that does not say which sales it covers, at the risk of fines of up to $8,000 per violation.

5. The Constitution does not permit that Hobson's choice. The Act regulates transactions all over the country by capping the resale price of a ticket to a live event at 110% of the ticket's total initial price. D.C. Code § 28-5506(b) (the "Price Cap"). But primary ticketers remain free to charge whatever the market will bear—a figure that will increase if consumers lack the options the resale market provides.

6. This legislation is not only misguided but also unlawful several times over.

a. *First*, the Price Cap is unconstitutionally vague. The Act does not tie it to D.C. residents, D.C. venues, or D.C. transactions, leaving resellers to guess what kind of resale it reaches. For example, the Act does not give a reseller based in Maryland a way to determine whether the Price Cap covers a transaction with a D.C. resident for a concert in Baltimore. The Act's sports exemption, riddled with ambiguous phrases and unclear geographical references, compounds the problem. So does the frequently unknowable benchmark of the "initial" ticket price.

b. *Second*, the Price Cap violates the Dormant Commerce Clause for three independent reasons. For one thing, it directly regulates transactions that take place wholly outside the District; even a cap limited to events occurring in the District would impermissibly control transactions involving out-of-District sellers providing tickets to out-of-District buyers in the interstate resale market. For another, the Price Cap discriminates against resellers—almost all of whom are

located outside the District—in favor of local interests. And for a third, it substantially burdens interstate commerce in ways that clearly exceed the purported local benefits.

c. *Third*, the Price Cap violates the Fifth Amendment's guarantee of equal protection by irrationally treating resellers and primary ticketers differently. While resellers face an artificial 10% cap, primary ticketers can set prices according to market demand. No rational basis justifies that differential treatment.

d. *Fourth*, the Price Cap exceeds the Council's legislative authority under the District of Columbia Home Rule Act. The Council can enact only laws that are "restricted in [their] application exclusively in or to the District." D.C. Code § 1-206.02(a)(3). The Price Cap is not so limited, however, because it applies to out-of-state transactions. So it is unlawful.

7. Plaintiffs are the National Association of Ticketing Professionals ("NATP" or the "Association")—the leading trade association for ticket resellers—and two of its members: ASC Ticket Company ("ASC") and Stage Front Tickets, Inc. ("Stage Front"). They support a secondary market for ticket resales that gives consumers choices beyond the primary ticketers—choices for selling tickets they can no longer use and for buying tickets they want. Plaintiffs thus ask this Court to declare that the Price Cap violates the United States Constitution and the Home Rule Act, and to enjoin the District from enforcing it against Plaintiffs and NATP's members.

8. Indeed, without preliminary relief from this Court, Plaintiffs and NATP's members will suffer immediate and irreparable injury from the constitutional violations described above. They will also lose business opportunities that they cannot recover and incur costs they cannot

recoup. Accordingly, while this Court decides this case, Plaintiffs intend to seek a preliminary injunction to avoid the irreparable harm that the Price Cap will otherwise inflict.

## THE PARTIES

9. The National Association of Ticketing Professionals, formerly known as the National Association of Ticket Brokers or NATB, is a District of Columbia not-for-profit trade association representing approximately 250 organizations that sell tickets to live events located throughout the United States, including in D.C. NATP's members offer and sell their tickets across the United States and in the District, primarily through interstate online platforms. Since its founding in 1994, the Association has represented its members' interests as legitimate ticket resellers and defended the rights of both ticket buyers and sellers. Specifically, NATP supports the rights of consumers and resellers to buy and sell tickets in a secondary marketplace governed by free-market principles rather than counter-productive regulations that restrict consumer choice. NATP also prioritizes consumer protection and ethical standards in the ticket resale industry. And it believes that supporting the rights of responsible ticket resellers is the best way to enhance consumer choice by providing a robust secondary market for tickets to live events. In short, NATP believes that fans should have as many options as possible—options to sell tickets they own if they can no longer attend or if others value the ticket more, and options to buy tickets if they want to attend an event or acquire a particular seat from a willing seller.

10. ASC Ticket Company is a limited liability company organized under the laws of Maryland with its principal place of business in Gaithersburg, Maryland. It has been a member of NATP since 2008. Founded in 2004, it acquires and sells tickets for live events, including those

occurring in D.C., to customers in 48 states and the District. ASC does so through interstate marketplaces.

11. Stage Front Tickets, Inc. is a Florida corporation with offices in Columbia, Maryland. Founded in 1984, it has been a member of NATP since the Association's inception in 1994. Stage Front offers fans access to tickets for live events across the country. It buys and resells some tickets itself, and it also helps other ticket holders resell their tickets to consumers.

12. The District of Columbia ("D.C." or the "District") is a municipal corporation established by Congress and is the local government of the District of Columbia. *See* U.S. Const. art. I, § 8, cl. 17. The Council of the District of Columbia, D.C.'s legislative body, enacted the RESALE Act. And through its officials, the District is responsible for enforcing its provisions.

## JURISDICTION, VENUE, AND NATURE OF THE ACTION

13. Plaintiffs' claims arise under the United States Constitution, 42 U.S.C. § 1983, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02. They implicate federal questions, so this Court has subject-matter jurisdiction under 28 U.S.C. § 1331.

14. This Court also has subject-matter jurisdiction under 28 U.S.C. § 1343(a) because Plaintiffs' claims involve the deprivation of constitutional rights under color of state law, which includes the District's law. *See* 28 U.S.C. § 1343(b)(1).

15. Plaintiffs' claim under the District of Columbia Home Rule Act, *see* D.C. Code § 1-201.01 *et seq.*, arises from the same facts as—and forms part of the same case or controversy as—their federal constitutional claims. This Court therefore has supplemental jurisdiction over that claim under 28 U.S.C. § 1367(a).

16. This case presents a justiciable case or controversy because the individual Plaintiffs have standing. The Act directly regulates ASC and Stage Front. ASC buys and sells tickets that

will be subject to the Price Cap, and sometimes those sales exceed the price that the Price Cap would allow. ASC has already passed up economic opportunities because of the Act. And when the Price Cap begins applying, ASC will need to either forgo more opportunities or lose revenue (while incurring more costs) because it faces a credible threat of enforcement by the District if it does not comply. Stage Front, for its part, sells some tickets it owns while also helping ticket owners find buyers and charging a fee for that service. It will lose revenue from those transactions because the Price Cap will suppress the sales prices on which those fees depend and reduce the number of sales as resellers avoid the Price Cap's reach. The Act therefore injures both individual Plaintiffs. And an order declaring unlawful and enjoining the Price Cap would redress those injuries.

17. This case is also justiciable because NATP has associational standing. At least one of its members would have standing to sue because, as described above, the Price Cap injures those members in ways redressable by the relief Plaintiffs seek. The Association seeks to protect interests that are not only germane to its purpose but central to it—namely, the ability of responsible resellers to support consumer choice and access to live events through the secondary market. And no individual member need participate in this case, which raises pure legal questions.

18. This case is also ripe. On September 25, 2026, the Act became law as D.C. Law 26-181. It applies beginning on January 1, 2027.

19. Venue is proper in this District because Defendant resides in the District and because the events giving rise to the claims occurred in this District. *See* 28 U.S.C. § 1391(b)(1)–(2).

20. Plaintiffs sue under 42 U.S.C. § 1983. The District is a "person" subject to suit under § 1983, and the Act qualifies as official District policy. *Monell* v. *Dep't of Soc. Servs.*, 436

U.S. 658, 690, 694 (1978). Alternatively, Plaintiffs also sue under this Court's equitable authority to enjoin violations—and planned violations—of federal law. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015). And they sue under the Declaratory Judgment Act.

21. Plaintiffs challenge the Price Cap facially and as applied to Plaintiffs and NATP's members. Vagueness permeates the Price Cap such that ordinary citizens must speculate about whether its prohibition applies. And the Price Cap violates the Dormant Commerce Clause and the Fifth Amendment's equal protection guarantee in all applications—or at least in a substantial number of its applications relative to any plainly legitimate sweep. Plaintiffs also challenge the Price Cap as applied to their businesses and resale transactions.

## FACTUAL BACKGROUND

### A. Resellers Promote Consumer Choice in a Ticketing Market Otherwise Dominated by Primary Ticketers.

22. Two kinds of entities provide tickets to customers in the market for live events: primary ticketers and resellers.

23. **Primary Ticketers**: Primary ticketers—also known as ticket issuers or, more generally, the primary market—make the first sale in a ticket's lifespan. They include venues, promoters, and artists. But these entities almost always work with ticketing companies, such as Ticketmaster, to make the initial sale. In many cases, the venue, promoter, or artist has a multi-year contract with a ticketing company, under which the ticketing company gives the venue, promoter, or artist a percentage of the ticketing fees it charges buyers (or a fixed amount) in exchange for the exclusive right to make the initial sale of those tickets.

24. Ticketmaster dominates the primary ticket market in the United States, including in the District. As the District's Committee on Public Works and Operations (the "Public Works Committee") explained, "[o]ne of the most glaring issues with the ticket industry" is that

Ticketmaster controls "80 percent of primary ticket[] sales at major venues in the country." Comm. on Pub. Works & Operations, Report on B26-0224 at 3 (June 22, 2026) (the "Committee Report").[1] Ticketmaster is a wholly owned subsidiary of Live Nation Entertainment, which was formed in 2010 through Ticketmaster's merger with Live Nation, an event promotion and venue management company. The District's Attorney General has explained that Live Nation controls artists and ticketing in the D.C. live-event industry. District of Columbia Office of the Attorney General, *Attorney General Schwalb Joins State Attorneys General to Continue Live Nation Lawsuit* (Mar. 9, 2026), https://tinyurl.com/4zcnxp5z.

25. The Live Nation-Ticketmaster stranglehold on the primary market has sparked significant anticompetitive concerns throughout the United States. When Live Nation and Ticketmaster merged in 2010, the Department of Justice (the "Department") and 17 state attorneys general sued because the merger threatened to slash competition in ticketing—a point NATP made as a strong opponent of the merger. The companies eventually entered a consent decree that, according to the Department, they repeatedly violated by conditioning (and threatening to condition) the provision of Live Nation's concerts on a venue's use of Ticketmaster to sell tickets to those concerts—and by retaliating against venues that used Ticketmaster's competitors. The companies eventually agreed to a revised consent decree in 2020.

26. Live Nation and Ticketmaster allegedly violated that consent decree too, prompting the Department and attorneys general from 39 states and the District to sue again four years later. The amended complaint alleged that the merged entity, Live Nation Entertainment, had continued

[1] The Committee Report and other materials in the legislative record of Bill 26-0224—including the amendments and written testimony submitted for the public hearing held on October 22, 2025—are available online. *See* Council of the District of Columbia, *B26-0224 – Restricting Egregious Scalping Against Live Entertainment (RESALE) Amendment Act of 2025*, https://lims.dccouncil.gov/Legislation/B26-0224 (last visited Oct. 14, 2026). Citations to witness testimony refer to the written statements in the public hearing record.

to engage in anticompetitive conduct since signing the 2020 consent decree. Live Nation Entertainment settled with the Department in March 2026.

27. But 34 attorneys general went to trial. As the District's Attorney General explained, "DC and a bipartisan coalition of 33 states refused to join the DOJ's settlement because it failed to adequately hold Live Nation accountable" for "rak[ing] in billions in profits from an illegal monopoly that coerces venues, restricts artists, and exploits fans." Office of the Attorney General, District of Columbia, *Attorney General Schwalb Issues Statement Following Win in Live Nation Antitrust Lawsuit* (Apr. 15, 2026), https://tinyurl.com/b23y5734. The jury agreed. In April of this year, it found that Live Nation and Ticketmaster operated as a monopoly that overcharged customers through anticompetitive conduct.

28. Moreover, the District believes that Live Nation has harmed consumers beyond the conduct that led to the antitrust verdict. Earlier this year, the company agreed to pay $9.9 million to resolve the District's investigation into misleading Ticketmaster practices. Assurance of Voluntary Compliance, *In the Matter of Live Nation Entertainment, Inc.* ¶¶ 12–18, 31 (Apr. 3, 2026), https://tinyurl.com/34vyzn3n. For example, Live Nation settled allegations that Ticketmaster offered "deceptively low Ticket prices," "misrepresented material facts," and "caused Consumers to pay more for Tickets than they would have expected." *Id.* ¶¶ 12, 15.

29. Ticketmaster's foothold in the District is particularly strong. Sales data show that "the District had far higher per capita Ticketmaster ticket sales than any state." Office of the Attorney General, *Attorney General Schwalb Joins State Attorneys General*, *supra*. The reason is simple: Live Nation controls ticketing and artists, so Ticketmaster is the "exclusive ticketer to nearly all sizable venues in DC." *Id.* Upon information and belief, it serves as the ticketer for all venues operated by I.M.P., a major player in the D.C. live-event scene and vocal supporter of the

Act and its Price Cap. And local venues, through their ticketing partners, can sell tickets at market-clearing prices, including by using real-time pricing adjustments known as dynamic pricing.

30. **Resellers**: The person who buys a ticket from the primary ticketer is not always the person who attends the event. Sometimes everyday life gets in the way—feeling under the weather, encountering a last-minute work obligation, or having child-care plans fall through. Or the buyer may realize that other individuals value the event more than he does, so selling the ticket for what they are willing to pay makes sense for both sides.

31. Professional resellers aim to ensure that consumers can go to the events they care about and that no one is stuck with a ticket they can't (or don't want to) use. When a show sells out, resellers give consumers a chance to attend if they will pay market price reflecting demand. Or if a fan wants to see her favorite artist from the front row, resellers help make that happen even if the primary ticketer has no remaining seats there. Resellers also enable fans who cannot attend to resell their tickets and avoid losses. This market function is especially important because Ticketmaster ordinarily does not offer refunds or even exchanges unless the event is canceled. If consumers lack access to other secondary markets and resellers, they may be precluded from transferring tickets they cannot use. Or they may be able to sell those tickets only through Ticketmaster's own secondary ticket exchange, assuming Ticketmaster allows ticket owners to resell their tickets for the event in question, which is not always the case. And even when it is, Ticketmaster may impose price floors that prevent the owner from listing tickets below what he paid. This practice can lead to tickets going unsold—and fans staying locked out.

32. Resellers protect consumers in other ways too. All NATP members adhere to the "NATP FAN Guarantee." Under this commitment, the reseller will either deliver the ticket to the customer or refund 200% of the contracted price. *See* National Association of Ticketing

Professionals, Code of Ethics, https://tinyurl.com/mvw9dwtz (last visited Oct. 14, 2026). And if the reseller cannot provide the exact ticket ordered, it will offer the customer comparable or better tickets at the same price or lower. *Id.*

33. When resellers buy a ticket, they don't always know the price for which the primary ticketer sold it. A ticket is often sold several times before reaching the consumer who attends the event. So, for example, a reseller may acquire a ticket from another reseller, who obtained it from a consumer, who bought it from the original buyer, who purchased it on the primary market. This dynamic can make it impossible to reliably and consistently verify the initial ticket price. And other ticketing practices, such as ticket bundles, can make it even harder to pin down that price.

34. To reach consumers, modern resellers often sell through nationwide online marketplaces (to which the Act refers as "secondary ticket exchanges"). There are virtually no geographic restrictions on such online sales. For example, a reseller in Chicago can list a ticket for a concert at Nationals Park, and a consumer anywhere in the country (or the world) can buy it.

35. Resellers don't pocket the entire difference between what they paid for the ticket and what it sells for on the marketplace. Anyone selling a ticket on the marketplaces pays a "seller's fee." The buyer also pays fees for the services that the marketplace provides. For example, if someone buys a ticket that a seller listed on a marketplace for $10, the buyer would pay slightly more than that—to cover buyer fees—and the seller would take home slightly less—to cover seller fees.

36. Nor do resellers reap significant profits on every resold ticket. The American Consumer Institute evaluated data showing that 55% of sampled events in 2023 offered tickets *below* face value on the resale market. By providing that choice, the resale market helped consumers save over $440 million in 2023 and another $414 million in 2024, when 62% of

sampled events offered tickets below face value. *See* American Consumer Institute, *Report Update: Secondary Market Is One Part of the Consumer Ticketing Ecosystem* (June 12, 2025), https://tinyurl.com/4cu59swc.

37. That pattern of consumer savings holds true in the District. Data from a leading analytics company showed that fans in D.C. saved over $6.1 million in 2024 on purchases on the resale market, as opposed to the primary market. *See* Protect Ticket Rights, *Ticket Resale Saved D.C. Live Event Fans Over $6 million in 2024* at 1 (Oct. 2025), https://tinyurl.com/4mxf9hss. On average, fans saved $13 on a resale purchase for a D.C. live event. *Id.* And some events led to far greater savings. For example, when Norwegian singer and songwriter "girl in red" performed at I.M.P.'s the Anthem in 2024, fans saved nearly $80,000 across over 2,000 tickets sold below cost. *Id.* at 4.

38. Resellers want to provide these options for consumers. But to remain viable, they must offset losses on tickets sold for less than the acquisition cost with profits from sales of tickets that are in higher demand. And those profits must also cover the expenses inherent in each transaction and in the business generally: ticket acquisition, marketplace seller fees, payment processing fees, inventory management and customer service, technology and compliance costs, interest for lines of credit, and more. If the upside for high-demand tickets is capped below market value, buying tickets to resell becomes economically infeasible given the fixed costs and the constant risk of losing money on transactions. That is why the ability to resell some tickets for more than the initial ticket price plus 10% is crucial for resellers' business models, including those of ASC, Stage Front, and the Association's other members.

**B. <u>The District Targets Resellers with a Stringent Price Cap.</u>**

39. Upon information and belief, the District had never attempted to regulate the price of tickets for live events before 2025.

40. On April 9 of that year, Councilmember Charles Allen introduced the legislation that became the RESALE Act. He and seven other councilmembers said that the law would "protect artists, venues, and consumers in the District from unfair and deceptive practices in the live event ticket market" that led to concertgoers being "fleeced and price gouged" and "denied a fair price and a fair opportunity to get initial tickets at face value." Letter from Councilmember Charles Allen, Council of the District of Columbia, to Secretary Nyasha Howard (Apr. 9, 2025) ("Allen Introduction Letter").

41. The proposed legislation regulated ticket transactions through two related caps. The first (the "Price Cap") limited the price for which anyone could resell a ticket to the price of the initial ticket plus 10% of that value. The second (the "Fee Cap") restricted the fee that marketplaces could charge to 10% of the initial ticket price. The councilmembers did not cite any study or economic analysis suggesting that these caps would help rather than hurt consumers. Nor did they propose to curtail the pricing practices of primary ticketers.

42. The councilmembers pointed out that the National Independent Venue Association ("NIVA"), a trade association of self-described "independent live entertainment venues, festivals, promoters, and more," supported the legislation. That is no surprise. As the Chamber of Progress has explained, the "business models, revenue streams, and survival" of "[m]any NIVA member venues" are "closely tied to the market power of Live Nation, whose control over touring and ticketing shapes the entire live events ecosystem." Chamber of Progress, *Captured by the Concert Machine* at 4 (Mar. 16, 2026), https://tinyurl.com/m8z8wc6t. And much of NIVA's leadership

comes from venues either owned by Live Nation or dependent on its ticketing products. So it is no coincidence that NIVA's "[p]ublic messaging often mirrors Live Nation's narratives on secondary markets." *Id.* at 6. Indeed, NIVA pushes for a national price control on resale transactions. NIVA, *Independent Music and Live Entertainment Industry Urges Senate Commerce Leaders to Strengthen Ticket Act with Complete Fake Ticket Ban, Resale Price Cap, and Full Price Transparency* (Mar. 4, 2026), https://tinyurl.com/ypyc3xyx.

43. The councilmembers also touted the support of I.M.P., a concert promotion and production company that owns or manages the District's most prominent venues. That is also unsurprising. Audrey Fix Schaefer, I.M.P.'s Director of Communications and a main proponent of the Act, is the President of NIVA. *See* Audrey Fix Schaefer Testimony ("Schaefer Testimony") at 1; NIVA, *NIVA Board*, https://tinyurl.com/2jkzsp6f (last visited Oct. 14, 2026). And I.M.P.'s local venue "the Anthem" illustrates the dynamic among NIVA, its member venues, and Live Nation. Because Live Nation decides where the major shows go, I.M.P. relies on it to send them to the Anthem. And the Anthem sells every ticket for every event exclusively through Live Nation's subsidiary Ticketmaster. *See* Chamber of Progress, *supra*, at 7. So when supporting the Act as "the most pro-consumer protection bill we've seen," I.M.P. criticized "predatory ticket resellers" without mentioning Live Nation or Ticketmaster—the entities that the District sued and held liable for harming consumers. Schaefer Testimony at 1.

44. The Price Cap helps local venues by insulating their primary sales from competition. Consider a venue hosting a breakout artist. The venue (likely through Ticketmaster) might begin selling tickets at $100. Demand spikes, and the venue thinks that fans will pay $250 a week later. With a robust secondary resale market, the venue would face competition; a reseller might offer similar tickets for $170, preventing the venue from significantly raising prices. But a

price control that drives out resellers leaves fans to the mercy of local venues (again, likely through Ticketmaster) as the only source of tickets.

45. The Council referred the legislation to the Public Works Committee, which studied the issues for months before highlighting several problems in its June 2026 report. First, the Committee observed that the proposed law ignored how primary ticketers hurt consumers. The Committee detailed how Live Nation and Ticketmaster have used monopoly power to snuff out competition, dominate the ticketing market, and force venues into exclusivity contracts by restricting access to artists. The report noted that "it is possible that regulating prices in the secondary market would have the effect of further consolidating monopoly power in the primary market." Committee Report at 8. Worse still, the Committee explained, Ticketmaster may use its market power in venues and primary ticketing to capture the resale market. *Id.* at 4.

46. The Committee struck both the Price Cap and the Fee Cap in favor of granting the mayor regulatory authority to address costs in both the primary and secondary markets. It offered several reasons for doing so. To start, the Committee identified "risks in directly legislating a price cap, and only doing so for the secondary market." Committee Report at 7. Caution was especially appropriate because the evidence on "resale price caps" remains "uncertain." *Id.* at 8. Such price controls also address none of the "price and supply manipulation practices in the primary ticket market." *Id.* Rather, capping prices in the secondary market risks "further consolidating monopoly power in the primary market" and allowing those primary ticketers to price gouge through "dynamic and algorithmic pricing." *Id.*

47. The Committee's concerns echoed testimony opposing the Price Cap at a public hearing in October 2025. *See* Committee Report at 10–29. The Office of the Deputy Mayor for Planning and Economic Development and the Department of Licensing and Consumer Protection

urged the Committee to "remove the price cap" because it risked "unintended consequences," including driving consumers to "unregulated markets" and exposing them to fraud and "greater financial losses." Ryan Nicholas Testimony at 2–3. The National Consumers League also warned about the "switch[] to less regulated platforms." National Consumers League Testimony at 2. And academic witnesses agreed that the Price Cap threatened to harm consumers by reviving an era of "scalpers on the streets outside of arenas." Christopher Gowen Testimony at 2; *see also* Marianne Jennings Testimony at 2–3 (warning of an "underground market").

48. Eight days after the Committee's markup, two members of the Council moved to amend the RESALE Act to reinstate both caps. They did so even though the Committee had provided several unrebutted reasons for excising the caps—and even though the Council still lacked any analysis suggesting that they would help consumers. None of that mattered. The point of the Price Cap, the councilmembers explained, was to allow consumers to recover only "what they paid and break even." Councilmembers Charles Allen and Christina Henderson, Amendment to B26-0224, Statement at 1 (June 30, 2026). The legislative design thus leaves no margin to cover a professional reseller's costs.

49. The Council adopted that amendment. Then, on July 14, 2026, the Council adopted an amendment that struck the mayor's authority to regulate the primary ticket market while leaving the Price Cap and Fee Cap on the secondary market in place. *See* Councilmember Brooke Pinto, Amendment to B26-0224 (July 14, 2026). The Council passed the RESALE Act that same day. The mayor signed it about a month later. And the congressional review period for D.C. legislation expired on September 25, 2026. So the Act has taken effect but by its terms does not "apply" until January 1, 2027.

**C. The Price Cap as Enacted**

50. As enacted, the Act provides that, as a general matter, "a reseller or secondary ticket exchange shall not sell or offer to sell a ticket that exceeds the total price of the initial ticket, including all fees and taxes in connection with the initial ticket, plus up to 10% of the total price of the initial ticket, including all fees and taxes in connection with the initial ticket." D.C. Code § 28-5506(b).

51. The Act defines "resale" as the "second or subsequent sale of a ticket by any method." D.C. Code § 28-5501(2). And a "reseller" is anyone "engaged in the resale of tickets." *Id.* § 28-5501(3). Neither definition contains any geographic limitations. The Act does not say, for example, that "resale" covers only subsequent ticket sales to D.C. residents, for live events at D.C. venues, or on D.C.-based marketplaces.

52. The Act defines a "ticket" as any kind of "evidence that grants the possessor . . . license to enter a place of entertainment" for an event, "including live concerts, theatrical performances, shows, or similarly scheduled live activities." D.C. Code § 28-5501(6). Here too, the Act places no geographical limit on what counts as a "ticket."

53. Without explanation, the Act carves out some events from the definition of "ticket." Specifically, "ticket" does not include licenses for entry to (1) "a sporting event organized by a professional or intercollegiate sports team located in the District or professional athletic association with an event located in the District," or (2) a movie. D.C. Code § 28-5501(6). But the Act never explains what it means for a team to "organize[]" an event. Nor does the Act clarify what the "located in the District" qualifier is intended to modify in the first clause of the sports exemption. It might apply to "a sporting event" (thus exempting such an event taking place in D.C. from the Price Cap) or to "a professional or intercollegiate sports team" (thus exempting a sporting

event anywhere in the country as long as it is "organized" by certain teams "located" in D.C.). If the latter, the Act still does not indicate what "located in the District" means when applied to a sports team. For example, a team could be "located in the District" only if it has a certain physical presence there (say, a stadium). Or perhaps the team's place of incorporation matters. The Act does not say.

54. Additionally, the Act defines a "secondary ticket exchange" as "an electronic marketplace that enables a person to sell, purchase, and resell tickets." D.C. Code § 28-5501(4). And it limits the fee that secondary ticket exchanges can charge to "10% of the total price of the initial ticket." *Id.* § 28-5506(c).

55. Under the Act, the mayor may adjust the caps on prices and fees through rulemaking beginning in January 2028. But she can do so only within specified parameters. The Price Cap cannot go below the initial ticket price or above that price plus 20%. *See* D.C. Code § 28-5507(b)(1). Nor can the Fee Cap drop below 5% or exceed 20% of the initial price. *See id.* § 28-5507(b)(2).

56. The Act also creates a penalty scheme. *See* D.C. Code § 28-5508(a)–(c). Violations of either cap are Class 2 civil infractions subject to fines under 16 DCMR § 3201, which range from $1,000 to $8,000 per violation. They are also unlawful trade practices under D.C. Code § 28-3904. The Price Cap thus exposes sellers to the risk of enforcement proceedings before the Department of Licensing and Consumer Protection, *see* D.C. Code § 28-3905; consumer lawsuits for treble damages or $1,500-per-violation statutory damages, punitive damages, attorneys' fees, and other relief, *see id.* § 28-3905(k)(1)–(2); and lawsuits by the District's Attorney General for statutory penalties or wide-ranging injunctive relief, *see id.* § 28-3909.

**D. Resellers Face Significant, Imminent, and Irreparable Harm.**

57. The Price Cap is hopelessly vague. And its ambiguity will significantly harm the individual Plaintiffs and the Association's members as they try to determine its scope or—more likely—avoid any transaction that it could possibly cover.

58. The Act's operative terms supply no limiting principle that allows sellers to know what transactions are unlawful. The Act does not say that the Price Cap applies only to events at venues within D.C.'s borders, to sales where the buyer (or the seller) is a D.C. resident (or perhaps physically located in D.C., even if not a resident), to transactions occurring on marketplaces located in D.C., or to some other subset of ticket resales. And the sports "exemption" adds more guesswork. Resellers trying in good faith to navigate the Price Cap and avoid significant penalties for violations will find no help in the Act's text.

59. Making matters worse, resellers often have no way of knowing the benchmark to which the Price Cap is pegged. The Act prohibits reselling a ticket for more than the "total price of the initial ticket" plus 10% of that price. But sometimes resellers neither know nor can confirm the purchase price for the first sale of a ticket. They do not always (or even frequently) buy ticket inventory from primary ticketers such that they would learn the initial ticket price. (And even when they do, some tickets are bundled or offered for free and thus lack any ascertainable "initial" price.) Indeed, by the time a ticket gets to a reseller, it has often changed hands multiple times. So the Act requires resellers to price transactions by referencing a historical sale that they may never have seen and may be costly—if not impossible—to verify.

60. These vague provisions and opaque benchmarks will force resellers to make a lose-lose choice. If they cannot verify the initial ticket price, they must either give up the opportunity to resell that ticket or hazard a guess while risking significant penalties. If they can verify that

price, they can assume that the Price Cap applies and lose revenue if it prevents them from selling the ticket for market value. Or, even if they can ascertain the initial ticket price, they can try to assess whether the Price Cap applies and sell the ticket for more if they think it does not while risking significant liability and reputational harm if the District interprets the Price Cap differently.

61. The Act would likely force ASC to exit the market for any transactions arguably subject to the Price Cap. As explained, ASC has fixed and variable costs, and it must account for losses on resales. So the Price Cap is likely to make it economically infeasible for ASC to engage in arguably covered transactions. Plus, ASC will likely steer clear of any transaction possibly covered by the Act's uncertain terms, narrowing its economic opportunities. Put simply, ASC would likely face too high a risk of loss to justify continued participation in the ticketing market for covered transactions.

62. The Price Cap would also injure Stage Front and NATP members with similar business models. Stage Front generates revenue by selling tickets it owns and by facilitating sales between ticket owners and consumers. The first part of the business will, like ASC and other ticket resellers, see certain transactions become economically infeasible. The second part of the business will also suffer because other ticket owners will pass up opportunities that would be profitable but for the Price Cap. For instance, they may find the economics unworkable. Or they may be unable to verify the initial ticket price. Even if they do engage in transactions covered by the Price Cap, the average sales price will decrease. All of that hurts Stage Front's bottom line. And neither Stage Front nor its customers can get those opportunities back.

63. The Association's other members face similar harms. Many members could not feasibly participate in the market for covered transactions. Selling in a market with such artificially

suppressed upside would be a non-starter for them given the costs that the members must clear before even thinking about turning a profit.

**E. <u>Consumers Will Suffer Because of the Price Cap.</u>**

64. The Act will also hurt the consumers it purports to protect. By making it infeasible for resellers to participate in the market for covered transactions, the Act undermines consumer choice. Someone who wants to attend a concert but could not get a ticket from the primary ticketer is less likely to find a ticket, even if he is willing to pay far more than it is worth to someone who did manage to obtain one through the primary ticketer. Moreover, because they will face less competition from resellers, local venues and their ticketing partners will no longer be constrained by the secondary market. And fans will be left to pay whatever the primary market chooses to charge—if they are lucky enough to find a ticket from that source.

65. Finally, consumers will be more likely to become victims of fraud as the flight of ethical, responsible ticketing professionals forces ticket resales underground. As multiple commenters explained in connection with the public hearing on the RESALE Act, other countries' experiences with resale price caps offer a cautionary tale. When researchers analyzed ticketing fraud in two jurisdictions with resale price caps, they found that fraud rates were roughly four times as high as in the United Kingdom, which had no such cap. Bradshaw Advisory, *Ticket Fraud: Its Impact and the Cost of Market Regulation* (Mar. 16, 2025), https://tinyurl.com/35k8dvbj. The researchers identified "the pushing of buyers and sellers towards unregulated black markets" as a potential "knock on impact[]" of price controls. *Id.* And the increased risk of fraud that comes with empowered underground markets discourages consumers from attending live events, which may cause as much as 2.5 billion pounds—equivalent to about $3.3 billion—of lost revenue over the course of a decade. *Id.*

## CLAIMS FOR RELIEF

## COUNT I

### Due Process Clause—Void for Vagueness
### Fifth Amendment to the United States Constitution
### (42 U.S.C. § 1983)

66. Plaintiffs repeat and reallege each allegation set forth in the preceding paragraphs as though fully set forth herein.

67. "A fundamental principle in our legal system . . . is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *Karem v. Trump*, 960 F.3d 656, 664 (D.C. Cir. 2020) (quoting *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012)). So when a law "leaves the public uncertain as to the conduct it prohibits," it "fails to meet the requirements of the Due Process Clause." *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999) (citation omitted). This "fair notice requirement" serves "to enable the ordinary citizen to conform his or her conduct to the law." *Id.* at 58.

68. The Price Cap violates this bedrock rule of due process because it does not tell ordinary citizens what conduct it covers. The statutory text does not say (or even suggest) how a reseller should determine the scope of the Price Cap. It does not identify any fact on which the Price Cap depends—not the location of the event, the residency of the buyer or seller, or the place where the transaction happens. Nor does the Act provide another way for ordinary citizens to understand its reach. Plaintiffs and other resellers are thus left to guess what conduct is proscribed.

69. The sports exemption makes matters worse. It is unclear whether the exemption depends on the location of the team or of the event. If the former, the Act does not identify what makes a team "located in" the District. For all resellers know, it could be some (unspecified) physical presence in the city. It could be the team's branding as a "D.C. team." Or it could be

something else the District has in mind. So it leaves resellers to guess whether the Price Cap would cover, for example, a March Madness basketball game at Capital One Arena between two college teams hailing from outside the District. Compounding that uncertainty, the Act supplies no answer for what it means for an event to be "organized" by a "sports team located in the District."

70. Pegging the permissible price to the initial ticket price adds another unknown. As explained, resellers may not know the initial price. Or if they have information about that price, they may not be able to verify it. Or worse still, the ticket may have been sold within a bundle that obscures the initial price.

71. A reseller, then, will often need to make at least one (and sometimes more) guesses before selling a ticket—and, in practice, before acquiring one. It must speculate whether the transaction would qualify as the "resale" of a "ticket." Sometimes, it must decide whether the sports exemption applies. And other times, it must figure out whether it can trust the information it has (if any) on the initial ticket price. A wrong guess risks significant fines, liability for unlawful trade practices, consumer lawsuits, and reputational injury. Those penalties—per-violation fines of up to $8,000, treble and punitive damages, and enforcement suits by the Attorney General—are quasi-criminal in nature. The Price Cap must therefore satisfy a more exacting standard of clarity than ordinary economic regulations must. It does not. And due process does not allow the District to expose resellers to these penalties while providing so little guidance on how to avoid them.

72. For these reasons, Plaintiffs are entitled to a declaratory judgment that the Price Cap violates the Fifth Amendment's Due Process Clause and to an injunction prohibiting the District from enforcing it, generally and as applied to Plaintiffs and NATP's members.

## COUNT II

**Commerce Clause—Prohibition on Extraterritorial Regulation**
**United States Constitution, Article I, Section 8**
**(42 U.S.C. § 1983)**

73. Plaintiffs repeat and reallege each allegation set forth in the preceding paragraphs as though fully set forth herein.

74. The Constitution gives Congress the authority to "regulate Commerce . . . among the several States." U.S. Const., art. I, § 8, cl. 3. This provision is known as the Commerce Clause.

75. The Supreme Court has "long interpreted the Commerce Clause as an implicit restraint on state authority, even in the absence of a conflicting federal statute." *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 338 (2007). This principle is known as the Dormant Commerce Clause.

76. This constitutional limit means that neither the states nor the District can enact laws having "the specific impermissible extraterritorial effect of controlling prices outside of" the enacting state (or D.C.). *Ass'n for Accessible Meds. v. Ellison*, 140 F.4th 957, 960 (8th Cir. 2025); *see also Metro. Wash. Chapter, Associated Builders & Contractors v. District of Columbia*, 62 F.4th 567, 576 (D.C. Cir. 2023) ("same interstate commerce analysis" applies to District and state laws (citation omitted)). Said differently, a law cannot "'*directly* regulate[] transactions which [take] place . . . wholly outside the State.'" *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 376 n.1 (2023) (quoting *Edgar v. MITE Corp.*, 457 U.S. 624, 641–43 (1982)).

77. The Price Cap violates the Dormant Commerce Clause by imposing D.C.'s price preferences on interstate resale transactions. The Act has no apparent limiting principle. If the District were to take the position that it can control ticket resale prices for events in every state, that would plainly violate the Constitution's prohibition on extraterritorial regulation.

78. Even if the Act—despite its vagueness—is construed as applying only to events in the District, the Price Cap remains impermissibly extraterritorial. Such a price control would still regulate transactions occurring entirely outside the District. An Ohio reseller selling a ticket to a Tennessee consumer through an interstate marketplace based outside of the District would need to heed the District's price preference if the resale involves a ticket for an event scheduled to take place in D.C.

79. The District cannot impose its will on out-of-state transactions in that way. The "in-state hook" of an event in D.C. (that the ticket buyer may or may not attend) does not allow extraterritorial regulation of "out-of-state conduct." *Pharm. Rsch. & Mfrs. of Am.* v. *District of Columbia*, 406 F. Supp. 2d 56, 69 (D.D.C. 2005). The Price Cap governs *transactions*, not events. And because it "directly regulat[es] . . . out-of-state transactions absent a sufficiently strong in-state nexus," it violates the Dormant Commerce Clause. *R.I. Truck Ctr., LLC v. Daimler Trucks N. Am., LLC*, 180 F.4th 365, 379–80 (1st Cir. 2026) (citation omitted).

80. For these reasons, Plaintiffs are entitled to a declaratory judgment that the Price Cap violates the Dormant Commerce Clause and to an injunction prohibiting the District from enforcing it, generally and as applied to Plaintiffs and NATP's members.

## COUNT III
## Commerce Clause—Discrimination
## United States Constitution, Article I, Section 8
## (42 U.S.C. § 1983)

81. Plaintiffs repeat and reallege each allegation set forth in the preceding paragraphs as though fully set forth herein.

82. The Dormant Commerce Clause "prohibits economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 273 (1988). This means that the

District cannot pursue legislative "goal[s] by depriving competitors, including out-of-state firms, of access to a local market." *C&A Carbone, Inc. v. Town of Clarkstown, N.Y.*, 511 U.S. 383, 386 (1994).

83. The Price Cap breaches this constitutional limit because it discriminates against resellers, a group of predominantly out-of-state entities or individuals. NATP is the leading trade association for resellers. None of its members is based in the District. The Act, by its very design, makes it economically infeasible for those out-of-state entities to operate in the interstate market for covered transactions. It does so by restricting them from selling tickets at market value when that value exceeds 110% of the initial ticket price.

84. Yet the Act does not limit primary ticketers at all. That group includes the local management interests for D.C. venues whose support the District touted. And the District's lopsided price control helps those venues and their ticketing partners because they can dynamically price their tickets without worrying about price competition from the secondary market—just as the Public Works Committee explained before the District overrode it.

85. Resellers and the primary market are also similarly situated in every relevant respect. Both sell the same product—tickets providing access to the same events—to the same customers, and they compete directly for those sales. The Act burdens one set of competitors, located almost entirely outside the District, for the benefit of local venues and their ticketing partners that sell on the primary market.

86. The legislative record confirms that this differential treatment was the point. The Act's sponsor explained that the Price Cap is "key" because "we're taking significant profit from scalper[s]." July 14, 2026 Hr'g at 16:53–19:28 (Councilmember Allen). The "system," he said, is "rigged against our residents, our artists, and our venues." *Id.* And he thanked "local venues, artists,

and theaters, especially I.M.P.," for identifying the problem and a solution. *Id.* I.M.P., for its part, told the Committee that price caps "will be an economic boon for DC" and would lead artists to "choose to play in DC" rather than in "neighboring states." Schaefer Testimony at 2–3. Those statements confirm what the structure of the Act shows: a purpose to shift profits from out-of-District resellers to local interests.

87. Because the Price Cap discriminates in this way, it "can be sustained only on a showing that it is narrowly tailored to advance a legitimate local purpose." *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 518 (2019) (cleaned up) (citation omitted). The District cannot make that showing. It marshaled no economic analysis supporting its decision to single out resellers for price control. It also exempted transactions for access to certain sports events and movies without explaining why those consumers require less protection, undermining any claim to be advancing a legitimate purpose. And even accepting the unsupported and—based on the Public Works Committee's findings—contradicted premise that capping prices helps consumers, the District bypassed more tailored solutions that lacked the Act's discriminatory purpose and effect.

88. For these reasons, Plaintiffs are entitled to a declaratory judgment that the Price Cap violates the Dormant Commerce Clause and to an injunction prohibiting the District from enforcing it, generally and as applied to Plaintiffs and NATP's members.

## COUNT IV

**Commerce Clause—Prohibition on Undue Burdens on Interstate Commerce**
**United States Constitution, Article I, Section 8**
**(42 U.S.C. § 1983)**

89. Plaintiffs repeat and reallege each allegation set forth in the preceding paragraphs as though fully set forth herein.

90. A "key constraint[]" of the Dormant Commerce Clause "is that a local measure 'may not impose undue burdens on interstate commerce.'" *Ass'n to Preserve & Protect Local Livelihoods v. Sidman*, 147 F.4th 40, 56 (1st Cir. 2025) (quoting *South Dakota v. Wayfair, Inc.*, 585 U.S. 162, 173 (2018)).

91. This strand of the Dormant Commerce Clause prohibits "even-handed[]" local regulations when "'the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits.'" *Id.* (quoting *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)).

92. The Price Cap violates this aspect of the Dormant Commerce Clause because it imposes significant burdens on the interstate resale market that plainly exceed the non-existent local benefits.

93. Begin with the burden. The U.S. live-events market was valued at over $28 billion in 2023. David Kowalski, *Concert Industry Statistics*, Gitnux (updated July 18, 2026), https://tinyurl.com/rjdt4fhy. That same year, 32 million tickets worth $3.5 billion were sold on the secondary market. *Id.* The Price Cap threatens to saddle these interstate transactions with the District's price control, driving them to unregulated markets that increase fraud and chilling aboveboard resale activity through its inscrutable scope. It adds to that burden by forcing resellers to develop some way to consistently and reliably verify the "initial ticket price" before participating in potentially covered interstate sales. Put another way, resellers engaged in interstate commerce will need to devote significant resources to (1) figuring out whether the Price Cap applies to a particular transaction and (2) identifying and confirming the initial price. They must do so even when they have no familiarity with that initial price—and, apparently, even when the price of that initial sale *cannot* be determined.

94. These burdens dwarf the putative local benefits. The District cited no analysis or studies suggesting that price-capping ticket resales would help consumers, local or otherwise. Rather, it pressed forward without this evidence even after the Committee removed the cap due to concerns about the lack of analysis supporting it and the potential harm to consumers flowing from it. And the evidence that *does* exist shows that the Price Cap is likely to increase ticketing fraud while sapping significant revenues from the live-event market and local economy as customers grow warier of paying for events.

95. Further, the District could target many of the putative benefits with more focused legislation that avoids artificially limiting resale prices and inviting these harms. For example, the District can address deceptive practices by preventing sellers from offering tickets that they do not possess or to which they do not have reasonable access. And it can create a safety net by requiring refunds when sellers cannot provide the tickets they said they would—something Plaintiffs already do voluntarily.

96. For these reasons, Plaintiffs are entitled to a declaratory judgment that the Price Cap violates the Dormant Commerce Clause and to an injunction prohibiting the District from enforcing it, generally and as applied to Plaintiffs and NATP's members.

## COUNT V

**Equal Protection**
**Fifth Amendment to the United States Constitution**
**(42 U.S.C. § 1983)**

97. Plaintiffs repeat and reallege each allegation set forth in the preceding paragraphs as though fully set forth herein.

98. The Due Process Clause of the Fifth Amendment "has been understood to include an equal protection component that applies to the District of Columbia." *Frederick Douglass*

*Found., Inc. v. District of Columbia*, 82 F.4th 1122, 1147 (D.C. Cir. 2023). So when the District "treats one group differently from another, the classification must withstand the appropriate level of scrutiny." *City of Saint Paul, Minn. v. Wright*, 816 F. Supp. 3d 65, 72 (D.D.C. 2026). At minimum, the "classification must be rationally related to a legitimate government purpose." *Clark v. Jeter*, 486 U.S. 456, 461 (1988).

99. The Act classifies ticket sellers into two groups. The first—primary ticketers—can sell tickets at any price they want, taking advantage of market opportunities as they arise. The second—resellers—cannot. They must instead comply with an artificial cap that eliminates any upside the market would provide.

100. That distinction lacks a rational relationship to a legitimate public purpose. When reviving the Price Cap, councilmembers said that limiting resale prices would protect consumers against "extreme gouging" and "market manipulation." Councilmembers Charles Allen and Christina Henderson, Amendment to B26-0224, Statement at 1 (June 30, 2026). But the District gave "no reason to believe" that capping prices on the resale market would address these problems. *City of Saint Paul*, 816 F. Supp. 3d at 72. Rather, the evidence before the Committee cut the other way: research suggests that ticketing fraud will increase when the Price Cap takes effect, hurting both consumers and the venues that rely on them.

101. The holes in the Act undermine any purported connection to consumer protection. The Price Cap carves out certain sports events and movies from *any* price regulation. But the District has never suggested that sports fans and moviegoers need less protection from allegedly predatory resellers. More broadly, the Act fails to control how primary ticketers set prices despite the Public Works Committee's warning that targeting resellers might "consolidat[e] monopoly power in the primary market" and lead to price-gouging. Committee Report at 8. By leaving

consumers so exposed under the District's own theory of consumer protection, the Act reveals the disconnect between the Price Cap and any legitimate public purpose.

102. For these reasons, Plaintiffs are entitled to a declaratory judgment that the Price Cap violates the equal protection guarantee of the Fifth Amendment and to an injunction prohibiting the District from enforcing it, generally and as applied to Plaintiffs and NATP's members.

## COUNT VI

### District of Columbia Home Rule Act
### D.C. Code § 1-206.02(a)(3)

103. Plaintiffs repeat and reallege each allegation set forth in the preceding paragraphs as though fully set forth herein.

104. The Council has authority to legislate only within the limits that Congress set in the Home Rule Act. That Act extends the Council's legislative power to "all rightful subjects of legislation within the District consistent with the Constitution of the United States." D.C. Code § 1-203.02. But it took care to identify several exceptions, including one relevant here: the Council "shall have no authority to . . . [e]nact any act . . . which is not restricted in its application exclusively in or to the District." *Id.* § 1-206.02(a)(3).

105. The Price Cap is not so restricted. Its operative definitions contain no geographic limit, so it could be read to reach resale transactions throughout the country. And even if the Act is read to cover only tickets to events in the District, the Price Cap still dictates the prices of resale transactions between out-of-District sellers and out-of-District buyers on marketplaces based outside the District. A price control of that scope is not a law applying "exclusively in or to the District." D.C. Code § 1-206.02(a)(3).

106. For these reasons, Plaintiffs are entitled to a declaratory judgment that the Price Cap exceeds the Council's authority under the Home Rule Act and to an injunction prohibiting the District from enforcing it, generally and as applied to Plaintiffs and NATP's members.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against the District and grant the following relief:

A. Declare that the Price Cap is unconstitutional and unlawful for any or all of the reasons described above, both on its face and as applied to Plaintiffs and NATP's members;

B. Enter a preliminary injunction under Federal Rule of Civil Procedure 65 that prohibits the District—as well as its officers, agents, employees, and all persons acting in concert with it—from implementing or enforcing the Price Cap against Plaintiffs and NATP's members;

C. Enter a permanent injunction granting the same relief upon final judgment;

D. Enter an award of Plaintiffs' reasonable attorneys' fees, expenses, and costs under 42 U.S.C. § 1988 and any other applicable authority, statutory or otherwise; and

E. Grant such other and further relief as the Court deems just and proper.

Dated: October 16, 2026

Respectfully submitted,

/s/ *Jessie K. Liu*

Jessie K. Liu (D.C. Bar 472845)
Justin V. Shur (D.C. Bar 973855)
Richard H. Poulson (D.C. Bar 90015456)

**LIU SHUR KRAVIS LLP**
607 Fourteenth Street, N.W.
Suite 625
Washington, D.C. 20005
jessie.liu@lskllp.com
justin.shur@lskllp.com
hundley.poulson@lskllp.com
Phone: (202) 240-7100

*Attorneys for Plaintiffs National Association of Ticketing Professionals; ASC Ticket Company; and Stage Front Tickets, Inc.*