**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL ASSOCIATION OF TICKETING PROFESSIONALS *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>DISTRICT OF COLUMBIA,<br><br>Defendant. | Case No. 26-cv-3620 |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

FACTUAL BACKGROUND ........................................................................................ 2

I. Resellers Promote Consumer Choice in a Ticketing Market Otherwise Dominated by Primary Ticketers. ........................................................................................................ 2

II. The District Targets Resellers with a Stringent Price Cap. ........................................ 5

III. The Act Directly Regulates Resale Transactions and Imposes Significant Penalties. ........... 8

LEGAL STANDARD ........................................................................................................ 10

ARGUMENT ........................................................................................................ 10

I. Plaintiffs Are Likely to Succeed on the Merits of Their Claims. ........................................ 10

A. The Price Cap Violates Due Process Because It Does Not Provide Fair Notice of What It Covers. ........................................................................................................ 10

1. The Act Does Not Say Which Resale Transactions the Price Cap Reaches. ................ 11

2. The Sporting Event Exemption Compounds the Act's Ambiguity. ............................ 13

3. The Price Cap's Benchmark Is Often Indiscernible. ................................................ 15

B. The Price Cap Violates the Dormant Commerce Clause and the District's Home Rule Act. ........................................................................................................ 16

1. The Price Cap Impermissibly Regulates Transactions Occurring Outside the District. 16

i. The Price Cap Violates the Dormant Commerce Clause. ........................................ 16

ii. The Price Cap Violates the District's Home Rule Act. ........................................ 20

2. The Price Cap Discriminates Against Out-of-District Resellers in Favor of Local Interests. ........................................................................................................ 21

C. The Price Cap Violates the Equal Protection Guarantee of the Fifth Amendment. ........ 25

II. Plaintiffs Will Suffer Irreparable Harm Absent a Preliminary Injunction. ........................... 26

III. The Balance of the Equities and the Public Interest Favor a Preliminary Injunction. .......... 27

CONCLUSION ........................................................................................................ 29

## TABLE OF AUTHORITIES

**Cases**

*Asante v. Kennedy*,
133 F.4th 97 (D.C. Cir. 2025) .................................................. 21

*Ass'n for Accessible Meds. v. Bonta*,
766 F. Supp. 3d 1020 (E.D. Cal. 2025) .................................................. 17

*Ass'n for Accessible Meds. v. Ellison*,
140 F.4th 957 (8th Cir. 2025) .................................................. 16, 17, 19, 27

*Ass'n for Accessible Meds. v. Frosh*,
887 F.3d 664 (4th Cir. 2018) .................................................. 17, 18

*Aylo Freesites Ltd. v. Utah Div. of Consumer Prot.*,
2026 WL 2874132 (D. Utah Sept. 24, 2026) .................................................. 17

*Bacchus Imports, Ltd. v. Dias*,
468 U.S. 263 (1984) .................................................. 21

*Brown v. Barry*,
710 F. Supp. 352 (D.D.C. 1989) .................................................. 26

*City of Chicago v. Morales*,
527 U.S. 41 (1999) .................................................. 10

*City of Saint Paul, Minn. v. Wright*,
816 F. Supp. 3d 65 (D.D.C. 2026) .................................................. 25

*Clark v. Jeter*,
486 U.S. 456 (1988) .................................................. 25

*Connally v. Gen. Constr. Co.*,
269 U.S. 385 (1926) .................................................. 10

*CSX Transp., Inc. v. Williams*,
2005 WL 902130 (D.D.C. Apr. 18, 2005) .................................................. 20

*Ctr. for Taxpayer Rights v. IRS*,
2026 WL 2635380 (D.C. Cir. Sept. 8, 2026) .................................................. 28

*DoorDash, Inc. v. City of New York*,
692 F. Supp. 3d 268 (S.D.N.Y. 2023) .................................................. 23

*Frederick Douglass Found., Inc. v. District of Columbia*,

82 F.4th 1122 (D.C. Cir. 2023) ... 25

*Karem v. Trump*,
960 F.3d 656 (D.C. Cir. 2020) ... 10, 27

*L.G.M.L. v. Noem*,
800 F. Supp. 3d 100 (D.D.C. 2025) ... 10

*Media Matters for Am. v. Paxton*,
138 F.4th 563 (D.C. Cir. 2025) ... 28

*Mills v. District of Columbia*,
571 F.3d 1304 (D.C. Cir. 2009) ... 26

*Nat'l Pork Producers Council v. Ross*,
598 U.S. 356 (2023) ... 17, 18, 21

*New Energy Co. of Ind. v. Limbach*,
486 U.S. 269 (1988) ... 21

*O'Donnell Constr. Co. v. District of Columbia*,
963 F.2d 420 (D.C. Cir. 1992) ... 27

*Or. Waste Sys., Inc. v. Dep't of Env't Quality*,
511 U.S. 93 (1994) ... 24

*Perkins Coie LLP v. DOJ*,
783 F. Supp. 3d 105 (D.D.C. 2025) ... 27

*Pharm. Rsch. & Mfrs. of Am. v. District of Columbia*,
406 F. Supp. 2d 56 (D.D.C. 2005) ... 18

*Philadelphia v. New Jersey*,
437 U.S. 617 (1978) ... 21

*Quality Brands, Inc. v. Barry*,
715 F. Supp. 1138 (D.D.C. 1989) ... 21

*R.I. Truck Ctr., LLC v. Daimler Trucks N. Am., LLC*,
180 F.4th 365 (1st Cir. 2026) ... 17, 19, 20

*Russello v. United States*,
464 U.S. 16 (1983) ... 13

*S. Dakota Farm Bureau, Inc. v. Hazeltine*,
340 F.3d 583 (8th Cir. 2003) ........................................ 23

*Sinclair Wyo. Refin. Co. v. EPA*,
114 F.4th 693 (D.C. Cir. 2024) ........................................ 13

*Talbott v. United States*,
176 F.4th 720 (D.C. Cir. 2026) ........................................ 27

*Taylor v. Trump*,
823 F. Supp. 3d 17 (D.D.C. 2026) ........................................ 26

*Tenn. Wine & Spirits Retailers Ass'n v. Thomas*,
588 U.S. 504 (2019) ........................................ 16

*United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*,
550 U.S. 330 (2007) ........................................ 16

*Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of President*,
784 F. Supp. 3d 127 (D.D.C. 2025) ........................................ 28

*Winter v. Nat. Res. Def. Council*,
555 U.S. 7 (2008) ........................................ 10

**Statutes**

D.C. Code § 1-206.02(a) ........................................ 16, 20

D.C. Code § 28-3905 ........................................ 9

D.C. Code § 28-3905(k) ........................................ 9

D.C. Code § 28-3909 ........................................ 9

D.C. Code § 28-5501(2) ........................................ 8, 11, 12, 20

D.C. Code § 28-5501(3) ........................................ 8, 11, 12, 20

D.C. Code § 28-5501(4) ........................................ 9

D.C. Code § 28-5501(6) ........................................ passim

D.C. Code § 28-5501(7) ........................................ 21

D.C. Code § 28-5506(b) ........................................ 8, 9, 10

D.C. Code § 28-5506(c) ........................................ 9

D.C. Code § 28-5508(a) .......... 9

D.C. Code § 28-5508(b) .......... 9

D.C. Code § 47-2890.02(a) .......... 13

**Other Authorities**

American Consumer Institute, *Report Update: Secondary Market is One Part of the Consumer Ticketing Ecosystem* (June 12, 2025), https://tinyurl.com/4cu59swc .......... 5

*Attorney General Schwalb Joins State Attorneys General to Continue Live Nation Lawsuit* (Mar. 9, 2026), https://tinyurl.com/4zcnxp5z .......... 3

Banana Ball Reminder, *Banana Bowl 2026*, https://tinyurl.com/55jwyv7c (last visited Oct. 15, 2026) .......... 15

Bradshaw Advisory, *Ticket Fraud: Its Impact and the Cost of Market Regulation* (Mar. 16, 2025), https://tinyurl.com/35k8dvbj .......... 7

Chamber of Progress, *Captured by the Concert Machine* (Mar. 16, 2026), https://tinyurl.com/m8z8wc6t .......... 22

DC News Now, *Savannah Bananas return to Nats Park for two-night sellout* (June 28, 2025), https://tinyurl.com/ytty9fbc .......... 14

*In the Matter of Live Nation Entertainment, Inc.*, Assurance of Voluntary Compliance ¶ 31 (Apr. 3, 2026), https://tinyurl.com/34vyzn3n .......... 4

NCAA, *Our Purpose*, https://tinyurl.com/mvy6keah (last visited Oct. 15, 2026) .......... 13

*NIVA and Fix the Tix Applaud the DC Council's Final Passage of Nation-Leading Resale Ticketing Bill*, National Independent Venue Association (July 14, 2026), https://tinyurl.com/4txwh3sn .......... 23

Office of the Attorney General, District of Columbia, *Attorney General Schwalb Issues Statement Following Win in Live Nation Antitrust Lawsuit* (Apr. 15, 2026), https://tinyurl.com/b23y5734 .......... 4

Pro Football Reference, *2025 NFL Attendance Data*, https://tinyurl.com/4c7bpjy2 (last visited Oct. 15, 2026) .......... 14

Protect Ticket Rights, *Ticket Resale Saved D.C. Live Event Fans Over $6 million in 2024* (Oct. 2025), https://tinyurl.com/4mxf9hss .......... 5

**Regulations**

16 DCMR § 3200.1(b) .......... 9

16 DCMR § 3201.1(b) .......... 9

**Constitutional Provisions**

U.S. Const. art. I, § 8, cl. 3 .......... 16

## INTRODUCTION

The District has passed a law that controls prices for an undefined set of transactions that happen mostly somewhere else. Starting this coming January, the District will prohibit ticket owners from selling tickets for more than the initial ticket price plus 10%. Professional resellers and casual fans alike will face significant fines and penalties for breaching that rule. And that will be so even if they live hundreds of miles from the District and sell a ticket to someone farther away still. If they want to know what transactions might create that risk, they will need to start guessing. But local venues and their ticketing partners need not worry; the District will allow them to charge consumers whatever the market will bear.

That lopsided law is the RESALE Act. And the District was warned that it would hurt the consumers it purports to help. The D.C. Council's own Public Works Committee studied the bill for months before finding that a resale-only cap risked "further consolidating monopoly power in the primary market"—*i.e.*, venues and their ticketers. The Committee also explained how the evidence on the effect of resale price caps was "uncertain." So it struck the cap. Eight days later—with no study, no data, no answer to the Committee's concerns, and apparently no desire to address consumer harms flowing from the primary market—the Council revived the cap. Its stated goal was to let ticket owners "recover what they paid and break even."

No business can run on breaking even, so the design of the Act's price control is clear: resellers are not welcome. That legislative attitude misunderstands the secondary marketplace that resellers serve. Resellers give fans a way into sold-out shows and a way out of tickets they cannot use. They often save consumers money by offering tickets below the original purchase price. In 2024 alone, they saved D.C. fans more than $6 million. Now each sale above the Act's price ceiling

exposes them to fines of up to $8,000 per violation, plus liability under the District's consumer-protection laws.

This price control is likely unlawful for at least four reasons.

*First*, it is void for vagueness. The Act does not say which transactions the price restriction covers, so resellers do not know what conduct is unlawful. The text of the Act does not tie the cap to D.C. buyers, D.C. sellers, or D.C. events. And the sports exemption only adds ambiguity.

*Second*, it violates the Dormant Commerce Clause and the District's Home Rule Act by directly regulating out-of-state transactions. Even if the Act reaches only events held in D.C., it still unlawfully sets the price of deals between out-of-District sellers and out-of-District buyers on interstate marketplaces.

*Third*, it also discriminates against resellers, who are predominantly located outside the District, to benefit local venues and their ticketing partners. Such discrimination violates another strand of the Dormant Commerce Clause.

*Fourth*, it denies equal protection. The Act caps what resellers can charge while letting the primary market charge any price, and no rational basis supports that distinction.

The Act will start applying on January 1, 2027. Once it does, Plaintiffs will suffer irreparable constitutional injuries and economic losses they cannot recover. The District has no legitimate interest in enforcing its unlawful price control. This Court should therefore preliminarily enjoin Defendant from enforcing it.

## FACTUAL BACKGROUND

### I. Resellers Promote Consumer Choice in a Ticketing Market Otherwise Dominated by Primary Ticketers.

Tickets to live events reach fans through two channels. The primary market makes the first sale. Sometimes that means the artist, venue, or a promoter sells the ticket directly to a consumer.

But these individuals and entities often contract with a ticketing company. Under typical terms, the ticketing company gets the exclusive rights to sell tickets to a particular event, and the artist or venue gets a cut of the fees that the ticketer charges consumers on top of the price of the ticket itself. After the initial sale on the primary market, the secondary market comes into play. There, resellers offer fans the chance to obtain seats at sold-out events and a way to sell tickets they can't (or don't want to) use anymore.

One company, Ticketmaster, is the ticketing partner for many venues. As the Council's Committee on Public Works and Operations (the "Public Works Committee") found, Ticketmaster controls "80 percent of primary ticket[] sales at major venues in the country." Ex. A (Public Works Committee Report) at 3. And Ticketmaster's grip on D.C. venues is especially strong. The District's Attorney General, for example, explained that "the District had far higher per capita Ticketmaster ticket sales than any state." *Attorney General Schwalb Joins State Attorneys General to Continue Live Nation Lawsuit* (Mar. 9, 2026), https://tinyurl.com/4zcnxp5z. Indeed, Ticketmaster is "exclusive ticketer to nearly all sizable venues in DC." *Id.*

Ticketmaster is a wholly owned subsidiary of Live Nation Entertainment, a conglomerate formed by Ticketmaster's merger with Live Nation, the country's dominant event promotion and venue management company. Governments have taken notice since Live Nation and Ticketmaster teamed up in 2010. That year, the Department of Justice (the "Department") and 17 state attorneys general sued because the merger threatened competition. *See United States v. Ticketmaster Entertainment, Inc.*, No. 1:10-cv-00139 (D.D.C.), Dkt. 1. Ticketmaster and Live Nation entered into a consent decree, but the Department alleged that the companies repeatedly violated it by tying Live Nation's concerts to Ticketmaster's ticketing services—and by retaliating against anyone who used competitor ticketers. *See id.* Dkt. 22. In 2024, the Department and attorneys general from

39 states and the District sued Live Nation and Ticketmaster again after they allegedly continued to engage in "additional, different, and more expansive forms of anticompetitive conduct and exclusionary practices." *United States v. Live Nation Entertainment, Inc.*, No. 1:24-cv-3973 (S.D.N.Y.), Dkt. 1 ¶ 13. The companies eventually settled with the Department. But the District and other states thought that the settlement did not "adequately hold Live Nation accountable" for "rak[ing] in billions in profits" by (among other things) "exploit[ing] fans." Office of the Attorney General, District of Columbia, *Attorney General Schwalb Issues Statement Following Win in Live Nation Antitrust Lawsuit* (Apr. 15, 2026), https://tinyurl.com/b23y5734. So they went to trial and convinced a jury that Live Nation and Ticketmaster harmed consumers by operating as a monopoly. Separately, Live Nation Entertainment paid the District just under $10 million to resolve an investigation into Ticketmaster's deceptive practices. *See In the Matter of Live Nation Entertainment, Inc.*, Assurance of Voluntary Compliance ¶ 31 (Apr. 3, 2026), https://tinyurl.com/34vyzn3n.

Resellers represent another part of the ticketing ecosystem. They offer tickets through the secondary market for events all over the country. Declaration of Lee Shenker ("ASC Decl.") ¶¶ 9–10; Declaration of Gary Adler ("NATP Decl.") ¶¶ 8, 10. For the most part, they do so by listing their inventory on online marketplaces open to consumers across the country and around the world. ASC Decl. ¶¶ 9–10. Thus, a reseller based in Michigan can sell a ticket for a concert in Atlanta to someone in Miami and, minutes later, sell a Chicago Cubs ticket to someone in Cleveland. Resellers and the secondary market they support give consumers options. A fan who was unable to buy a ticket to a show on the primary market may be able to purchase a ticket from a reseller. Or a fan who did obtain a ticket on the primary market but is willing to pay more for a better seat may find such a ticket on the secondary market. Conversely, if a fan cannot attend a show, he can

quickly reach buyers across the country to ensure that he does not eat the price of the ticket—and that someone who wants to see the show can. Or a fan might choose to sell his ticket to someone who values the show far more than he does.

Like most businesses, resellers have costs. When selling through marketplaces, they must pay a seller's fee that cuts into any margin they may have. ASC Decl. ¶¶ 13, 20. They also have fixed costs like payroll, interest payments for lines of credit, inventory management, insurance, compliance, and other overhead. *Id.* ¶¶ 13, 20. And they have variable costs—for example, the cost of acquiring a given ticket that they later resell. *Id.* ¶ 20. To have a viable business, they must make enough to cover their costs. NATP Decl. ¶ 14. And they must be able to earn enough on profit-generating sales to offset the many transactions that result in a loss. ASC Decl. ¶¶ 16, 21–22. After all, resellers do not reap significant profits on every resale. Data from 2023 and 2024, for instance, show that for 55% and 62% (respectively) of the analyzed events, resellers sold tickets for prices below the initial face value of the tickets. *See* American Consumer Institute, *Report Update: Secondary Market Is One Part of the Consumer Ticketing Ecosystem* (June 12, 2025), https://tinyurl.com/4cu59swc. Consumers saved over $850 million as a result. *Id.*

This dynamic holds in the District, too. In 2024, fans reportedly saved over $6.1 million on ticket purchases in the resale market. NATP Decl. ¶ 13; Protect Ticket Rights, *Ticket Resale Saved D.C. Live Event Fans Over $6 million in 2024* at 1 (Oct. 2025), https://tinyurl.com/4mxf9hss. That translated to the average fan saving $13 on a resale ticket for a D.C. live event. *Id.*; NATP Decl. ¶ 13.

## II. The District Targets Resellers with a Stringent Price Cap.

In April 2025, Councilmember Charles Allen and seven other councilmembers introduced the bill that would eventually become the RESALE Act. They said that it would "protect artists, venues, and consumers in the District from unfair and deceptive practices," including "price

goug[ing]" and "egregiously higher" resale prices. Ex. B (Letter from Councilmember Charles Allen, Council of the District of Columbia, to Secretary Nyasha Howard (Apr. 9, 2025)) at 1. The centerpiece of the proposed legislation was a prohibition on reselling a ticket for more than the initial ticket price plus 10% (the "Price Cap"). The bill also included a provision restricting the fees that secondary ticket exchanges could charge to 10% of that initial ticket price (the "Fee Cap"). When introducing the bill, the councilmembers cited the support of local interests like I.M.P., which owns many of D.C.'s marquee venues, including the Anthem and the 9:30 Club. *Id.* at 2. But they did not identify any economic study or evidence suggesting that the bill's dual price controls would help consumers. Nor did they propose regulating what the primary market could charge consumers.

The District's Council referred the proposed legislation to the Public Works Committee, which studied it for months. NIVA (the National Independent Venue Association) and its D.C. member venues led the charge in supporting the bill—particularly the Price Cap. I.M.P., for instance, criticized "predatory ticket resellers" and "the platforms that make billions from them." Ex. C (Audrey Fix Schaefer Testimony) at 1. And it identified "price caps" as the way to stop "scalpers" from price gouging. *Id.* at 2. I.M.P. hailed the "groundbreaking" proposed legislation as "the most pro-consumer protection bill" it had ever seen. *Id.* at 1, 3. But I.M.P. said nothing about protecting consumers from Live Nation and Ticketmaster—the entities that a jury held liable for harming consumers and that paid D.C. nearly $10 million to resolve an investigation into deceptive practices. *See supra* at 3–4. That is no surprise. Ticketmaster is the exclusive ticketer for the Anthem, I.M.P.'s flagship venue, which also depends on Live Nation for access to popular artists who generate significant revenue. *See* Compl. ¶¶ 42–43.

But the Committee also heard how the Price Cap would hurt consumers. Testifying jointly, the Office of the Deputy Mayor for Planning and Economic Development and the Department of Licensing and Consumer Protection expressed concern about "unintended consequences associated with the proposed ticket price cap." Ex. D (Ryan Nicholas Testimony) at 2. They also pointed out that price controls threatened to drive consumers to "unregulated markets," and that pushing the resale market underground risked increased fraud and "greater financial losses for consumers." *Id.* at 2–3. These agencies requested that the Committee "remove the price cap provisions." *Id.* at 3–4. The National Consumers League shared their concerns. *See* Ex. E (National Consumers League Testimony) at 2. So did several scholars, who warned about reviving the days of "scalpers on the streets outside of arenas." Ex. F (Christopher Gowen Testimony) at 2; Ex. G (Marianne Jennings Testimony) at 2–3.

They had good reason to worry. Although there was no evidence that the Price Cap would help consumers, there was research showing that it would likely hurt them. In 2025, researchers analyzed ticketing fraud rates in two jurisdictions with price caps and in one without a cap. The price-controlled jurisdictions had fraud rates almost four times as high as those in the non-capped jurisdiction. *See* Bradshaw Advisory, *Ticket Fraud: Its Impact and the Cost of Market Regulation* (Mar. 16, 2025), https://tinyurl.com/35k8dvbj; *see also, e.g.*, Ex. E at 2 (National Consumers League highlighting this study). Major international banks, moreover, "have explicitly warned regulators that price caps may fuel £100 million in ticket fraud." Ex. H (Get Safe Online Testimony) at 1 (citation omitted).

After studying the issues, the Committee struck the Price and Fee Caps. *See* Ex. A at 7; *see also* Committee Print § 28-5507(b) (June 22, 2026). It acknowledged the "risks in directly legislating a price cap, and only doing so for the secondary market." Ex. A at 7. Any benefit, it

observed, was speculative because the evidence on resale price caps remains "uncertain." *Id.* at 8. And the downside was significant because handicapping resellers risked "further consolidating monopoly power in the primary market" while leaving consumers exposed to the primary market's "dynamic and algorithmic pricing," which the D.C. Council had not proposed to regulate. *Id.* Two councilmembers moved to revive the Price Cap and Fee Cap eight days later. *See* Ex. I (Councilmembers Charles Allen and Christina Henderson, Amendment to B26-0224, Statement (June 30, 2026)). They cited no studies or analysis rebutting the evidence before the Committee. They did not address the Committee's concerns about imposing price controls on the secondary market. And they did not propose to deal with the risks that the primary market posed to consumers. Instead, they asserted that the District needed the Price Cap because it would limit those selling tickets to "recover[ing] what they paid and break[ing] even." *Id.* That amendment passed. Two weeks later, the Council handed another gift to the local venues and their ticketing partners by removing the mayor's authority over primary-market fees—regulatory authority the Public Works Committee had endorsed to protect consumers. *See* Ex. J (Councilmember Brooke Pinto, Amendment #1 to B26-0224, Statement (July 13, 2026)); Ex. A at 7–8.

The Council passed the bill on July 14. About a month later, the Mayor signed it. And it became D.C. law in late September after the congressional review period expired. The Act begins applying on January 1, 2027.

## III. The Act Directly Regulates Resale Transactions and Imposes Significant Penalties.

As enacted, the Price Cap provides that "a reseller" cannot "sell or offer to sell a ticket that exceeds the total price of the initial ticket . . . plus up to 10% of th[at] total price." D.C. Code § 28-5506(b). The scope of this proscription depends on the definition of three terms: resale, reseller, and ticket. "Resale" means the "second or subsequent sale of a ticket by any method." *Id.* § 28-5501(2). "Reseller" means anyone "engaged in the resale of tickets." *Id.* § 28-5501(3). And

"ticket" means "any form of physical, electronic, or other evidence that grants the possessor . . . license to enter a place of entertainment for one or more events, including live concerts, theatrical performances, shows, or similarly scheduled live activities, at a specified date and time." *Id.* § 28-5501(6). But the Act exempts two kinds of events from the definition of "ticket." First, it carves out movie screenings. *Id.* And second, it excludes "sporting event[s] organized by a professional or intercollegiate sports team located in the District or professional athletic association with an event located in the District." *Id.* So the Price Cap does not apply to transactions involving those events. The Act also restricts any "secondary ticket exchange," defined as an "electronic marketplace that enables a person to sell, purchase, and resell tickets," from selling or offering to sell tickets that exceed the Price Cap and further prevents those entities from charging a fee exceeding 10% of the initial ticket price. *Id.* §§ 28-5501(4), 28-5506(b)–(c).

A reseller who violates the Price Cap faces severe penalties. The Act labels violations as Class 2 civil infractions. *Id.* § 28-5508(a). That classification covers "serious infractions" and provides for fines ranging from $1,000 to $8,000 *per* offense, which could quickly become ruinous for resellers that typically offer many ticket options to consumers each day. 16 DCMR §§ 3200.1(b), 3201.1(b). The Act also says that violating the Price Cap is an "unlawful trade practice." D.C. Code § 28-5508(b). A violation exposes resellers to enforcement proceedings before the Department of Licensing and Consumer Protection, *see id.* § 28-3905; consumer lawsuits for treble damages or $1,500-per-violation statutory damages, plus possible punitive damages, *see id.* § 28-3905(k)(1)–(2); and lawsuits by the D.C. Attorney General for statutory penalties or wide-ranging injunctive relief, *see id.* § 28-3909.

## LEGAL STANDARD

A plaintiff seeking a preliminary injunction must show that (1) "he is likely to succeed on the merits," (2) "he is likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of the equities tips in his favor," and (4) "an injunction is in the public interest." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). When a plaintiff "seek[s] to enjoin the government, the last two preliminary-injunction factors . . . merge." *L.G.M.L. v. Noem*, 800 F. Supp. 3d 100, 133 (D.D.C. 2025) (citation omitted).

## ARGUMENT

### I. Plaintiffs Are Likely to Succeed on the Merits of Their Claims.

#### A. The Price Cap Violates Due Process Because It Does Not Provide Fair Notice of What It Covers.

Laws that regulate "'persons or entities must give fair notice of conduct that is forbidden or required.'" *Karem v. Trump*, 960 F.3d 656, 664 (D.C. Cir. 2020) (quoting *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012)). Rooted in the Due Process Clause, the void-for-vagueness doctrine enforces that principle by prohibiting laws "so vague and standardless" as to "leave[] the public uncertain as to the conduct [they] prohibit[]." *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999) (citation omitted). What matters is whether the law provides enough clarity for "the *ordinary citizen* to conform his or her conduct to the law." *Id.* at 58 (emphasis added). Put another way, a law is unconstitutionally vague when it regulates conduct "in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926). The Price Cap violates this "well-recognized requirement." *Id.*

#### 1. The Act Does Not Say Which Resale Transactions the Price Cap Reaches.

No one can comply with a price control if he cannot tell which transactions it covers. But the RESALE Act leaves sellers in exactly that situation. All sellers know is that the Price Cap prohibits a "reseller" from selling or offering to sell "a ticket" for more than the initial ticket price plus 10%. D.C. Code § 28-5506(b). A "reseller" is any "person engaged in the resale of tickets," *id.* § 28-5501(3), and "resale" means the "second or subsequent sale of a ticket," *id.* § 28-5501(2). So neither of those definitions does much to help sellers discern the Price Cap's scope. Nor does "ticket." The Act defines that term as any "evidence that grants the possessor . . . license to enter a place of entertainment for one or more events," but not including movies and certain sports events. *Id.* § 28-5501(6). The result is a prohibition that, to the ordinary citizen, seems to sweep in any resale transaction of any concert, musical, or other live event other than the two exempted categories (one of which is itself vague).

Clarifying terms are not hard to imagine. The Act's preamble says that the legislation is meant to "protect artists, venues, and consumers in the District." D.C. Act 26-410, preamble. Those are all potential factors that could matter to someone trying to understand how far the Price Cap goes. For example, the Act could define "ticket" to mean evidence providing access to "a place of entertainment *in the District*." That would tell resellers what conduct is prohibited: selling a ticket to a concert in D.C., but not to a concert in Maryland. Or it could define "resale" to mean "the second or subsequent sale of a ticket, provided that the buyer is a *resident of the District*." This too would give resellers fair notice of the prohibited conduct by tying the Price Cap to the buyer's residency. Or the Act could focus on the location of the transaction by defining a "reseller" as "a person engaged in the resale of tickets *in the District*." Or, perhaps, the Act could say that some combination of conditions must exist—for instance, by clarifying that the Price Cap applies only

when the event is in D.C. *and* the buyer lives there. But the Act includes none of these options. It offers no clue as to which facts—the buyer's residency, the event location, or others—define the scope of prohibited conduct under this law supposedly designed to protect "artists, venues, and consumers in the District."

Resellers must either hazard a guess at what the District meant (while risking significant liability) or avoid potentially covered transactions altogether. NATP Decl. ¶ 18. And the specter of the Price Cap's ambiguity sweeps broadly. How is a Virginia resident reselling a ticket to a sold-out show at Nashville's Ryman Auditorium supposed to decide whether he can sell the ticket for a 15% markup to a D.C. resident? What about the same seller offering a ticket for a concert at the Anthem to someone living in Maryland? The absence of clarifying terms renders the Price Cap susceptible to even broader application. Consider a Texan reselling a ticket to a Californian for a concert at the Las Vegas Sphere. What fact should the seller rely on to determine whether the Price Cap applies to that transaction? After all, the Texas resident is a person making the "second or subsequent sale" of "evidence that grants the possessor" the right to "enter a place of entertainment." D.C. Code § 28-5501(2)–(3), (6).

The vagueness of the Price Cap as enacted is beyond saving. No doubt, the preamble gestures at several ways the District *could have* clarified the Price Cap by tying it to D.C. consumers, venues, or even artists. But none of those limits made it into the Act's operative terms. Nor can the District say that the Act naturally hinges on one fact—say, the event's location in D.C. Were that true, the Act presumably would not have specified that certain provisions depend on an event or entity being "located in the District" while omitting that descriptor from the definition of "ticket." *Compare* D.C. Code § 28-5501(6) (defining "ticket" as evidence granting the holder a "license to enter a place of entertainment for one or more events, including live concerts . . . or

similarly scheduled live activities, at a specified date and time"), *with id.* (excluding from that definition "sporting event[s] organized by a professional or intercollegiate sports team *located in the District* or professional athletic association with an event *located in the District*" (emphases added)), *and id.* § 47-2890.02(a)(1) (barring certain resellers from "operat[ing] *in the District*" without obtaining a license (emphasis added)). The District, like Congress, "is generally presumed" to have "act[ed] intentionally and purposely" when it "includes particular language in one section of a statute but omits it in another section of the same Act." *Russello v. United States*, 464 U.S. 16, 23 (1983). Because this Court "may not narrow a provision's reach by inserting words [the District] chose to omit," *Sinclair Wyo. Refin. Co. v. EPA*, 114 F.4th 693, 709 (D.C. Cir. 2024) (citation omitted), it cannot clarify the Price Cap by reading in language tied to the event location.

### 2. The Sporting Event Exemption Compounds the Act's Ambiguity.

The exemption for some sports events further muddies the scope of the Price Cap. Recall that the Act excludes from the definition of "ticket"—and thus from the Price Cap—"sporting event[s] organized by a professional or intercollegiate sports team located in the District or professional athletic association with an event located in the District." D.C. Code § 28-5501(6). That provision is vague in at least three ways.

*First*, the Act does not tell ordinary citizens whether the exemption for professional and college sports depends on whether the "sporting event [is] . . . located in the District" or on whether the "sports team [is] located in the District." *Id.* That creates confusion about whether all kinds of events for which resellers ordinarily buy and sell tickets are subject to the Price Cap. This past March, for instance, Capital One Arena hosted a high-profile matchup between Duke University and the University of Connecticut in the Elite Eight round of the NCAA men's basketball tournament. These "intercollegiate sports team[s]" are not even arguably "located in the District," nor did a "*professional* athletic association" organize the event. *Id.*; *cf.* NCAA, *Our Purpose*,

https://tinyurl.com/mvy6keah (last visited Oct. 15, 2026) ("The NCAA supports *student*-athletes, schools[,] and conferences." (emphasis added)). So the Price Cap may cover transactions for tickets to this game. But the game itself—the "sporting event"—*was* located in D.C., so the matchup may be exempt. Or take the flip-side example: the Washington Nationals (a team presumably "located in the District") travel to Seattle's T-Mobile Park to play the Mariners (an event not "located in the District"). In both situations, ordinary citizens can only guess whether the Price Cap applies because the Act does not say whether it is the location of the event or of the team that matters.

*Second*, even if the "located in the District" qualifier applies to "a professional or intercollegiate sports team" rather than to the "sporting event," the Act fails to provide fair notice about what dictates whether a team meets that standard. Is it the team's stated geographical affiliation or the physical location of the stadium that hosts home games? The Commanders illustrate the problem. They are a "Washington" team that plays its home games in Maryland and draws more than one million fans per year. *See* Pro Football Reference, *2025 NFL Attendance Data*, https://tinyurl.com/4c7bpjy2 (last visited Oct. 15, 2026). But the Act gives resellers no guidance on how to decide whether selling those tickets at market value would expose them to liability.

*Third*, the Act is not sufficiently clear to allow ordinary citizens to know when a sporting event has been "*organized* by a professional or intercollegiate sports team." Do the Wizards "organize" a road game in Atlanta because they coordinate logistics for the event? Or is a game only "organized" by a team if that team hosts the event? Consider, too, the confusion when a professional team with a stadium in the District facilitates other teams playing there. Last year, the Savannah Bananas—a barnstorming "[e]xhibitionist baseball team"—played two games at

Nationals Park against the Firefighters, another exhibitionist team in the Georgia-based league. DC News Now, *Savannah Bananas return to Nats Park for two-night sellout* (June 28, 2025), https://tinyurl.com/ytty9fbc. Both games sold out, *id.*, and the league returned to Nats Park last weekend for the first "Banana Bowl" championship, *see* Banana Ball Reminder, *Banana Bowl 2026*, https://tinyurl.com/55jwyv7c (last visited Oct. 15, 2026). Yet the Act says nothing about how to decide whether the Nationals "organized" these sold-out events such that the exemption applies.

**3. The Price Cap's Benchmark Is Often Indiscernible.**

A reseller who correctly guesses the scope of the Price Cap and its sports exemption is not home free. He must still determine the "initial" ticket price to know what he can charge. And that will often be unknowable for any number of reasons. Tickets often change hands several times before a reseller acquires them, and resellers often lack any knowledge of the first sale. ASC Decl. ¶ 17; NATP Decl. ¶ 15. And even when a reseller buys a ticket from a consumer who reports the price of the initial sale, the reseller cannot always verify that information. ASC Decl. ¶¶ 17–18.

Further, resellers sometimes will be unable to determine the "total price of the initial ticket" even if they possess verified information about the first sale. For example, if a primary ticketer issues a ticket for free as part of a promotion, it would be impossible to gauge whether a resale at any particular price would trigger liability—unless the District intends to ban the resale of that ticket for even a penny. Ticket packages and bundles (such as season tickets) pose another problem. The original ticketer sometimes sells such groups of tickets for an aggregate price without attributing specific values to the individual tickets. ASC Decl. ¶ 17; NATP Decl. ¶ 15. Yet the Act does not tell resellers how to evaluate the "total price of the initial ticket" under these circumstances.

* * *

Plaintiffs oppose price controls on ticket resales because they are bad policy and hurt consumers. But Plaintiffs are responsible industry participants; they want to comply with the laws that govern them. The RESALE Act gives them no way to do that. It forces them to guess whether the Price Cap applies, and if they are wrong, they run the risk of significant financial and reputational injury. And it prohibits conduct in which they would otherwise engage. For all these reasons, Plaintiffs are likely to succeed in showing that the Act's Price Cap is unconstitutionally vague.

### B. The Price Cap Violates the Dormant Commerce Clause and the District's Home Rule Act.

The Commerce Clause gives Congress the power to "regulate Commerce with foreign Nations, and among the several States." U.S. Const. art. I, § 8, cl. 3. But it also operates "as an implicit restraint on state authority," *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 338 (2007), by "prohibit[ing] state laws that unduly restrict interstate commerce." *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 514 (2019). This principle is known as the Dormant Commerce Clause. The Price Cap violates this constitutional restraint twice over and, because it purports to regulate activity outside the District, also contravenes the D.C. Home Rule Act. *See* D.C. Code § 1-206.02(a)(3).

#### 1. The Price Cap Impermissibly Regulates Transactions Occurring Outside the District.

##### i. <u>The Price Cap Violates the Dormant Commerce Clause.</u>

To protect the interstate market, the Dormant Commerce Clause bars legislation with "the specific impermissible extraterritorial effect of controlling prices outside of" the enacting state. *Ass'n for Accessible Meds. v. Ellison*, 140 F.4th 957, 960 (8th Cir. 2025). A locality thus lacks the "'power to project its legislation into [another state] by regulating the price to be paid in that state'

for [goods] sold there." *Id.* (quoting *Pharm. Rsch. & Mfrs. of Am. v. Walsh*, 538 U.S. 644, 669 (2003)).

This principle "remains good law" after the Supreme Court's 2023 decision in *National Pork Producers Council v. Ross*. *See Ellison*, 140 F.4th at 960. There, although it rejected the argument that a state law with extraterritorial effect was an "almost *per se*" violation of the Dormant Commerce Clause, the Court made clear that it did not mean to "trivialize the role territory and sovereign boundaries play in our federal system." *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 373–76 (2023). And it left undisturbed precedent that refused to enforce a state law that "'directly regulated transactions which took place wholly outside the State.'" *Id.* at 376 n.1 (quoting *Edgar v. MITE Corp.*, 457 U.S. 624, 641–43 (1982)) (cleaned up). After *Pork Producers*, lower courts have continued to hold that a law "violate[s] the Dormant Commerce Clause" if it "directly regulat[es] . . . out-of-state transactions absent a sufficiently strong in-state nexus." *R.I. Truck Ctr., LLC v. Daimler Trucks N. Am., LLC*, 180 F.4th 365, 379–80 (1st Cir. 2026) (citation omitted); *see also Ass'n for Accessible Meds. v. Bonta*, 766 F. Supp. 3d 1020, 1033–34 (E.D. Cal. 2025) (invalidating law that "on its face may result in the extraterritorial regulation of settlement agreements in which none of the parties, the agreement, or the pharmaceutical sales have any connection with" the enacting state); *Aylo Freesites Ltd. v. Utah Div. of Consumer Prot.*, 2026 WL 2874132, at *16 (D. Utah Sept. 24, 2026) (preliminarily enjoining law that "would regulate a massive amount of wholly out-of-state conduct with no connection to" the enacting state).

The Price Cap breaches this prohibition on extraterritorial regulation. There is no question that if the District takes the position that its Price Cap applies to transactions between buyers and sellers from any state for tickets to any venue, such a nationwide price control would violate the

Dormant Commerce Clause—and likely other constitutional principles such as due process and the horizontal separation of powers. *See Pork Producers*, 598 U.S. at 376. And even assuming (atextually) that the Price Cap applies only to tickets for events in D.C., it still would run afoul of the Dormant Commerce Clause. The Cap "is not fixated on" the event in the District; it regulates nothing about what happens at the venue. *Ass'n for Accessible Meds. v. Frosh*, 887 F.3d 664, 671 (4th Cir. 2018). Instead, the "lawfulness of a price" for a resold ticket "is measured according to the price" at which the reseller offers and sells it in the resale transaction. *Id.* That transaction, whenever and wherever it may occur, is the regulatory target. And the vast majority—"[a]pproximately 85–90%"—of those transactions involve an out-of-state buyer *and* an out-of-state seller consummating a deal through a marketplace based outside the District. *See Ticket Policy Forum v. District of Columbia*, No. 26-cv-3577 (CJN) (D.D.C.), Dkt. 10-1 at 26; *see also* NATP Decl. ¶¶ 5, 10.

The District cannot dictate the price terms for those transactions based on a downstream connection to a D.C. venue. Courts have rejected that approach before and after *Pork Producers*. In *Pharmaceutical Research and Manufacturers of America v. District of Columbia*, 406 F. Supp. 2d 56, 69 (D.D.C. 2005), for example, this Court struck down a D.C. law restricting pharmaceutical prices, even though it could not "be used to create liability against [a] manufacturer[]" unless the drug was sold in the District. "But as soon as that drug is sold in the District," the Court observed, "the manufacturer's out-of-state sale becomes the Act's primary target." *Id.* Similarly, in *Frosh*, 887 F.3d at 672–73 (citation omitted), the Fourth Circuit held that a Maryland law "regulate[d] the price of [an] out-of-state transaction," and therefore violated the Dormant Commerce Clause, because it prohibited charging certain prices in sales that "occur[] outside Maryland's borders."

And that held true even though liability was "triggered only when" the product became "available for sale in Maryland." *Id.* at 670 (citation omitted).

Two post-*Pork Producers* cases confirm that the Price Cap lacks a "sufficiently strong in-state nexus" to comply with the Dormant Commerce Clause. *R.I. Truck Ctr.*, 180 F.4th at 379 (citation omitted). In *Ellison*, the Eighth Circuit affirmed a preliminary injunction against enforcement of a Minnesota law that barred drug manufacturers from causing "an excessive price increase." 140 F.4th at 959. The law had a clear in-state nexus: it regulated drug prices only if the drug was "sold, dispensed, or delivered to any consumer in the state." *Id.* (citation omitted). But the court held that that limited connection was insufficient because "Minnesota concede[d] that a Colorado manufacturer would be penalized if it sold drugs to a New Jersey distributor at prices above those proscribed by the Act" just because "those drugs ended up in Minnesota." *Id.* at 960. The Price Cap here (assuming it applies only to events in D.C.) works the same way. Like the Minnesota law, the District's Price Cap purports to regulate out-of-jurisdiction buyers and sellers transacting on an interstate marketplace based solely on some downstream event—in *Ellison*, a drug entering the state; here, a venue hosting a show in the District. And as in Minnesota, the District's purported "effort to protect its consumers from skyrocketing . . . costs" does not allow it to "impose its preferences" on out-of-state conduct. *Id.*

Or take *Rhode Island Truck Center*. There, the First Circuit addressed a Rhode Island law requiring car manufacturers intending to establish a new dealership in an existing in-state dealer's "relevant market area" (defined as a 20-mile radius surrounding the in-state dealer) to notify the existing dealer. 180 F.4th at 368. When a manufacturer granted a franchise to a Massachusetts dealer within an existing Rhode Island dealer's "relevant market area," the Rhode Island dealer sought a ruling that the manufacturer had violated Rhode Island's notification law and that the

violation must be remedied by removing the Massachusetts dealership. *Id.* at 368–69. The court held that given the law's direct regulation of out-of-state transactions, the limited "in-state nexus" was not "sufficiently strong" to sustain the law against a Dormant Commerce Clause challenge. *Id.* at 379 (citation omitted). So too here. The location of an event supplies no more of an in-state nexus than the location of an entity to whom a statute provides certain notice rights. In both situations, the enacting state (or District) may want to protect certain in-state (or in-District) interests. But in neither case can it directly regulate out-of-state (or out-of-District) transactions.

ii. The Price Cap Violates the District's Home Rule Act.

The Court could reach the same result under the Home Rule Act, which provides that D.C. may not enact any law that "is not restricted in its application exclusively in or to the District." D.C. Code § 1-206.02(a)(3). This prohibition, like the Dormant Commerce Clause, distinguishes "between the incidental effects of local regulation and direct regulation of external conduct." *CSX Transp., Inc. v. Williams*, 2005 WL 902130, at *23 (D.D.C. Apr. 18, 2005), *rev'd on other grounds*, 406 F.3d 667 (D.C. Cir. 2005).

The Price Cap falls on the wrong side of the line because it directly regulates transactions outside the District. The operative terms—resale, reseller, and ticket—contain no geographic limit. *See* D.C. Code § 28-5501(2)–(3), (6). On its face, then, the Price Cap may reach transactions throughout the country. And even if it is read to cover only tickets to events in the District, the Price Cap still dictates the prices of resale transactions between out-of-District sellers and out-of-District buyers on marketplaces based outside the District—including a Maryland-based reseller such as ASC selling a ticket for a show at the Anthem to a fan in Virginia through an interstate marketplace. In no sense does the Price Cap apply "exclusively in or to the District," *id.* § 1-206.02(a)(3), and it is therefore unlawful under D.C. law as well as under the Dormant Commerce Clause.

### 2. The Price Cap Discriminates Against Out-of-District Resellers in Favor of Local Interests.

The Dormant Commerce Clause also “prohibits economic protectionism.” *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 273 (1988). State legislation with a “discriminatory purpose” or “discriminatory effect” violates that constitutional limit. *Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 270 (1984). This “antidiscrimination principle,” *Pork Producers*, 598 U.S. at 364, 369, is straightforward: states cannot treat “‘in-state and out-of-state economic interests’” differently in ways that “‘benefit[] the former and burden[] the latter,’” *Asante v. Kennedy*, 133 F.4th 97, 102–03 (D.C. Cir. 2025) (quoting *United Haulers*, 550 U.S. at 338). And this principle applies to “legislative means as well as legislative ends” because the “evil of protectionism can reside in” either. *Philadelphia v. New Jersey*, 437 U.S. 617, 626 (1978). Further, a law’s text and “[f]acts external to the stated purpose may reveal protectionist purposes.” *Quality Brands, Inc. v. Barry*, 715 F. Supp. 1138, 1141 (D.D.C. 1989). Both do here.

*First*, the Act’s text and structure show a statute designed to target an out-of-state group to bolster in-state interests. The Act recognizes that consumers get tickets from two sources. “Ticket issuers” provide “tickets for initial sale.” D.C. Code § 28-5501(7). These issuers can sell tickets for whatever price they want. If a local venue has 50 tickets remaining for a high-demand country-music star, it can charge whatever the market will bear—often hundreds or even thousands of dollars, with ticketing fees on top of that. The Act does nothing to restrict this conduct.

Instead, the Act targets those competing with those issuers. The Price Cap prevents resellers from selling tickets based on market value. If a ticket issuer sells a ticket for $100 that a reseller buys for $105 because the original buyer can no longer attend, the reseller could sell that ticket for only $110 even if demand causes it to triple in market value. Meanwhile, a local venue could sell a ticket one seat over at the same event for $300 (or whatever buyers are willing to pay).

Thus, there would be no viable secondary market to compete with the primary market on price by, for example, offering a comparable ticket for $200.

That discrepancy reveals a price control that burdens a predominantly out-of-state group while benefiting a predominantly local one. Start with the resellers. They operate throughout the country, but very few are based in the District. NATP is the leading trade association for resellers, and none of its approximately 250 members is based in D.C. NATP Decl. ¶ 5. Primary ticketers, who are not subject to the Price Cap, are a different story. They include local venues that supported the Price Cap, as well as ticketing partners like Ticketmaster on which those venues rely—and from which they benefit. As one councilmember explained when moving to strike the mayor's authority "to regulate ticket fees in the primary market," "[m]any venues make contracts with their ticketing platforms" that "allow[] venues to get an advance of the money." Ex. J at 1.

The relationship between Ticketmaster and I.M.P.—owner of the District's most prominent venues—is telling. Those companies have a good thing going in D.C. I.M.P. operates the Anthem, a preeminent venue on the District's Wharf with a "calendar of blockbuster shows." Chamber of Progress, *Captured by the Concert Machine* at 7 (Mar. 16, 2026), https://tinyurl.com/m8z8wc6t. But that slate of high-demand, revenue-generating events "is tied to Live Nation's decisions about where its tours stop." *Id.* And—no surprise—"[a]ll tickets for events at the venue are sold exclusively through Ticketmaster." *Id.* at 7–8. Small wonder, then, that the "[p]ublic messaging" of I.M.P. and other venues "often mirrors Live Nation's narratives on secondary markets and consumer issues." *Id.* at 6.

*Second*, the legislative record confirms that economic protectionism underlies this differential treatment. Here too, I.M.P.'s role is instructive. The D.C. Council touted I.M.P.'s support when introducing the bill. And I.M.P.'s testimony is what one would expect from a

powerful local venue looking out for its interests in D.C.'s primary market. For example, I.M.P. decried "scalpers," "predatory ticket resellers," and "the platforms that make billions from them." Ex. C at 1. "Price caps" were especially important, I.M.P. claimed, because they "will be an economic boon for DC" and will make artists "choose to play in DC" venues over those in "neighboring states." *Id.* at 2–3.

That sentiment reared its head again when the District Council voted to pass the Act. The Public Works Committee had scrapped the Price Cap because it threatened to increase price gouging in the primary market and hurt consumers. Ex. A at 4, 7–8. Eight days later, with no evidence to the contrary, two councilmembers moved to add the Price Cap back. *See* Ex. I. The Act's sponsor later explained that the "price cap" is "key" because "we're taking significant profit from scalper[s]." July 14, 2026 Hr'g at 16:53–19:28 (Councilmember Allen). The resale "system," he asserted, was "rigged against our residents, our artists, and our venues." *Id.* He concluded by thanking "local venues, artists, and theaters, especially I.M.P., who called this out as a problem." *Id.* And after the Council passed the Act, he said he expected that the Act would "keep more dollars in our local economy." *NIVA and Fix the Tix Applaud the DC Council's Final Passage of Nation-Leading Resale Ticketing Bill*, National Independent Venue Association (July 14, 2026), https://tinyurl.com/4txwh3sn.

Sometimes legislative records are murky. This one isn't. The Council said plainly that it wanted to help local venues by making life harder for resellers. Those legislative "comments" evince the "not-so-veiled purpose of the legislation": "economic protectionism." *DoorDash, Inc. v. City of New York*, 692 F. Supp. 3d 268, 292 (S.D.N.Y. 2023); *see also S. Dakota Farm Bureau, Inc. v. Hazeltine*, 340 F.3d 583, 594 (8th Cir. 2003) (considering government official's statement that was "brimming with protectionist rhetoric"). More to the point, they are reflected in the Act's

lopsided regulation of ticket prices, which imposes a price control that prevents many resellers from making a fair profit while letting local venues (and Ticketmaster) charge consumers whatever they want.

A discriminatory "restriction on commerce" like the Price Cap is "virtually *per se* invalid." *Or. Waste Sys., Inc. v. Dep't of Env't Quality*, 511 U.S. 93, 99 (1994). The District must therefore "sho[w] that it advances a legitimate local purpose that cannot be adequately served by nondiscriminatory alternatives." *Id.* at 100–01 (citation omitted). But it cannot clear even the first hurdle: that the Price Cap "advances a legitimate local purpose." The Council cited no analysis suggesting that the Price Cap would actually protect consumers and disregarded (without explanation) evidence showing that it would harm them—all while local venues and the primary market profit. *See, e.g.*, Ex. E at 2. And by exempting sporting events that should trigger the same purported consumer-protection concerns, the Price Cap itself undermines the notion that it advances a legitimate local purpose.

Nor can the District show that nondiscriminatory alternatives would not have worked. It had the Committee's revised bill at its fingertips. That bill addressed speculative ticketing, bot use, pricing disclosures, surety bonds, and regulation of the primary market—all ways to protect D.C. consumers without discriminating against predominantly out-of-District resellers. Ex. A at 7–9. Other jurisdictions have taken similar non-discriminatory and less burdensome approaches. California, for instance, recently enacted Assembly Bill 1349, which bars speculative tickets without imposing price ceilings.

In sum, the Price Cap discriminates against out-of-state interests to support local ones. And the District cannot meet its heavy burden to justify that differential treatment.

### C. The Price Cap Violates the Equal Protection Guarantee of the Fifth Amendment.

The Constitution's guarantee of equal protection binds the District. *See Frederick Douglass Found., Inc. v. District of Columbia*, 82 F.4th 1122, 1147 (D.C. Cir. 2023). So the District can "treat[] one group different from another" only if "the classification [can] withstand the appropriate level of scrutiny." *City of Saint Paul, Minn. v. Wright*, 816 F. Supp. 3d 65, 72 (D.D.C. 2026). At the very least, the District's "classification" must "be rationally related to a legitimate government purpose." *Clark v. Jeter*, 486 U.S. 456, 461 (1988).

The Price Cap cannot meet that standard. It treats two groups that provide tickets differently. It classifies one group as resellers and prohibits them from charging market price for the tickets they own and sell. But the other group—the primary market's local venues and ticketing partners—can sell their tickets for market value.

There is no rational basis for that distinction. According to various councilmembers, the Act protects fans from being "fleeced and price gouged," missing out on the "opportunity to get initial tickets at face value," and seeing prices for similar seats fluctuate. Ex. B at 1. But "there is no reason to believe that" regulating the price that resellers can charge "furthers [the District's] priorities any more than" doing the same for primary ticketers. *City of Saint Paul*, 816 F. Supp. 3d at 72. The District cited "no evidence that" resellers are more likely than primary ticketers to harm consumers. *Id.* That is probably because the record cuts the other way: consumers are more likely to become victims of ticket fraud when price controls are in place. *See supra* at 7.

The District's Council again turned a blind eye when the Public Works Committee warned it that the Price Cap threatened to harm consumers by further empowering the primary market. *See* Ex. A at 7–9. *That* market, the Committee explained, exposed consumers to "price and supply manipulation practices" that a "resale price cap[]" would not address. *Id.* at 8. Indeed, one of the

specific concerns that the Act's sponsor highlighted—fluctuating prices for the same ticket, *see* Ex. B at 1—is just another way of describing the "dynamic pricing and algorithmic pricing" that the *primary* market can deploy under the Act. Ex. A at 8; *see also id.* at 5, 7 (recommending mayoral authority to regulate dynamic pricing).

The District's refusal to protect consumers from the primary market reveals an unbridgeable gap between the Price Cap and any ostensible pro-consumer purpose. And that is not the only way the Price Cap hangs consumers out to dry. The District never explained why sports fans are uniquely capable of withstanding deceptive "scalpers" looking to "fleece[] and price gouge[]" them. Ex. B at 1. Nor did it say why movie buffs need less protection than concertgoers. If the District had a legitimate consumer-protection purpose, such porous and internally contradictory legislation is no way to rationally advance it.

The Price Cap "irrationally and arbitrarily singles out [resellers] as unique" from primary ticketers for purposes of consumer protection. *Brown v. Barry*, 710 F. Supp. 352, 355 (D.D.C. 1989). The "rational basis test" may be forgiving, but "it does not go [so] far" as to allow such baseless differential treatment. *Id.* (quoting *N.Y. State Club Ass'n v. City of New York*, 487 U.S. 1, 20 (1988) (Scalia, J., concurring in part)).

## II. Plaintiffs Will Suffer Irreparable Harm Absent a Preliminary Injunction.

The Price Cap will irreparably injure Plaintiffs unless this Court grants preliminary relief. It will do so in two independent ways.

*First*, Plaintiffs "meet the irreparable harm standard" because they are likely to suffer a "violation of their constitutional rights." *Taylor v. Trump*, 823 F. Supp. 3d 17, 40 (D.D.C. 2026). It "has long been established that the loss of constitutional freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (citation omitted). And although the Price Cap will likely cause several

"prospective violation[s] of" Plaintiffs' "constitutional right[s]," any one "constitutes irreparable injury." *Karem*, 960 F.3d at 667–68 ("violation of Fifth Amendment due process rights . . . support[s] injunctive relief"); *see also Talbott v. United States*, 176 F.4th 720, 747 (D.C. Cir. 2026) (where plaintiffs showed a likelihood that governmental policy "violates the equal protection guaranteed to them by the Fifth Amendment," it "follow[ed] that they ha[d] been irreparably harmed"); *Ellison*, 140 F.4th at 961–62 (affirming preliminary injunction based on Dormant Commerce Clause violation).

*Second*, the Price Cap will inflict irremediable financial injury. Plaintiffs have detailed how the Price Cap will force them to pass up economic opportunities or sell tickets at a loss—or both. *See* ASC Decl. ¶¶ 20–28; Declaration of Karl Roes ("Stage Front Decl.") ¶¶ 8–11; NATP Decl. ¶¶ 16–17. It will also force them to spend significant resources verifying initial ticket prices just to have the option of trying to participate in covered transactions. *See* ASC Decl. ¶¶ 17–19; NATP Decl. ¶ 15. Although ordinary financial harm may not count as irreparable injury, "[t]he threat of *unrecoverable* economic loss . . . does qualify." *Perkins Coie LLP v. DOJ*, 783 F. Supp. 3d 105, 179 (D.D.C. 2025) (emphasis added) (quoting *Iowa Utilities Bd. v. FCC*, 109 F.3d 418, 426 (8th Cir. 1996)). And that describes Plaintiffs' injuries. Identifying and valuing the transactions they avoided would be "inherently speculative" following final judgment. *O'Donnell Constr. Co. v. District of Columbia*, 963 F.2d 420, 428 (D.C. Cir. 1992). So would retroactively evaluating how much tickets would have gone for had the Price Cap not suppressed prices. *See* ASC Decl. ¶ 29; NATP Decl. ¶ 21. These difficulties "weigh[] heavily in favor of granting the injunction." *O'Donnell Constr.*, 963 F.2d at 428.

**III. The Balance of the Equities and the Public Interest Favor a Preliminary Injunction.**

Because the last two preliminary-injunction factors merge when the government opposes the relief, those factors depend on how this Court "weigh[s] the benefits to [Plaintiffs] from

obtaining an injunction against the harms to the government and the public from being enjoined." *Media Matters for Am. v. Paxton*, 138 F.4th 563, 585 (D.C. Cir. 2025) (citation omitted).

That test favors Plaintiffs—heavily. They face imminent harms that cannot be remedied if the Price Cap regulates them while this litigation proceeds in the ordinary course. During that time, constitutional injuries will occur, and irrecoverable economic losses will accrue. Preliminary relief would not only avoid those harms to Plaintiffs but would also benefit consumers. At a basic level, "enforcement of an unconstitutional law is always contrary to the public interest," and the injunction would stop that from happening. *Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of President*, 784 F. Supp. 3d 127, 173 (D.D.C. 2025) (citation omitted). Consumers would also continue to benefit from a viable secondary market in which responsible resellers can participate. That resale market will provide consumers with choices otherwise missing in the live-event market. And it will prevent unregulated resale channels from filling the void and harming consumers through increased fraud.

No harm to the District or the public offsets these benefits. The District "has no legitimate interest in" enforcing a law that "violat[es]" the Constitution or the Home Rule Act. *Ctr. for Taxpayer Rights v. IRS*, 2026 WL 2635380, at *13 (D.C. Cir. Sept. 8, 2026). And the Act's exemptions undermine any suggestion that the District's purported effort to protect consumers is urgent such that preliminary relief would harm its interests. After all, the District has excluded sports fans and moviegoers from the protection it claims it needed to extend to others.

A preliminary injunction would thus preserve the benefits to Plaintiffs and consumers without harming the public or the District.

## CONCLUSION

This Court should grant Plaintiffs' motion and preliminarily enjoin Defendant from enforcing the Price Cap against Plaintiffs and NATP's members.

Dated: October 16, 2026

Respectfully submitted,

/s/ *Jessie K. Liu*

Jessie K. Liu (D.C. Bar 472845)
Justin V. Shur (D.C. Bar 973855)
Richard H. Poulson (D.C. Bar 90015456)

**LIU SHUR KRAVIS LLP**
607 Fourteenth Street, N.W.
Suite 625
Washington, D.C. 20005
Phone: (202) 240-7100
jessie.liu@lskllp.com
justin.shur@lskllp.com
hundley.poulson@lskllp.com

*Attorneys for Plaintiffs National Association of Ticketing Professionals, ASC Ticket Company, and Stage Front Tickets, Inc.*