**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

NATIONAL ASSOCIATION OF TICKETING PROFESSIONALS *et al.*,

Plaintiffs,

v.

DISTRICT OF COLUMBIA,

Defendant.

Case No. 26-cv-_________

**DECLARATION OF GARY ADLER IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

Pursuant to 28 U.S.C. § 1746, I, Gary Adler, declare as follows:

**Background and Personal Knowledge**

1. I am the Executive Director and General Counsel of the National Association of Ticketing Professionals ("NATP" or the "Association"). I have served in these roles since the establishment of NATP (formerly known as the National Association of Ticket Brokers or NATB) in 1994. Nothing in this declaration discloses legal advice I have provided to the Association or its members, and the Association does not waive any privilege.

2. I am over the age of eighteen and competent to make this declaration. I have personal knowledge of the facts set forth in this declaration, except where stated otherwise. If called as a witness, I could and would testify competently to these facts. Where I describe facts based on the Association's records, those records were made and kept in the ordinary course of its regularly conducted activities.

3. My responsibilities include directing the Association's legislative, regulatory, and public-policy advocacy at the federal, state, and local levels; advising the Association and its members on legal and compliance matters affecting the ticket resale industry; and managing the

day-to-day operations of the Association. Through that work, I regularly communicate with the Association's members about their businesses, the interstate market in which they operate, the secondary marketplaces on which they sell tickets, and the laws affecting their operations.

4. I submit this declaration in support of Plaintiffs' Motion for a Preliminary Injunction to enjoin enforcement of the resale price cap in the District of Columbia's Restricting Egregious Scalping Against Live Entertainment (RESALE) Amendment Act of 2026 (the "Act"), which prohibits a reseller from selling or offering to sell a ticket for more than the total price of the initial ticket plus 10% of that price (the "Price Cap").

**NATP's Mission and Membership**

5. NATP is a District of Columbia not-for-profit trade association representing approximately 250 organizations that engage in the resale of tickets to live events across the United States and internationally, including events occurring in just about every state and the District of Columbia. The Association's members engage in the resale of tickets for live events. It is my understanding that they would qualify as "resellers" under the Act. To my knowledge, no member of NATP is based in Washington, D.C.

6. The Association's mission includes promoting consumer protection and ethical standards of conduct in the ticket resale industry, as well as ensuring that consumers and resellers have the right and freedom to buy and sell tickets in a secondary marketplace governed by free-market principles—not by restrictive and counter-productive laws, rules, and regulations. Members agree to abide by the NATP Code of Ethics, which is available on the Association's website at https://www.natp.org/why-natp/.

7. The Association's members provide the "NATP FAN Guarantee" to all customers buying from them. Under the FAN Guarantee, a customer will receive the tickets purchased or a

200% refund if the member reseller does not deliver the tickets. And if the exact tickets purchased are unavailable, the member will provide comparable or better tickets at the same or lower price.

8. NATP members range from sole proprietors to large businesses with numerous employees. Members are located throughout the United States. They sell tickets to residents of virtually every state and D.C., primarily through interstate online marketplaces, for events across the country. ASC Ticket Company ("ASC") and Stage Front Tickets, Inc. ("Stage Front"), Plaintiffs in this action, are members. The Association serves its members by protecting their interest in preserving a free market in which consumers have the ticket choices they deserve, provided by responsible, ethical sellers.

**How NATP Members Operate**

9. Based on my experience, professional resellers perform a number of core functions that benefit consumers. These include helping consumers purchase tickets without spending time in long queues or waiting to see if prices offered by the primary ticketer decline (more than 50% of events have resale options for less than the initial ticket price). Resellers also help consumers attend events that have sold out or for which tickets are otherwise hard to obtain. And they help consumers who can no longer attend an event avoid major losses on tickets they have purchased. This last function is especially important because, to my knowledge, primary ticket issuers often do not make refunds to purchasers.

10. NATP members sell tickets primarily through a variety of nationwide online secondary marketplaces. On those platforms, a seller in one state can list a ticket for an event occurring in another state, and consumers anywhere in the country can see that ticket, compare it to other options, and buy it if they like the deal. For example, a NATP member in California can list a ticket for a concert at Nationals Park in the District, and a buyer in any state can purchase it.

In my experience, the buyer, the seller, the marketplace, and the event are frequently located in different jurisdictions. The ease of acquiring tickets through this interstate system facilitates interstate travel, supporting local economies through increased economic activity from residents of other jurisdictions. That dynamic is especially true for events occurring in D.C. Indeed, many people who attend events located in D.C. are not residents of the District, nor are the individuals or entities that sell them the tickets.

11. As for the interstate transaction itself, marketplaces typically charge sellers a seller fee and charge buyers a separate buyer fee. A ticket that the seller lists at $10 would thus cost the buyer slightly more than that price and net the seller slightly less.

12. Resale prices in this market move with demand. Many resold tickets sell for less than their original purchase price. NATP members regularly sell tickets at a loss when demand for an event turns out to be lower than expected, when an event is approaching yet tickets remain available, or when inventory must be cleared for another reason. Industry data reported by the American Consumer Institute indicate that in 2023, 55% of sampled events offered tickets below face value on the secondary market, saving consumers over $440 million. Similar data for 2024 showed that 62% of sampled events offered such savings, totaling $414 million.

13. This pattern holds true in the District. Reported data indicate that fans attending live events occurring in the District saved over $6.1 million in 2024 by buying resale tickets as opposed to tickets from the primary ticketer, and that the average resale purchase saved fans $13 for a live event happening in D.C. To take one example, when the artist “girl in red” performed at the Anthem in 2024, fans saved nearly $80,000 across roughly 2,000 tickets sold below cost.

14. Professional resellers can remain viable only if they can offset losses from transactions involving lower-demand events with profits on higher-demand inventory. Those

profits must also cover the costs of doing business, including acquiring tickets, marketplace fees, payment processing, inventory management and customer service, payroll, technology, and legal and regulatory compliance.

15. Additionally, resellers do not always know the "initial" price of a ticket, which is the Act's benchmark for setting the maximum resale price. A ticket often changes hands several times before a professional reseller acquires and sells it, and primary-market prices themselves fluctuate, including through dynamic pricing. Nor can resellers consistently and reliably identify the initial price unless they purchased directly from the primary ticketer—and even then, *future* resellers may not know the initial price. Moreover, primary ticketers sometimes sell tickets in bundles (in season ticket packages, for example), making it unclear what the initial price of any individual ticket in that bundle would be for purposes of the Price Cap.

**The 10% Price Cap Is Economically Infeasible for NATP Members**

16. Based on my experience, a reseller could likely not sustain its business if its upside on all resales were capped at 10% above the initial ticket price. That maximum 10% margin must cover all fixed costs, processing fees, marketplace seller fees, and all losses on tickets that sell below their purchase price.

17. By artificially limiting upside, the Price Cap will prevent the Association's members from absorbing losses that are simply part of the resale market. And when a reseller cannot recover market value on higher-demand tickets, buying inventory whose resale might trigger the Price Cap becomes economically infeasible. I believe that in this way, the Price Cap would significantly undermine the professional resale industry for covered transactions. In particular, I expect that many resellers would stop participating in any transactions that are arguably covered by the Price Cap.

18. Additionally, I believe that there is uncertainty among members about the scope of the Act's geographic reach. The exemption for transactions involving certain sports events is also unclear to them. Because the penalties are so significant, I believe that members will forgo transactions possibly covered by the Price Cap because they cannot know which tickets they can sell for above it.

**Irreparable Harm to NATP Members**

19. The Price Cap is scheduled to apply starting on January 1, 2027. Based on my communications with members, the Price Cap threatens to force some NATP members, including ASC and Stage Front, into an untenable position for tickets whose resale might trigger the Price Cap—a position that will make it economically infeasible for numerous resellers to participate in those transactions.

20. The Act is not clear about what transactions the Price Cap covers. But even if it applies only to transactions involving tickets for events occurring in D.C., some members of the Association will be forced to exit a significant portion of the District's market. As explained, many NATP members do not view doing business under the Price Cap as economically feasible and will likely stop engaging in transactions potentially covered by the Price Cap. Indeed, because tickets for many live events are sold months in advance, some members are already declining to acquire tickets for events happening in the District in the upcoming months.

21. Those losses cannot be recovered later. When a member of NATP passes on the opportunity to acquire and resell tickets for a particular event, that potential transaction disappears. Moreover, based on my experience, I do not think it would be possible to calculate the financial harm to resellers with reasonable certainty if the Price Cap began applying and was then invalidated. For transactions that resellers choose not to pursue because of the Price Cap, the

resellers would not monitor those tickets to see their final purchase price and then further monitor them to see if they are resold—and, if so, for how much. And any resale of that ticket—as well as any covered transaction that Plaintiffs may complete—would not provide a benchmark for evaluating how much the ticket would have gone for had the Price Cap not artificially suppressed the price. In short, resellers will suffer financial losses as a result of the Price Cap, and it is unlikely that they could recover them by recapturing the lost transactions or by pursuing damages in subsequent litigation.

22. Additionally, NATP itself would suffer harm. It is my understanding that opponents of the secondary market have repeatedly promoted the Price Cap as the linchpin for efforts across the United States and have stated the intent to use the D.C. precedent in every state in the country. Those efforts would hinder NATP's mission of promoting a responsible resale market that provides consumer choice and prevents unregulated markets from gaining a foothold. If unregulated sources of tickets became empowered, the resulting increase in fraud would threaten the entire ticket resale ecosystem. And because price caps—including the Act's Price Cap—harm NATP's members, there is risk that NATP would lose members, which would lead to lost member dues and harm to NATP's reputation.

**Threat of Enforcement**

23. The Association's members take the Act's penalties seriously. Violations are Class 2 civil infractions carrying fines of $1,000 to $8,000 depending on the number of violations. Additionally, violations are unlawful trade practices under the District's consumer protection law. That exposes members to enforcement by the District's Department of Licensing and Consumer Protection, lawsuits by the Attorney General for penalties and injunctive relief, and private consumer suits seeking treble damages or $1,500 per violation in statutory damages, punitive

damages, attorneys' fees, and other relief. Because a single reseller may list and sell many tickets, potential per-violation exposure could quickly become ruinous.

24. The Association's members are law-abiding businesses committed to heeding the NATP Code of Ethics and ensuring that their customers know they are responsible, ethical professionals. They will not knowingly violate the law. So, without an injunction, members will comply with the Price Cap by significantly curtailing or ceasing their business for covered transactions, leading to the harms described above.

**Harm to Consumers and the Public**

25. Based on my experience in this industry, the Price Cap will harm consumers as well. If ethical, professional resellers exit the market for covered transactions, consumers will lose options for buying and selling tickets, will become more dependent on primary ticketers like Ticketmaster, a subsidiary of Live Nation Entertainment, the country's dominant concert promoter and venue manager, and will likely face higher prices. Consumers who cannot attend an event will have fewer ways to recover their investment in the ticket.

26. Evidence suggests that the Price Cap will likely push resale activity underground and away from regulated marketplaces and professional resellers that offer protections like the FAN Guarantee. Research by Bradshaw Advisory, a consultancy based in Britain, found that fraud rates in Ireland and Victoria, Australia—jurisdictions with resale price caps—were roughly four times higher than in the United Kingdom, which did not have a resale price cap. This research also identified black markets as a potential downstream effect of such regulation.

**Need for Preliminary Relief**

27. Because tickets for upcoming events are currently being sold, and because members must decide now whether to acquire inventory for those events, the harm from the Price Cap is not

hypothetical or distant. Members are already losing opportunities. And some members will immediately begin curtailing or ending their business as to covered transactions. A preliminary injunction is necessary to allow NATP members, including ASC and Stage Front, to continue serving consumers and to avoid irremediable harm to their business.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 15, 2026, in Chicago, Illinois.

/s/ Gary Adler
Gary Adler
Executive Director and General Counsel
National Association of Ticketing Professionals