**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL ASSOCIATION OF TICKETING PROFESSIONALS *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>DISTRICT OF COLUMBIA,<br><br>Defendant. | Case No. 26-cv-________ |

**DECLARATION OF LEE SHENKER ON BEHALF OF ASC TICKET COMPANY IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

Pursuant to 28 U.S.C. § 1746, I, Lee Shenker, declare as follows:

**Background and Personal Knowledge**

1. I am the Vice President & General Counsel of ASC Ticket Company ("ASC"), a Plaintiff in this action. I have held that position since 2010. In that role, I am responsible for ASC's overall operations, marketplace relationships, finances, and legal and regulatory compliance.

2. I am over the age of eighteen and competent to make this declaration. I have personal knowledge of the facts set forth in this declaration except where stated otherwise. If called as a witness, I could and would testify competently to these facts. Unless stated otherwise, where I describe facts based on ASC's records, those records were made at or near the time of the events they record, by or from information transmitted by persons with knowledge, and are kept in the ordinary course of ASC's regularly conducted business activity.

3. My responsibilities require me to be familiar with how ASC acquires ticket inventory, how it prices and sells that inventory, the marketplaces on which it sells, the costs it incurs, and the laws that affect its business. Through that work, I am familiar with the District of

Columbia's Restricting Egregious Scalping Against Live Entertainment (RESALE) Amendment Act of 2026 (the "Act") and how it would affect ASC's business.

4. I submit this declaration in support of Plaintiffs' Motion for a Preliminary Injunction to enjoin enforcement of the Act's resale price cap, which provides that a reseller "shall not sell or offer to sell a ticket that exceeds the total price of the initial ticket, including all fees and taxes in connection with the initial ticket, plus up to 10%" of that total price (the "Price Cap"). I understand that the Price Cap is scheduled to apply beginning on January 1, 2027.

**ASC's Business and NATP Membership**

5. ASC is a limited liability company organized under the laws of the State of Maryland with its principal place of business in Maryland. ASC has been in business since 2004. ASC has approximately 15 employees. ASC does not maintain an office in the District of Columbia.

6. ASC acquires and resells tickets to live events, including concerts, theatrical performances, comedy shows, sporting events, and other live entertainment, in the District of Columbia and across the United States. ASC sells to customers throughout the country, primarily through interstate online marketplaces.

7. ASC has been a member of the National Association of Ticketing Professionals ("NATP") (formerly known as the National Association of Ticket Brokers or NATB) since 2008. ASC adheres to the NATP Code of Ethics and honors the NATP FAN Guarantee, under which a customer receives either the tickets purchased or a refund of 200% of the contracted price; if the exact tickets ordered are unavailable, the fan may instead receive comparable or better tickets at the same or lower price.

8. ASC serves fans in multiple ways. It helps fans attend sold-out events for which tickets were hard to obtain from the primary ticketer and allows fans to make last-minute decisions to see events. Even when the primary ticketer has some tickets remaining, ASC and other resellers compete with that ticketer on price and provide alternatives for consumers if the primary ticketer raises prices for remaining tickets. ASC also gives fans access to particular kinds of seats, such as those near the stage, when those seats would otherwise be unavailable. Additionally, ASC helps fans who can no longer attend an event—for example, because of illness, travel issues, or a work conflict—avoid losing what they paid for their tickets. This service is particularly important because, in my experience, primary ticketers such as Ticketmaster ordinarily do not offer refunds or exchanges unless an event is canceled or rescheduled. And although Ticketmaster itself has a secondary marketplace, it is not always a reliable way to recoup money invested in tickets because Ticketmaster does not always allow resale. Even when resale through Ticketmaster is allowed, it is frequently subject to price floors that prevent sellers from listing tickets below what they paid, which can lead to tickets going unsold. And the seller is not paid until the event takes place, which is sometimes months after the sale.

**ASC's Interstate Operations**

9. ASC lists and sells tickets primarily through nationwide online marketplaces, including SeatGeek, StubHub, Vivid Seats, and Ticketmaster. To my knowledge, the marketplaces that ASC uses are not headquartered in the District of Columbia. When ASC lists a ticket on these marketplaces, buyers anywhere in the world can view it, compare it to competing listings, and purchase it.

10. ASC, which is based in Maryland, sells tickets for events in many states (and the District of Columbia) to buyers located in many states (and the District). For example, since

January 1, 2025, ASC has sold tickets for events in 48 states and the District of Columbia. To my knowledge, most of ASC's transactions involve buyers, marketplaces, and events outside the District.

11. ASC regularly sells tickets for events in the District, including at venues such as Nationals Park, Capital One Arena, the National Theatre, the Kennedy Center for the Performing Arts, the Anthem, and the 9:30 Club. Based on ASC's records since January 1, 2025, these tickets were purchased through marketplaces based outside the District. And over the past three years, ASC's transactions for events in the District have generated millions of dollars in revenue. I would expect that ASC would continue earning similar revenue but for the Price Cap.

12. ASC frequently acquires inventory months before an event takes place because that is when tickets for many live events are first offered for sale.

13. Marketplaces charge ASC a seller fee on each sale and charge buyers a separate buyer fee. ASC also bears costs related to interest payments, payment processing, technology, inventory management, customer service, and compliance.

**ASC Sells Tickets Both Above and Below the Price Cap**

14. Resale prices in the market in which ASC operates fluctuate with consumer demand. ASC currently engages in ticket-resale transactions that I believe would be subject to the Price Cap at prices above what the Price Cap allows. ASC sells tickets to D.C. residents and for events located in the District. But for the Price Cap, ASC would continue acquiring and selling such tickets at market prices after January 1, 2027, including tickets whose resale would potentially trigger the Price Cap at prices likely above the 110% limit.

15. At the same time, ASC regularly sells tickets for less than it paid for them. This can happen when demand for an event turns out to be lower than expected, when an event approaches and inventory remains unsold, or when inventory must be cleared for another reason.

16. ASC can absorb those losses only because it earns profits on higher-demand inventory. Those profits must also cover ASC's fixed costs and the per-transaction costs described above. The ability to resell some tickets for more than 110% of the initial ticket price is therefore essential to ASC's business model.

**ASC Often Cannot Know or Verify the "Initial" Ticket Price**

17. Under the Act, the maximum price at which a reseller can sell a ticket is determined by "the total price of the initial ticket, including all fees and taxes in connection with the initial ticket." Except in cases where ASC purchased a ticket directly from a primary seller, ASC often does not know that price. Tickets frequently change hands several times before ASC acquires them. For example, it is not uncommon for ASC to acquire a ticket from a fan who bought from another fan who bought from the primary ticketer. And ASC typically receives no reliable record of the original transaction. Primary-market prices also fluctuate, including through dynamic pricing, so tickets in the same section for the same event may have been sold initially at different prices and with different fees. Moreover, tickets sometimes come in bundled packages, so ASC would not know how to identify the "total price of the initial ticket" for a particular ticket within that bundle.

18. Even when a seller tells ASC what it paid for a single ticket, ASC frequently has no practical means to verify that representation. Determining and documenting the initial price for each ticket, if that is even possible for a given ticket, would impose significant additional costs on ASC. Unless primary ticketers uniformly made such information available, ASC would need to

request proof of purchase from each seller and review it to ensure accuracy and legitimacy. It would need to do so *before* acquiring the ticket to see if the opportunity is worthwhile, meaning that ASC may lose opportunities it otherwise would have pursued if the ticket owner sells to someone else during ASC's verification process. And even if ASC gained access to verified information, it would still need to invest considerable resources in its point-of-sale system and pricing tools to record the correct initial sales price and to ensure that all ticket listings complied with the Act.

19. As a result, if the Act begins applying, ASC would be forced to choose between two unfavorable options for many tickets. ASC could proceed without reliable verification of the benchmark price, even though getting that number wrong could expose ASC to significant penalties under the Act. Or ASC could simply avoid the opportunity altogether, even if it would have otherwise been profitable.

**The Price Cap Makes ASC's Business for Covered Transactions Economically Infeasible**

20. ASC has substantial fixed costs, including payroll, rent, interest on its line of credit necessary to fund operations, software and technology, insurance, payment processing, accounting, compliance, and other overhead. Additionally, ASC makes significant expenditures tied to acquiring tickets. And ASC pays seller fees when reselling tickets through online marketplaces—the main way ASC does business. Under the Act, ASC would also need to spend resources verifying the initial ticket price, even assuming that is possible for a given ticket.

21. The most ASC could ever charge for a covered ticket is 110% of the initial ticket price. That ceiling does not account for marketplace seller fees, payment processing, verification expenses, or ASC's other costs. Based on my experience, I expect that the Price Cap would force ASC to operate at a loss as to those transactions. For example, if a fan sells a ticket with an initial

price of $50 to ASC for $52, ASC could resell that ticket for at most $55 even if many potential buyers would pay $85 by the time ASC sells it. That leaves $3 to cover the costs tied to acquiring the ticket, confirming the initial price, paying the seller fee, and absorbing the transaction's share of ASC's fixed costs.

22. Because ASC depends on profits from higher-demand inventory to offset losses on other resales, the Price Cap turns the resale of covered (and arguably covered) tickets into transactions with significant downside but little upside. ASC would therefore likely stop acquiring and reselling tickets that might trigger the Price Cap. And if the District construes the Price Cap to reach transactions beyond those involving events in D.C., the effect on ASC would be even more widespread and severe.

23. Even if the Price Cap clearly applied only to events in the District, ASC would be unable to participate in a significant portion of the District market.

**Lost Transactions: Slipknot at Nationals Park and Other Events**

24. Tickets for many live events are sold months before the event takes place. ASC is therefore already making purchasing decisions for events and expected resale transactions that will occur after the Price Cap begins applying on January 1, 2027.

25. ASC had the opportunity to buy tickets to the Slipknot concert at Nationals Park scheduled for July 2027. Because the Act would seemingly apply and cap ASC's resale price at 110% of the initial ticket price, the risk of the transaction outweighed the small possible reward, and ASC did not pursue it. But for the Price Cap, ASC would have considered purchasing tickets for this event that met its economic criteria.

26. ASC has also declined, or expects to decline, opportunities to acquire tickets for other upcoming events in the District, such as Def Leppard and Goo Goo Dolls at Capital One

Arena on March 21, 2027, because many resales of those tickets would likely occur after January 1, 2027. Once ASC passes on the opportunity to acquire and resell tickets for a given event, that opportunity is gone and likely cannot be recaptured.

27. ASC currently holds, and has committed to acquire, hundreds of tickets for events that are taking place in the coming months and that may be covered by the Price Cap. Absent an injunction, ASC would face significant losses because it would need to either conduct a fire sale before January 1, 2027, or lose the ability to sell the tickets at market value after that date.

28. But for the Price Cap, ASC would continue to engage in covered transactions by acquiring and selling tickets at market prices, as it does today. It is the Price Cap that would prevent ASC from doing so.

**Irreparable Harm to ASC's Business**

29. Based on my experience, if the Price Cap begins applying and is later held invalid, it would be impossible—or at best highly speculative—to reconstruct the transactions ASC would have engaged in (but did not) while the Price Cap was in effect. ASC makes acquisition decisions continuously based on real-time market conditions, including which inventory becomes available, from whom, at what price, and how demand for a particular event is trending. When ASC passes on an opportunity, it does not know what the ticket would ultimately have cost to acquire, whether ASC would have bought it for that amount, or what price it would have commanded in an uncapped market at the moment of sale. Nor could ASC reliably determine after the fact what it would have earned on tickets it did sell subject to the Price Cap, because the prices of those sales would have been artificially suppressed, and the market prices that would have prevailed without the Price Cap would never be observed. I am not aware of any records or method that ASC could use to reliably recreate those forgone transactions once the opportunity to engage in them has passed.

**Threat of Enforcement**

30. ASC takes compliance with the law seriously and will not knowingly violate the Act. I understand that violations of the Price Cap are Class 2 civil infractions subject to fines that, for each violation, range from $1,000 for a first violation to $8,000 for a fourth or subsequent violation. I further understand that violations are unlawful trade practices under the District's consumer protection law, which could expose ASC to enforcement proceedings by the Department of Licensing and Consumer Protection, lawsuits by the Attorney General for penalties and injunctive relief, and private consumer suits seeking treble damages or $1,500 per violation in statutory damages, punitive damages, and attorneys' fees.

31. Because ASC lists and sells many tickets, and because each listing or sale could be treated as a separate violation, ASC's potential exposure could quickly become ruinous. A finding that ASC violated a consumer-protection law would also damage ASC's reputation with customers, suppliers, and marketplaces, as well as the financial institutions that it works closely with to finance its business. Absent an injunction, ASC will likely avoid the market for tickets whose resale would arguably trigger the Price Cap.

**Effect of an Injunction on Consumers and the District**

32. If ASC and similar ethical, professional resellers are forced out of the market for covered transactions, District-area fans will have fewer options for buying and selling tickets. Fans who cannot obtain tickets from the primary ticketer will be less likely to find them, and fans who cannot attend will have fewer ways to recover what they paid. In my experience, they will also become more dependent on Ticketmaster, which is the exclusive primary ticketer for most of the major District venues that host events for which ASC sells tickets.

**Need for Preliminary Relief**

33. Tickets for upcoming events are currently on sale, and ASC must decide now whether to acquire inventory for those events. ASC has already lost opportunities because of the Price Cap. A preliminary injunction is necessary to avoid irremediable harm to ASC's business.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 15, 2026, in Gaithersburg, Maryland.

/s/ Lee Shenker
Lee Shenker
Vice President & General Counsel
ASC Ticket Company