# **Exhibit G**

Prepared statement of Marianne M. Jennings
Professor, Legal and Ethical Studies
W.P. Carey School of Business
Arizona State University
Tempe, AZ

RE: Restricting Egregious Scalping Against Live Entertainment (RESALE) Amendment Act of 2025 (B26-0224)
Revisions relating to the resale of tickets to an athletic contest or live entertainment venue

Professor Stephen Happel, an economist and professor of economics, and I (professor of legal and ethical studies in business and attorney) have been studying the primary and secondary markets for ticket sales since 1988. Our first work on ticket markets was published in the *Notre Dame Journal of Legislation* in 1989 (bio attached). Since that time we have had numerous additional journal and business publications, including several appearing in the *Wall Street Journal.*[1] We are interviewed by news programs and journalists from around the world who seek to understand the phenomenon of ticket sales for in-person events.[2]

From the beginning of our studies of the statutes, practices, public policies issues, and markets related to primary and secondary ticket sales, we have recognized and recommended the free market as the solution to concerns raised by consumers, regulators, artists, producers, sports franchises, and event sponsors. The free market is the most equitable and efficient resolution for issues and concerns related to the distribution of high-demand, single-time, extraordinary, and, even, on occasion, not so extraordinary, event tickets. When tickets are sold in an open and free market, consumers benefit from increased supply, decreasing prices, and more access to both tickets and information.

Our recommendations on free market implementation in the primary and secondary ticket markets have been adopted by many states and municipalities. Professor Happel and I have testified, without compensation to avoid conflicts or the appearance of conflicts, at legislative hearings around the country, including those for the states of Kansas, New Jersey, New York, and municipalities such as the city of Phoenix. We are proud to have played some small part in helping those involved in legislation and regulation, as well as those who are part of the ticket markets themselves, come to the same realization we reached following years of study: free market principles solve problems. Indeed, in most cases, regulation and legislation were the cause of the negative effects and problems further attempts at regulation tried, without success, to remedy. We have witnessed the shift in regulation that existed during our initial work in this field from the majority of states regulating ticket prices and imposing criminal punishments on those involved in ticket resales to a competitive global ticket market that offered more opportunities at lower prices for consumers to enjoy all forms of in-person events.

---

[1] A partial list of our articles follows: Stephen K. Happel and Marianne M. Jennings, "Creating a Futures Market for Major Event Tickets: Problems and Prospects," 21 *The Cato Journal* 443 (2002); __________, "The Folly of Anti-Scalping Laws," 15 *The Cato Journal* 65 (1995); ____________, "Assessing the Economic Rationale and Legal Remedies for Ticket Scalping," 16 *Journal of Legislation* 1 (1990); ____________, "Just the Ticket for Super Bowl Fans," *The Wall Street Journal*, January 25, 1996, A20; and _______________, "Herd Them Together and Scalp Them," *The Wall Street Journal*, February 23, 1995, A25.
[2] See vita for media citations.

However, in the past three years, ironically, we have witnessed an attempted return to the ineffective regulation of the earliest period of our initial research. This legislative and regulatory response has resulted because of allowed vertical integration (monopolization) and control of the live event primary and secondary markets for ticket distribution. Where there should have been regulatory oversight in the acquisitions and mergers of forum owners, event promoters, and even the artist themselves, those who should curb anticompetitive behaviors have stood by idly as complete vertical control was permitted to take hold. The phenomenon of high-ticket prices does not spring from "scalpers, i.e., ticket brokers or resellers. Further, the imposition of price controls attempts to control market prices when, in fact, vertical market control prevents competition.

**What Helps Free and Open Markets in B26-0224**

There is merit in portions of the proposed regulation. Because of the negative results from all the generations of all the various forms of ticket resale legislation, Professor Happel and I have witnessed, we are concerned about B26-0224. Professor Happel and I do view regulation of secondary ticket markets as we do all types of free and open markets. Some regulatory oversight, just as in the stock markets in the form of registration, anti-fraud provisions, speculation, and disclosure is necessary. There are several provisions in B26-0224 that mirror regulation of the securities markets. For example, the provisions in §28-5506 on Reseller Registration is a reasonable and effective means for creating a free market that regulates its participants. Likewise, the records and reporting requirements on resellers is a reasonable means of oversight. Likewise, §28-5507 provides standards for ticket resellers' operations. Section 28-5502 on required disclosures on total ticket costs and provisions for refund are the types of consumer protections that exist in many markets and serve to ensure the clean operation of free and open markets. Prohibitions on the use of bots as well as ticket speculation (§28-5503) are also necessary and reasonable controls on the ticket market. The penalties under B26-0224 are in line with other types of consumer protections fines and penalties. The regulation of tickets markets proposed in these sections protect both ticket markets and consumers as well as those who are sellers and resellers.

**The Price Controls Provision of B26-0224**

Proposed Bill B26-0224 would result in a reversal of the progress Professor Happel and I have witnessed in secondary ticket markets over the past thirty years. Too often, in the name of consumer protection, legislators and regulators actually curb open and free markets and preclude consumers from market access and deprive them of the ability to negotiate prices. Since the time of Shakespeare, regulators, from sheriffs to constables to legislative bodies have, with all the best intentions, attempted to control ticket prices and resales. Since the time of Shakespeare, these efforts have failed. Instead, the attempts to control ticket markets through price controls have resulted in consumers trying to buy tickets in information voids or with the disadvantage of asymmetrical information and through channels that are not regulated either by law or by professional standards. Good intentions, in the form of consumer advocacy, have resulted in

higher ticket prices, greater demand, and the resulting fraud that thrives in markets in which buyers cannot obtain full information and an underground market develops.[3]

Section 28-5508 will exacerbate ticket pricing levels, There is an overarching issue not tackled by the bill. Indeed, the bill assumes some characteristics of "scalpers" and "original ticket sellers. The bill should not proceed without first addressing these knowledge voids that remain unaddressed by primary ticket sellers. The nature of the market depicted by the description of the bill and in the language of the bill itself has produced regulation that will not address the issue of ticket prices and will increase the reselling activity under the radar of registration.

What We Do Not Know About Primary Sellers

Primary sellers are seemingly protected in the bill and will no longer lose the profits they might make on resale of tickets. What we do not know and we have been unable to determine in our years of research is the number of tickets that primary sellers release for initial sales. Although the claim is that their tickets are "sold out," what we don't know is whether indeed all the tickets were available for buyers. For example, what Professor Happel and I have been able to uncover is that credit card companies have deals with primary ticket sellers. Those companies use the tickets for promotional purposes. We have also learned that performers are given a certain number of tickets. Theater box office staff have been known to "skim." That is they hold tickets back and participate in the secondary market. A free and market open cannot exist when consumers lack information about the supply of the commodity being sold.

Price controls defy market forces and result in unintended consequences. The most common unintended consequence is higher prices. Other consequences of these controls that adversely affect consumers include less transparency, artificial demand, and markets operating in ways that consumer protection agencies and statutes can never address. A black market arises in which we have resellers are not concerned with registration, refunds, or speculation.

The most common question we are asked is, "How can allowing open pricing and free trade on tickets help consumers?" The question is a fair one given a typical knowledge base that springs from news stories highlighting singular experiences of a few ticket holders or high ticket prices for some events. Like so many price regulations proposed over the decades, B26-0224 appears to be a response to the experience of a limited number of ticket buyers. News stories reflect a form of sensationalism that fails to recognize the millions of secondary market ticket sales that occur in a transparent market without any problems and afford consumers many options such as when they purchase, what they are purchasing, and from whom they can purchase. Our decades of research demonstrate that with free and open markets, ticket prices reach equilibrium (lower prices) when consumers are able to participate freely in those markets.

**Secondary Sellers Are Not the Root Cause of High Ticket Prices**

---

[3] For a full discussion of the misguided attempts at pro-consumer legislation and a history of the unintended consequences of bans on ticket resales, see Stephen K. Happel and Marianne M. Jennings, "The Eight Principles of the Microeconomics and Regulatory Future of Ticket Scalping, Ticket Brokers, and Secondary Ticket Markets," 28 *Journal of Law and Commerce* 115 (2010).

The proposed legislation has assumed that secondary sellers are the issue. It is more likely that the control of ticket releases and set-asides by the primary sellers causes the distortion, not the ticket resales themselves. Ironically, the control of the secondary market serves to give primary market sellers greater control and profits – the two issues most consumer legislation attempts to address. The number of tickets available is controlled by the primary seller. In the initial wave of ticket sales, there is the perception of high demand/limited seating. That perception may be desirable for purposes of a sell-out, with secondary releases allowing for sales at higher prices. Banning secondary sales does not control behaviors of primary sellers who will benefit from bans on secondary market sales.

Primary sellers underprice tickets for a number of reasons (see our work from 2010 on economic principles of ticket markets). The underpricing results from artist demands, the value of ancillary sales, and, in some cases, the desire on the part of primary ticket sellers to participate in secondary ticket market sales for purposes of profit maximization without the backlash from pricing tickets initially according to demand. The distortion comes at the primary pricing level; not in the secondary market. Consumers determine the prices in the secondary market; not brokers. Tickets are held back at the primary market levels, not in the secondary markets.

Professor Happel and I offer a strong caution in this area: Be careful about assumptions on the purity of primary ticket sellers and never regulate a market unless you are certain of the sources of distortion. Tickets are now fungible goods. Limitations on resale of tickets will return us a time of mysterious and inaccessible markets that force consumers to purchase from those who are not subject to the basic regulations of licensing and usual consumer protection remedies. Any artificial scarcity is not a function of open secondary markets, but, rather a function of primary sellers and vertically integrated event sponsors and talent agents controlling the supply of those tickets from the first wave. Eliminating secondary markets turns more of the control of supply over to primary sellers and exacerbates the artificial scarcity problem. Unwittingly, B26-0224 will grant more power to those who have caused the problem.

The proposed legislation fails to recognize the significant role that secondary market participants play in providing consumers access to tickets. Artists and primary ticket sellers should be cautious about this legislation for another reason. The risk of ticket pricing levels will pass to them. There is significant risk in the very nature of these one-time events and the psychology related thereto. Part of consumer enjoyment comes from the perception that the experience is unique in the sense of the challenge of obtaining tickets. However, if there is a change in demand for the event (the artist or the team has lost its luster), there will be empty seats at the event because consumers are no longer purchasing. When there is a secondary market, those who absorb this loss are the secondary ticket sellers because they erred in their initial purchase price for those tickets, at a time of initial high demand. They have to take the loss on the tickets if demand changes. In this role, secondary sellers absorb risk of changing demand for the primary seller. Their investment is quite high because they are buying in the initial stages of ticket sales when the queues are long. However, as consumers begin to realize that there are other sources for tickets, those prices drop. A secondary ticket seller who gauged the market incorrectly cannot recoup those losses. The artist, forum, and sponsor always have their revenues and the profits from their ticket sales (along with the revenues from on-site sales). Secondary sellers are a market cushion, a hedge, for primary sellers.

Further, it is important to understand what has happened to the ticket market since the advent of the open secondary markets. Available events have increased at all sizes of forums. Only economic conditions (i.e., whether consumers are employed, level of taxes, inflation) have had an impact on these events. Open markets have boosted the opportunities for artists, forum owners, and event sponsors. The effect of price controls in the legislation with the goal of returning the profits to primary sellers is misguided. Presently, the vertical monopoly is giving primary sellers the greatest share of the profits from prices they control through a lack of information about the actual ticket supply, side deals with third-parties (credit-card companies), and a lack of transparency for consumers. To go back to price controls is to take away the progress in ticket markets in the broad economic sense because of the expansion of opportunities. A vibrant secondary market has made that expansion possible.

**Final Thoughts**

Professor Happel and I have worked with many legislators and regulators over the years who have expressed frustrations with ticket markets based on the emotions of anecdotal case studies. However, over the four decades of testimony and assistance to them (given without compensation (or tickets) from any individual or group) we have been able to convince them that free and open markets work in the most efficient manner to achieve their desired results of consumer protection. Here are the basic principles we have advocated and urge again as a framework for any legislative attempt to deal with their concerns about consumers:

- Recognizing ticket sales and resales as a service that the free market provides in the most equitable and efficient manner
- Ensuring an open and fair market through the licensing and bonding of ticket market participants such as primary sellers and secondary ticket market brokers and other agents
- Regulating market participants, not the market itself
- Allowing the market to take its natural shape, an approach that will allow consumers greater access and resultant lower prices

What will happen with such expansive secondary market controls proposed by B26-0224 is that primary sellers will gain power, something often believed to create protections for consumers. In fact, by turning over full market power to vertically integrated sellers (artists, forum, and sponsors are often connected through ownership or agency relationships), monopoly pricing is likely. Consumers not only lose the benefit of lower prices and open access, but they are forced to deal in an underground market with parties who will not be subject to the either the legislative or trade association protections now afforded them in open secondary markets. They will be purchasing tickets from those not subject to the protections of licensing, bonding, and refund requirements.

Professor Happel and I offer our strongest concerns about price controls this proposed legislation. The discussion of its purposes and direction indicates a fundamental misunderstanding of root causes of consumer and primary seller concerns. Passing regulation on the basis of incorrect causes will exacerbate the very problems good legislative intentions set out

to correct. The result will be a fall-back to an era of limited consumer choices, higher prices, and no remedies for secondary sales issues. Ironically, the result for the primary ticket sellers will be increased risk and perhaps, finally, a recognition of the dynamic market function secondary ticket sellers play in creating a low-risk business model for them.