**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **NATIONAL ASSOCIATION OF TICKETING PROFESSIONALS, *et al.*,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**DISTRICT OF COLUMBIA,**<br><br>**Defendant.** | **No. 1:26-cv-03620-CJN** |

**DEFENDANT'S OPPOSITION TO**
**PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........ ii

INTRODUCTION ........ 1

BACKGROUND ........ 2

I. The Live-Entertainment Ticket Market ........ 2

II. The RESALE Act ........ 4

III. Procedural History ........ 6

LEGAL STANDARD ........ 6

ARGUMENT ........ 7

I. Plaintiffs Fail to Establish a Likelihood of Success on the Merits. ........ 7

A. Plaintiffs Are Unlikely to Succeed on Their Vagueness Claim. ........ 8

B. Plaintiffs Are Unlikely to Succeed on Their Claim That the Price Cap Violates the Dormant Commerce Clause by Regulating Extraterritorially. ........ 15

C. Plaintiffs Are Unlikely to Succeed on Their Home Rule Act Claim. ........ 22

D. Plaintiffs Are Unlikely to Succeed on Their Claim That the Price Cap Violates the Dormant Commerce Clause by Discriminating Against Out-of-District Commerce. ........ 24

E. Plaintiffs Are Unlikely to Succeed on Their Equal Protection Claim. ........ 30

II. Plaintiffs Fail to Establish Irreparable Harm in the Absence of an Injunction. ........ 32

III. The Balance of Harms and Public Interest Alone Support Denying an Injunction. ........ 40

CONCLUSION ........ 45

# TABLE OF AUTHORITIES

## Cases

*Abbott v. Perez*,
585 U.S. 579 (2018) .......... 27

*Act Now to Stop War & End Racism Coal. v. District of Columbia*,
846 F.3d 391 (D.C. Cir. 2017) .......... 8

*Alexander v. S.C. State Conf. of the NAACP*,
602 U.S. 1 (2024) .......... 45

*Alpine Sec. Corp. v. Fin. Indus. Regul. Auth.*,
121 F.4th 1314 (D.C. Cir. 2024) .......... 36

*Am. Council of Life Ins. v. District of Columbia*,
645 F. Supp. 84 (D.D.C. 1986) .......... 24

*Am. Foreign Serv. Ass'n v. Trump*,
768 F. Supp. 3d 6 (D.D.C. 2025) .......... 44

*Am. Trucking Ass'ns, Inc. v. R.I. Tpk. & Bridge Auth.*,
123 F.4th 27 (1st Cir. 2024) .......... 26

*Ams. for Prosperity Found. v. Albence*,
191 F.4th 169 (3d Cir. 2026) .......... 7, 39

*Appalachian Voices v. FERC*,
139 F.4th 903 (D.C. Cir. 2025) .......... 43

*Araya v. JP Morgan Chase Bank, N.A.*,
775 F.3d 409 (D.C. Cir. 2014) .......... 23

*Asante v. Kennedy*,
133 F.4th 97 (D.C. Cir. 2025) .......... 16

*Ass'n for Accessible Medicines v. Bonta*,
766 F. Supp. 3d 1020 (E.D. Cal. 2025) .......... 18

*Ass'n for Accessible Meds. v. Ellison*,
140 F.4th 957 (8th Cir. 2025) .......... 16, 19, 36

*Ass'n for Accessible Meds. v. Frosh*,
887 F.3d 664 (4th Cir. 2018) .......... 17

*Ass'n for Accessible Meds. v. Raoul*,
805 F. Supp. 3d 854 (N.D. Ill. 2025) .......... 17, 18

*Ass'n to Pres. & Protect Loc. Livelihoods v. Sidman*,
147 F.4th 40 (1st Cir. 2025) ........ 28

*Ayele v. District of Columbia*,
704 F. Supp. 3d 231 (D.D.C. 2023) ........ 35, 36, 37, 39

*Aylo Freesites Ltd. v. Utah Div. of Consumer Protection*,
No. 26-cv-340, 2026 WL 2874132 (D. Utah Sept. 24, 2026) ........ 18

*Bacchus Imports, Ltd. v. Dias*,
468 U.S. 263 (1984) ........ 28

*Baldwin v. G.A.F. Seelig, Inc.*,
294 U.S. 511 (1935) ........ 16

*Banks v. Hoffman*,
346 A.3d 665 (D.C. 2025) ........ 23

*Bell Atl. Tel. Cos. v. FCC*,
131 F.3d 1044 (D.C. Cir. 1997) ........ 27

*Bellion Spirits, LLC v. United States*,
7 F.4th 1201 (D.C. Cir. 2021) ........ 15

*Benisek v. Lamone*,
585 U.S. 155 (2018) ........ 34, 40, 41, 43

*Brown v. Chote*,
411 U.S. 452 (1973) ........ 43

*Browne v. United States*,
332 A.3d 512 (D.C. 2025) ........ 11

*Chaplaincy of Full Gospel Churches v. England*,
454 F.3d 290 (D.C. Cir. 2006) ........ 32, 33, 35, 36

*Classic Cab, Inc. v. District of Columbia*,
288 F. Supp. 3d 218 (D.D.C. 2018) ........ 23

*Clevinger v. Advoc. Holdings, Inc.*,
134 F.4th 1230 (D.C. Cir. 2025) ........ 32, 37, 38

*Coal. for Humane Immigrant Rts. v. Mullin*,
185 F.4th 1275 (D.C. Cir. 2026) ........ 32

*Cmty. Oncology All. v. Becerra*,
No. 23-cv-2168, 2023 WL 9692027 (D.D.C. Dec. 21, 2023) ........ 37, 39, 41, 44

*Comptroller of the Treas. of Md. v. Wynne*,
575 U.S. 542 (2015) .......... 26

*Corewell Health William Beaumont Univ. Hosp. v. Kennedy*,
No. 26-cv-3111, 2026 WL 3257581 (D.D.C. Oct. 29, 2026) .......... 39

*Crooks v. Mabus*,
845 F.3d 412 (D.C. Cir. 2016) .......... 8

*Daskalea v. District of Columbia*,
227 F.3d 433 (D.C. Cir. 2000) .......... 24

*Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.*,
108 F.4th 194 (3d Cir. 2024) .......... 33, 43

*DIRECTV v. Utah State Tax Comm'n*,
364 P.3d 1036 (Utah 2015) .......... 28

*Dirks v. SEC*,
802 F.2d 1468 (D.C. Cir. 1986) .......... 9, 14, 15

*D.C. Ass'n of Chartered Pub. Schs. v. District of Columbia*,
930 F.3d 487 (D.C. Cir. 2019) .......... 22

*District of Columbia v. Greater Wash. Cent. Lab. Council, AFL-CIO*,
442 A.2d 110 (D.C. 1982) .......... 23

*Doe v. Burlew*,
165 F.4th 525 (6th Cir. 2026) .......... 7

*DoorDash Inc. v. City of New York*,
692 F. Supp. 3d 268 (S.D.N.Y. 2023) .......... 29

*Dorfmann v. Boozer*,
414 F.2d 1168 (D.C. Cir. 1969) .......... 33

*Dotson v. District of Columbia*,
No. 24-cv-1864, 2024 WL 5046282 (D.D.C. Dec. 9, 2024) .......... 33

*Douglas v. NPS*,
835 F. Supp. 3d 159 (D.D.C. 2026) .......... 40

*Eastland v. U.S. Servicemen's Fund*,
421 U.S. 491 (1975) .......... 26

*Econ. Rsch. Servs., Inc. v. Resol. Econ., LLC*,
140 F. Supp. 3d 47 (D.D.C. 2015) .......... 38

*Edgar v. MITE Corp.*,
457 U.S. 624 (1982) .......... 17

*Edwards v. Aguillard*,
482 U.S. 578 (1987) .......... 27

*Electrolert Corp. v. Barry*,
737 F.2d 110 (D.C. Cir. 1984) .......... 25

*Exxon Corp. v. Governor of Md.*,
437 U.S. 117 (1978) .......... 21

*FCC v. Beach Commc'ns, Inc.*,
508 U.S. 307 (1993) .......... 30, 31

*Flemming v. Nestor*,
363 U.S. 603 (1960) .......... 7

*Friends of the Earth U.S. v. Exp.-Imp. Bank of the U.S.*,
187 F.4th 616 (D.C. Cir. 2026) .......... 7

*Gen. Motors Corp. v. Tracy*,
519 U.S. 278 (1997) .......... 25

*Hanson v. District of Columbia*,
120 F.4th 223 (D.C. Cir. 2024) .......... 32, 33, 35, 36, 40, 43

*Healthcare Distrib. All. v. Boughton*,
No. 3:25-cv-1724, 2025 WL 3725031 (D. Conn. Dec. 24, 2025) .......... 17

*Healthcare Distrib. All. v. Boughton*,
No. 25-3216, 2026 WL 3135340 (2d Cir. Oct. 20, 2026) .......... 17, 19

*Healy v. Beer Inst.*,
491 U.S. 324 (1989) .......... 16, 17

*Hines Immigr. L., PLLC v. Exec. Off. for Immigr. Rev.*,
No. 26-cv-1018, 2026 WL 969020 (D.D.C. Apr. 10, 2026) .......... 37

*Houston Cmty. Coll. Sys. v. Wilson*,
595 U.S. 468 (2022) .......... 20

*Huisha-Huisha v. Mayorkas*,
27 F.4th 718 (D.C. Cir. 2022) .......... 43

*IMS Health Inc. v. Mills*,
616 F.3d 7 (1st Cir. 2010) .......... 20

*IMS Health, Inc. v. Schneider*,
564 U.S. 1051 (2011) .......... 20

*In re Johnson*,
699 A.2d 362 (D.C. 1997) .......... 11

*In re Macklin*,
286 A.3d 547 (D.C. 2022) .......... 11

*In re Nat'l Football League's "Sunday Ticket" Antitrust Litig.*,
--- F.4th ----, No. 24-5493, 2026 WL 3266788 (9th Cir. Oct. 30, 2026) .......... 38

*John Doe Co. v. CFPB*,
849 F.3d 1129 (D.C. Cir. 2017) .......... 41

*Just Puppies, Inc. v. Brown*,
123 F.4th 652 (4th Cir. 2024) .......... 17, 26

*Karem v. Trump*,
960 F.3d 656 (D.C. Cir. 2020) .......... 35

*Kim v. Fin. Indus. Regul. Auth., Inc.*,
698 F. Supp. 3d 147 (D.D.C. 2023) .......... 40

*L.W. by & through Williams v. Skrmetti*,
83 F.4th 460 (6th Cir. 2023) .......... 21, 42, 43

*Labrador v. Poe by & through Poe*,
144 S. Ct. 921 (2024) .......... 41

*Lemon v. Kurtzman*,
411 U.S. 192 (1973) .......... 43

*Maplebear Inc. v. City of New York*,
No. 25-cv-9979, 2026 WL 181637 (S.D.N.Y. Jan. 22, 2026) .......... 28

*Mass. State Grange v. Benton*,
272 U.S. 525 (1926) .......... 41

*Mazurek v. Armstrong*,
520 U.S. 968 (1997) .......... 7, 27

*Metro. Wash. Chapter, Associated Builders & Contractors, Inc. v. District of Columbia*,
62 F.4th 567 (D.C. Cir. 2023) .......... 25, 27

*Milk Control Bd. v. Eisenberg Farm Prods.*,
306 U.S. 346 (1939) .......... 29

*Miller v. Gruenberg*,
No. 21-cv-3035, 2022 WL 20699638 (D.D.C. Aug. 24, 2022)........................................... 39

*Mills v. District of Columbia*,
571 F.3d 1304 (D.C. Cir. 2009)..........................................................................35, 36

*Nat'l Ass'n of Mfrs. v. Taylor*,
549 F. Supp. 2d 68 (D.D.C. 2008) .......................................................................... 7

*Nat'l Immigr. Project of Nat'l Laws. Guild v. Exec. Off. of Immigr. Rev.*,
456 F. Supp. 3d 16 (D.D.C. 2020) ........................................................................35, 44

*Nat'l Pork Producers Council v. Ross*,
598 U.S. 356 (2023) ...........................................................14, 15, 16, 17, 18, 20, 22

*Nat'l Shooting Sports Found., Inc. v. James*,
144 F.4th 98 (2d Cir. 2025) ...................................................................................... 22

*Nat'l Treasury Emps. Union v. United States*,
927 F.2d 1253 (D.C. Cir. 1991) ................................................................................ 35

*Nat'l Tr. for Historic Pres. in the United States v. NPS*,
185 F.4th 1185 (D.C. Cir. 2026)..........................................................................43, 44

*Navistar, Inc. v. EPA*,
No. 11-cv-449, 2011 WL 3743732 (D.D.C. Aug. 25, 2011)............................................ 34

*N.J. Staffing All. v. Fais*,
110 F.4th 201 (3d Cir. 2024) .................................................................................... 16

*Newman v. Moore*,
151 F.4th 472 (D.C. Cir. 2025)..................................................................................... 7

*O'Donnell Constr. Co. v. District of Columbia*,
963 F.2d 420 (D.C. Cir. 1992) ................................................................................. 38

*Petroleum Expl. v. Pub. Serv. Comm'n*,
304 U.S. 209 (1938) ................................................................................................. 37

*Pharm. Research & Mfrs. of Am. v. District of Columbia*,
406 F. Supp. 2d 56 (D.D.C. 2005) ........................................................................... 17

*Pheenix Ush LLC v. Dist. Dep't of Transp.*,
No. 25-7060, 2025 WL 3013527 (D.C. Cir. Oct. 24, 2025)............................................. 23

*Pocket Veto Case*,
279 U.S. 655 (1929) ................................................................................................. 20

*Price v. Bd. of Ethics & Gov't Accountability*,
284 A.3d 1019 (D.C. 2022) ........................................ 14

*Quality Brands, Inc. v. Barry*,
715 F. Supp. 1138 (D.D.C. 1989) ........................................ 28

*Real Est. Bd. of N.Y., Inc. v. City of New York*,
182 F.4th 140 (2d Cir. 2026) ........................................ 31

*R.I. Truck Ctr., LLC v. Daimler Trucks N. Am., LLC*,
180 F.4th 365 (1st Cir. 2026)........................................ 18, 19, 20

*Saiyed v. Council on Am.-Islamic Rels. Action Network, Inc.*,
346 F. Supp. 3d 88 (D.D.C. 2018) ........................................ 9

*Sanchez v. Off. of State Superintendent of Educ.*,
45 F.4th 388 (D.C. Cir. 2022)........................................ 30, 31, 32

*Santos v. Collins*,
No. 24-cv-1759, 2025 WL 1823471 (D.D.C. Feb. 26, 2025)........................................ 36

*Save Long Beach Island, Inc. v. U.S. Dep't of Com.*,
No. 25-cv-2214, 2025 WL 2996157 (D.D.C. Oct. 24, 2025)........................................ 40

*Screws v. United States*,
325 U.S. 91 (1945)........................................ 8, 9

*Sierra Club v. U.S. Dep't of Energy*,
825 F. Supp. 2d 142 (D.D.C. 2011) ........................................ 34

*South Dakota Farm Bureau, Inc. v. Hazeltine*,
340 F.3d 583 (8th Cir. 2003) ........................................ 29, 30

*South Dakota v. Wayfair, Inc.*,
585 U.S. 162 (2018)........................................ 15, 16, 21

*S. Wine & Spirits of Am., Inc. v. Div. of Alcohol & Tobacco Control*,
731 F.3d 799 (8th Cir. 2013) ........................................ 27, 28

*SPGGC, LLC v. Blumenthal*,
505 F.3d 183 (2d Cir. 2007) ........................................ 20

*Talbott v. United States*,
176 F.4th 720 (D.C. Cir. 2026)........................................ 35, 44

*Taylor v. Trump*,
823 F. Supp. 3d 17 (D.D.C. 2026) ........................................ 35, 36

*Thomas v. Securiguard Inc.*,
412 F. Supp. 3d 62 (D.D.C. 2019) ..... 23

*Thompson v. DeWine*,
959 F.3d 804 (6th Cir. 2020) ..... 41

*Trump v. Thompson*,
20 F.4th 10 (D.C. Cir. 2021) ..... 6

*Turner Broad. Sys., Inc. v. FCC*,
507 U.S. 1301 (1993) ..... 33

*United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.*,
550 U.S. 330 (2007) ..... 22, 24

*United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs.*,
484 U.S. 365 (1988) ..... 9

*United States v. Bronstein*,
849 F.3d 1101 (D.C. Cir. 2017) ..... 8, 9, 13

*United States v. Griffith*,
No. 21-cv-244, 2023 WL 1778192 (D.D.C. Feb. 6, 2023) ..... 8

*United States v. McHugh*,
583 F. Supp. 3d 1 (D.D.C. 2022) ..... 13

*United States v. Nat'l Dairy Prods. Corp.*,
372 U.S. 29 (1963) ..... 13

*United States v. O'Brien*,
391 U.S. 367 (1968) ..... 27

*Village of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*,
455 U.S. 489 (1982) ..... 8, 14, 15

*Walters v. Nat'l Ass'n of Radiation Survivors*,
468 U.S. 1323 (1984) ..... 7

*Wash. Bankers Ass'n v. State*,
495 P.3d 808 (Wash. 2021) ..... 28

*Wash. State Grange v. Wash. State Republican Party*,
552 U.S. 442 (2008) ..... 25, 41

*Washington v. United States*,
206 A.3d 864 (D.C. 2019) ..... 10

*Webb v. D.C. Dep't of Emp. Servs.*,
204 A.3d 843 (D.C. 2019) ... 9

*Whalen v. Roe*,
429 U.S. 589 (1977) ... 42

*Whole Woman's Health v. Jackson*,
595 U.S. 30 (2021) ... 34

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ... 6, 27, 40

*Wis. Gas Co. v. FERC*,
758 F.2d 669 (D.C. Cir. 1985) ... 37, 39

*Women Prisoners of D.C. Dep't of Corr. v. District of Columbia*,
93 F.3d 910 (D.C. Cir. 1996) ... 23

**Statutes**

D.C. Code § 1-206.02(a)(3) ... 6, 22, 23, 24

D.C. Code § 21-802.01 ... 5

D.C. Code § 28-3901(c) ... 10

D.C. Code § 28-3904 ... 9

D.C. Code § 28-3905(k)(1) ... 5, 34

D.C. Code § 28-3909 ... 5

D.C. Code § 28-5501(4) ... 4

D.C. Code § 28-5501(6) ... 4, 12, 19

D.C. Code §§ 28-5502–5506 ... 4

D.C. Code § 28-5506(a)(2) ... 13

D.C. Code § 28-5506(b) ... 13

D.C. Code § 28-5507 ... 5

D.C. Code § 28-5507(b) ... 5

D.C. Code § 28-5508(a) ... 5

D.C. Code § 28-5508(b) .......... 9, 34

D.C. Code § 47-2851.02(a) .......... 10

D.C. Code § 47-2890.01 .......... 4

D.C. Code §§ 47-2890.01–47-2890.05 .......... 4

D.C. Code § 47-2890.02(a)(1) .......... 10

D.C. Code § 47-2890.03 .......... 10

D.C. Code § 47-2890.04(c)(2) .......... 10

D.C. Code § 47-2890.05(a) .......... 5

D.C. Code § 47-2890.05(b) .......... 5, 34

8 Me. Rev. Stat. Ann. § 1301(2-A)(G) .......... 4

5 R.I. Gen. Laws Ann. § 5-22-26 .......... 4

28 U.S.C. § 1367(c)(1) .......... 23

9 Vt. Stat. Ann. § 2479f(c) .......... 4

**Rules**

Fed. R. Civ. P. 65(d)(2) .......... 34

**Other Authorities**

James Chen, *Understanding the Scarcity Principle: Definition, Importance, and Examples*, Investopedia (Mar. 2, 2026) .......... 32

Council of the Dist. of Columbia, *B26-0224*, Legis. Info. Mgmt. Sys. .......... 5

Exec. Order No. 14254 .......... 3

Bruce Houghton, *CA, NC, DC, VT, ME Laws Limit Ticket Resale as Feds Fail to Act*, Hypebot (July 7, 2026) .......... 4

Breck P. McAllister, *Price Control by Law in the United States: A Survey*, 4 Law & Contemp. Probs. 273 (1937) .......... 20

Note, *Price and Sovereignty*, 135 Harv. L. Rev. 755 (2021) .......... 20

*Price*, Merriam-Webster Dictionary ........................................................................ 13

RESALE Act, pmbl., 73 D.C. Reg. 11,351 (Aug. 14, 2026) ................................. 4, 9, 19, 26, 41

## INTRODUCTION

When fans go to buy tickets to a concert, they often find that tickets sold out in milliseconds. Fans are then left to scour secondary ticket marketplaces (think StubHub) where tickets are resold for several times above the original price. One of the main culprits behind this frustrating experience is a class of professional ticket resellers, commonly known as scalpers. These are businesses that snatch up tickets for live entertainment and resell them for a marked-up price to make a profit. In response to the scourge of scalpers and unscrupulous practices in the ticket market, the elected representatives of the District of Columbia (District) enacted the Restricting Egregious Scalping Against Live Entertainment Amendment Act of 2026 (RESALE Act or Act), D.C. Law 26-0181. As relevant here, the Act caps resale prices, and resellers will not be able to mark up tickets by more than 10% of the original price.

Plaintiffs disagree with that policy choice. Plaintiffs are two professional ticket resellers (ASC Ticket Company and Stage Front Tickets) and a trade association that lobbies for them (the National Association of Ticketing Professionals). Plaintiffs lobbied against the Act, but they failed to persuade a single councilmember, congressperson, or senator. The D.C. Council voted unanimously to approve the Act, which was then signed by the Mayor and sailed through congressional review. Striking out with the democratic process, Plaintiffs turned to this Court for a judicial veto of the price cap. They sued the District, alleging a smattering of strained constitutional theories, and moved for a preliminary injunction to prevent the District's enforcement of the price cap.

That is an extraordinary remedy requiring a clear showing on several factors, but Plaintiffs fail to carry their burden on even one. On the merits, Plaintiffs are unlikely to succeed because they bring claims that have particularly heavy burdens, and rather than meet them, Plaintiffs ignore or misconstrue dispositive precedents. Next, Plaintiffs fail to show irreparable

harm or any emergency because they will have to comply with the Act regardless of whether the Court issues a preliminary injunction, and all their alleged harms from compliance are quintessentially reparable. Lastly, Plaintiffs fail to show that the equities or public interest weigh in their favor because the equities counsel against nullifying the will of the people unless and until the Court is sure, on a full record, that the price cap is unconstitutional. Any one of those failures is fatal, so the Court should deny Plaintiffs' Motion for a Preliminary Injunction [9].

## BACKGROUND

### I. <u>The Live-Entertainment Ticket Market</u>

There is no denying that ticket prices for live-entertainment events are a real problem. "On average, ticket prices have risen 80.5 percent since 2021, and 428.7 percent since 1996." Pls.' Ex. A [9-6], Comm. Rep. at 2. Not only have prices skyrocketed, but it is "widely known that the ticket-buying experience, for events big and small, has deteriorated for consumers and venues" due to "scalping bots, speculative ticket sales, and more unfair trade practices." *Id.* High prices and harmful practices have "shut out" consumers from events. *Id.* Less access to live events is particularly concerning for "the District's music and arts scenes," which are unique in their offerings and "contribute substantially to the District's tourism economy and cultural identity." *Id.*

The "increased cost of tickets and worsening consumer experience" are attributable to business practices in the ticket market. *Id.* at 3. That market "has two distinct segments: the primary and secondary markets." *Id.* "The primary market is where tickets are initially sold by the ticket issuer, which has increasingly become a third-party ticket marketplace rather than directly by the venue or performer." *Id.* Ticketmaster, for example, operates a primary ticket market. *Id.* "The secondary market is where tickets are resold after their initial purchase,

typically an online platform that facilitates these transactions." *Id.* StubHub, for example, operates a secondary market. Def.'s Ex. 3, Vanderbilt Rep. at 6.

Each market "contributes in different ways to" worsening consumer experiences. Comm. Rep. at 3. One of the biggest problems in the secondary market is that it is dominated by professional resellers. *Id.* at 4–5. Ticket issuers "typically price tickets below the level the market would bear, sometimes out of genuine desire for broad fan access, sometimes for promotional or relationship reasons." *Id.* In response to these low prices, "a professional class of resellers" has "sprouted up" "to quickly earn a profit by purchasing large volumes of tickets—sometimes using 'bots' to do it automatically—immediately after they go on sale to then flip them on a secondary market platform at a higher price." Vanderbilt Rep. at 7. These resellers "provide[ ] no value to the artist, the venue, or the event." Comm. Rep. at 4. Most resales on the major secondary marketplaces are by professional resellers trying to make a profit, not ordinary people trying to recoup money for an event they can no longer attend. Def.'s Ex. 1, GAO Rep. at 12. And so, average ticket resale prices are higher than the face-value price. *Id.* at 13–14. Consequently, "[f]ans who cannot afford or will not pay secondary market prices are priced out of events entirely." Comm. Rep. at 4.

These high prices and anti-consumer practices have caught the attention of the elected branches from the White House to the statehouse. President Trump issued an executive order directing his administration to take action against the problem of "[t]icket scalpers [who] use bots and other unfair means to acquire large quantities of face-value tickets and then re-sell them at an enormous markup on the secondary market, price-gouging consumers and depriving fans of the opportunity to see their favorite artists without incurring extraordinary expenses." Exec. Order No. 14254 § 1(a), tinyurl.com/429j655x. For its part, Congress has held hearings, debated

legislation, and passed bills related to the ticket industry. Def.'s Ex. 2, CRS Rep. at 1. And at the state-level, legislatures across the country have enacted or are considering legislation providing a variety of reforms to the ticketing industry. *See, e.g.*, Comm. Rep. at 6; Bruce Houghton, *CA, NC, DC, VT, ME Laws Limit Ticket Resale as Feds Fail to Act*, Hypebot (July 7, 2026), tinyurl.com/354hkrkv; 8 Me. Rev. Stat. Ann. § 1301(2-A)(G); 5 R.I. Gen. Laws Ann. § 5-22-26; 9 Vt. Stat. Ann. § 2479f(c).

## II. The RESALE Act

The District's elected representatives likewise took up the mantle and recently enacted the RESALE Act to "protect artists, venues, and consumers in the District from unfair and deceptive practices in live event ticket purchases." RESALE Act, pmbl., 73 D.C. Reg. 11,351 (Aug. 14, 2026). The Act has two main components. First, the Act requires that ticket resellers with 50 or more ticket resale listings a year and "secondary ticket exchanges" obtain business licenses from the Department of Licensing and Consumer Protection (Department) to operate in the District and imposes reporting requirements on them. D.C. Code §§ 47-2890.01–47-2890.05. A "secondary ticket exchange" is "an electronic marketplace that enables a person to sell, purchase, and resell tickets." *Id.* § 28-5501(4); *see id.* § 47-2890.01. Second, the Act contains several measures regulating ticket sales and resales. *See id.* §§ 28-5502–28-5506. Those apply to "tickets," which are defined as "any form of physical, electronic, or other evidence that grants the possessor . . . license to enter a place of entertainment for one or more events, including live concerts, theatrical performances, shows, or similarly scheduled live activities." *Id.* § 28-5501(6). But the Act does not apply to tickets for "a sporting event organized by a professional or intercollegiate sports team located in the District or professional athletic association with an event located in the District" or "a motion picture screening." *Id.*

Only one of the Act's measures is at issue here: The Act caps the price of resale tickets. *Id.* § 28-5506(b). More specifically, the Act provides that "a reseller or secondary ticket exchange shall not sell or offer to sell a ticket that exceeds the total price of the initial ticket, including all fees and taxes in connection with the initial ticket, plus up to 10% of the total price of the initial ticket," inclusive of fees and taxes. *Id.*

The Council unanimously passed the RESALE Act on July 14, 2026, after two legislative meetings, a committee markup, and a public hearing consisting of over nine hours of oral testimony and almost 800 pages of written testimony. *See* Council of the Dist. of Columbia, *B26-0224*, Legis. Info. Mgmt. Sys., tinyurl.com/y3adpryu. The Mayor signed the Act on August 10. *Id.* Following congressional review, the Act became effective on September 25. *Id.* The price cap applies beginning January 1, 2027. RESALE Act § 4.

Implementation and enforcement of the Act are multifold. The Act gives rulemaking authority to the Mayor, which will be exercised by the Department. D.C. Code § 28-5507; Def.'s Ex. 4, Decl. of Shakira Richardson (DLCP Decl.) ¶ 4. That authority allows the Department to adjust the price cap, subject to certain limitations. D.C. Code § 28-5507(b). As to enforcement, the Act provides that a violation of its provisions is an "unlawful trade practice." *Id.* §§ 28-5508(b), 47-2890.05(b). District law grants a private right of action to seek relief from unlawful trade practices. *Id.* § 28-3905(k)(1). The Attorney General of the District of Columbia may also bring an action to stop and remedy unlawful trade practices. *Id.* § 28-3909. Next, the Act makes a violation a civil infraction, which is enforceable by the Department. *Id.* §§ 28-5508(a), 2-1802.01; DLCP Decl. ¶ 8. Finally, the Act provides that "[t]he Department may suspend, revoke, or deny the license of any secondary ticket exchange or reseller found to be in violation" of the Act. D.C. Code § 47-2890.05(a).

## III. <u>Procedural History</u>

Three weeks after the RESALE Act became law, Plaintiffs brought this case. *See* Compl. [1]. Plaintiffs include the National Association of Ticketing Professionals, a trade association that purports to represent "ticket resellers," *id.* ¶ 9, and two professional ticket reselling companies, ASC Ticket Company and Stage Front Tickets, *id.* ¶¶ 10–11. The Complaint alleges that the price cap violates the Due Process Clause of the Fifth Amendment because it is vague; the dormant Commerce Clause because it regulates extraterritorially, discriminates against interstate commerce, and unduly burdens interstate commerce; the equal protection guarantee of the Fifth Amendment; and the Home Rule Act, D.C. Code § 1-206.02(a)(3). *Id.* ¶¶ 66–106. Plaintiffs seek declaratory and injunctive relief against the price cap and attorney's fees and costs. *Id.*, Prayer. With their Complaint, Plaintiffs moved for a preliminary injunction on all their claims except their claim that the price cap unduly burdens interstate commerce. *See* Mem. of L. in Supp. of Pls.' Mot. for a Prelim. Inj. (Pls.' Mot.) [9-1] at 2.[1]

## LEGAL STANDARD

A preliminary injunction is an "extraordinary remedy" requiring a plaintiff to make "a clear showing" on four factors: "he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20–22 (2008). "The balance of harms and the public interest factors merge when the government is the opposing party." *Trump v. Thompson*, 20 F.4th 10, 31 (D.C. Cir. 2021). A

---

[1] Two days before Plaintiffs filed their motion and Complaint, four secondary ticket exchanges and a trade group representing them had brought a case challenging the RESALE Act. Compl. [1], *Ticket Policy Forum, Inc. v. District of Columbia*, 1:26-cv-03577-CJN (D.D.C. Oct. 14, 2026). Those plaintiffs also moved for a preliminary injunction, although the claims are not identical. The Court is hearing the motions for preliminary injunctions together.

movant's evidentiary burden is "much higher" than a non-movant's burden at summary judgment and requires "substantial proof." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). Additionally, when a plaintiff challenges a duly enacted statute, that statute is presumed constitutional. *Flemming v. Nestor*, 363 U.S. 603, 617 (1960). This presumption of constitutionality must be considered as a "factor" "in evaluating success on the merits" and "an equity . . . in favor of [the government] in balancing hardships." *Walters v. Nat'l Ass'n of Radiation Survivors*, 468 U.S. 1323, 1324 (1984) (Rehnquist, J., in chambers); *see also, e.g.*, *Nat'l Ass'n of Mfrs. v. Taylor*, 549 F. Supp. 2d 68, 72 (D.D.C. 2008); *Ams. for Prosperity Found. v. Albence*, 191 F.4th 169, 177 (3d Cir. 2026).

## ARGUMENT

### I. Plaintiffs Fail to Establish a Likelihood of Success on the Merits.

Plaintiffs are unlikely to succeed on any of their claims, and that "is alone sufficient to defeat their motion." *Friends of the Earth U.S. v. Exp.-Imp. Bank of the U.S.*, 187 F.4th 616, 625 (D.C. Cir. 2026). Plaintiffs bear a heavy burden because they bring a facial challenge and ask the Court to enjoin the price cap in all its applications to Plaintiffs. *See* Pls.' Proposed Order [9-16] at 1; *Doe v. Burlew*, 165 F.4th 525, 530 (6th Cir. 2026) (plaintiffs must meet the facial-challenge standard if they seek to "prohibit the government from enforcing the law against the plaintiff[s] *in any circumstance*—not just as applied to *specific conduct*"). "[S]uch challenges are quite difficult to make out" because Plaintiffs "must show that no set of circumstances exists under which the law would be valid or that the law lacks a plainly legitimate sweep." *Newman v. Moore*, 151 F.4th 472, 483–84 (D.C. Cir. 2025) (citation modified), *cert. denied*, 146 S. Ct. 2728 (2026).

**A. Plaintiffs Are Unlikely to Succeed on Their Vagueness Claim.**

Plaintiffs first claim that the price cap is vague and thus denies fair notice of what is prohibited. Pls.' Mot. at 10–16. "A law may be vague in violation of the Due Process Clause" if, as relevant here, it "fail[s] to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits." *Act Now to Stop War & End Racism Coal. v. District of Columbia*, 846 F.3d 391, 409 (D.C. Cir. 2017) (citation modified). "Even as the vagueness inquiry refers to a law's meaning to the 'ordinary person,'" "a statute is unconstitutionally vague if, applying the rules for interpreting legal texts, its meaning specifies no standard of conduct at all." *United States v. Bronstein*, 849 F.3d 1101, 1107 (D.C. Cir. 2017) (citation modified).

This is a "heavy burden" for Plaintiffs, *Crooks v. Mabus*, 845 F.3d 412, 418 (D.C. Cir. 2016), as "vagueness challenges are difficult to mount," *United States v. Griffith*, No. 21-cv-244, 2023 WL 1778192, at *3 (D.D.C. Feb. 6, 2023). Plaintiffs' burden is compounded because "economic regulation is subject to a less strict vagueness test because its subject matter is often more narrow, and because businesses . . . can be expected to consult relevant legislation in advance of action." *Village of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498 (1982). So the Supreme Court has "expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe." *Id.* at 498–99. The Court must find that "no construction can save the Act," and the rules of statutory interpretation "consistently favor that interpretation of legislation which supports its constitutionality." *Bronstein*, 849 F.3d at 1106 (quoting *Screws v. United States*, 325 U.S. 91, 98, 100 (1945)).

Trying to meet their heavy burden, Plaintiffs argue that the RESALE Act does not provide fair notice of (1) what transactions it covers, (2) how the sports exemption applies, and

(3) how to determine the initial ticket price. Each argument fails to meet Plaintiffs' heavy burden to show that "no construction can save the Act." *Id.* (citation omitted).

To start, Plaintiffs contend that the RESALE Act does not provide fair notice of which transactions it covers because it could seemingly cover resales for events anywhere. Pls.' Mot. at 11–13. In particular, Plaintiffs take issue with the Act's definition of "ticket" for not specifying that the Act only covers tickets for events in the District. *Id.* But the Department interprets the Act to apply to the sale and resale of tickets for events in the District. DLCP Decl. ¶ 6. The agency's interpretation should "fend off a vagueness challenge." *Dirks v. SEC*, 802 F.2d 1468, 1471 (D.C. Cir. 1986).

If the Department's interpretation were not dispositive, the same result obtains by applying "the tools of statutory interpretation." *Bronstein*, 849 F.3d at 1104. When considered as a whole, the Act is properly construed as regulating the sale and resale of tickets for events in the District. *See Webb v. D.C. Dep't of Emp. Servs.*, 204 A.3d 843, 849 (D.C. 2019) ("Statutory construction generally demands reading a statute in its entirety, and a statute should be interpreted as a harmonious whole." (citation modified)).[2] Several parts of the Act lead to that conclusion. First, the first clause of the RESALE Act's preamble specifies its intent to "protect artists, venues, and consumers *in the District*." RESALE, pmbl. (emphasis added). Second, the RESALE Act is enforceable as an unfair trade practice under D.C. Code § 28-3904, *see* D.C. Code § 28-5508(b), which is part of the District of Columbia Consumer Protection and

---

[2] In interpreting District statutes, a federal court applies District-law statutory interpretation principles. *See, e.g.*, *Saiyed v. Council on Am.-Islamic Rels. Action Network, Inc.*, 346 F. Supp. 3d 88, 96 (D.D.C. 2018). But the principles applied above are recognized by federal courts interpreting federal law, unless noted. *See, e.g.*, *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 371 (1988).

Procedures Act. That statute "establishes an enforceable right to truthful information from merchants about consumer goods and services that are or would be purchased, leased, or received *in the District*." *Id.* § 28-3901(c) (emphasis added). Third, under the RESALE Act's reporting and licensing requirements, secondary ticket exchanges are required to maintain records of "ticket resales *in the District*" and to report "unlicensed or non-compliant resellers that sell, offer to sale [*sic*], or list tickets to *an event being held in the District* to the Department." *Id.* § 47-2890.04(c)(2) (emphasis added). Fourth, secondary ticket exchanges are required to obtain a basic business license "to operate in the District." *Id.* § 47-2890.03; *see id.* § 47-2851.02(a). And fifth, licenses are required only for resellers who "operate in the District." *Id.* § 47-2890.02(a)(1).

Given the statute's repeated references to events in the District and operations in the District, it only makes sense to construe it as applying to tickets to District events. If the statute were construed as Plaintiffs suggest to apply to events outside the District, then parts of the statute would not make sense. For example, why would the Act require secondary ticket exchanges to report non-compliant resellers of "tickets to an event being held in the District" if the Act applied more broadly? *Id.* § 47-2890.04(c)(2). Plaintiffs do not acknowledge that the reporting requirements are specifically tied to events in the District or the definition of an unfair trade practice. Instead, Plaintiffs harp on the lack of more District-specific language in some of the statute's definitions. But "a provision in isolation is often clarified by the remainder of the statutory scheme because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law." *Washington v. United States*, 206 A.3d 864, 867 (D.C. 2019) (citation modified). That is so here.

If the plain language were not enough, Plaintiffs' proposed interpretation creates implausible and potentially unconstitutional results that are to be avoided. *See Browne v. United States*, 332 A.3d 512, 516 (D.C. 2025) ("When interpreting statutes, we assume that the legislature acted logically and rationally and we avoid interpretations of statutes which lead to implausible results." (citation omitted)); *In re Johnson*, 699 A.2d 362, 369 (D.C. 1997) ("[W]e construe a statute so as to avoid a constitutional confrontation."). It is implausible that the *D.C.* Council intended the statute to apply to events in Nashville and Las Vegas. *See* Pls.' Mot. at 12. Indeed, Plaintiffs point to no affirmative indication in the statute's text or history that the Council intended to reach beyond District events—instead, Plaintiffs rely on supposed ambiguities in a few terms. Legislating for events around the country is something "one would think the Council would have stated . . . directly" in the text or "mention[ed]" in the legislative history. *In re Macklin*, 286 A.3d 547, 557 (D.C. 2022).[3] Although Plaintiffs argue that the Council needed to be more explicit about whether the definition of "ticket" applied to events in the District, *see* Pls.' Mot. at 11–12, Plaintiffs have it backwards. The *D.C.* Council legislates for *the District*, so it is reasonable for the Council to draft statutes with the understanding, even if not explicitly expressed, that they apply to the District. If the Council were to reach beyond the District, it would do so explicitly. Had the Council done so here, that would create constitutional problems, which this Court must avoid.

An additional nail in the coffin for Plaintiffs' vagueness claim is the fact that the secondary ticket exchanges in *Ticket Policy Forum* interpret the Act to apply to District events and do not raise a vagueness challenge to the scope of the Act. Apparently, those plaintiffs can

---

[3] The D.C. Court of Appeals relies more on legislative history than federal courts. *See, e.g.*, *Macklin*, 286 A.3d at 553 ("We may also look to the legislative history to ensure that our interpretation is consistent with legislative intent." (citation omitted)).

understand the scope of the conduct that the Act prohibits. Another nail is the fact that Plaintiffs' testimony before the Council did not take issue with the Act's scope. *See* Def.'s Ex. 6, Adler Testimony. It is thus hard to credit Plaintiffs' newly minted complaints that they will have to "guess" what the Act covers when they understood the Act well enough to testify about its pros and cons. Pls.' Mot. at 12. Still another nail, no reseller or secondary ticket exchange has come to the Department saying they cannot figure out how they are supposed to comply by January 1. *See* DLCP Decl. ¶ 12.

Second, Plaintiffs fare no better tussling with the exemption for tickets for sporting events located in the District. *See* Pls.' Mot. at 13–15. Plaintiffs argue that it is ambiguous whether the statute exempts sporting events in the District or events organized by sports teams based in the District, such as Commanders games in Maryland or road games for the Wizards. *Id.* Again, the RESALE Act applies to events in the District. Even without the exemption, the RESALE Act would not apply to games by District sports teams outside of the District or Commanders games in Maryland. Because such events are already outside of the scope of the RESALE Act, the exemption should not be interpreted to cover such events. Reading this exemption in the context of the statute as a whole, it exempts tickets for events located in the District that are "organized by a professional or intercollegiate sports team" or a "professional athletic association." D.C. Code § 28-5501(6). And reading this provision to depend on which entity organized the event would be at odds with the structure and provisions of the rest of the Act. Plaintiffs' remaining arguments about why this statute is ambiguous depend on this Court agreeing that the statute is susceptible to a reading that would restrict events organized by teams in the District, rather than events in the District, *see* Pls.' Mot. at 14–15, and accordingly fail.

Third, Plaintiffs contend that the "initial" ticket price—the "[b]enchmark" for the price cap—is "[i]ndiscernible" in certain instances. *Id.* at 15. A law is not vague simply because the practicalities of compliance can be difficult in some instances or because some marginal situations present an interpretive question as to whether the statute applies. *See United States v. Nat'l Dairy Prods. Corp.*, 372 U.S. 29, 32 (1963) ("[S]tatutes are not automatically invalidated as vague simply because difficulty is found in determining whether certain marginal offenses fall within their language."); *United States v. McHugh*, 583 F. Supp. 3d 1, 21 (D.D.C. 2022) ("The need to examine statutory language, determine its meaning, and apply it to a specific factual situation is not evidence of a constitutionally defective statute—it is the ordinary work of judging in the age of statutes."). The Court is "not concerned with vagueness in the sense that the term requires a person to conform his conduct to an imprecise but comprehensible normative standard, whose satisfaction may vary depending upon whom you ask. Rather, a statute is unconstitutionally vague if . . . its meaning specifies no standard of conduct at all." *Bronstein*, 849 F.3d at 1107 (citation modified).

The RESALE Act provides a sufficient standard. Recall that the RESALE Act limits the price that a ticket reseller can resell a ticket for to "10% of the total price of the initial ticket." D.C. Code § 28-5506(b). The "price" of the "initial ticket" refers to the *purchase* price. That follows from the plain meaning of "price," which is "the amount of money given or set as consideration for the sale of a specified thing," *Price*, Merriam-Webster Dictionary, tinyurl.com/mtjyurtn, and subsection (a) of the same section, which provides that secondary ticket exchanges must disclose "the original *purchase* price of the ticket, including all fees and taxes in connection with the initial *purchase* price of the ticket," D.C. Code § 28-5506(a)(2) (emphases added). Subsection (b) then uses the shorthand "initial ticket," and the terms should

be construed the same across the section. *See Price v. Bd. of Ethics & Gov't Accountability*, 284 A.3d 1019, 1025 (D.C. 2022) (statutory language must "be interpreted in context" not "isolation," and in light of "the language of surrounding and related paragraphs" (citation modified)). If the statute were not enough, the Department interprets the Act to refer to the initial purchase price. DLCP Decl. ¶¶ 9–10; *see Dirks*, 802 F.2d at 1471.

Thus, there will be an identifiable purchase price for that ticket—*i.e.*, the amount that was actually paid to purchase that ticket. So Plaintiffs' hypotheticals fall away: Bundled tickets have a purchase price and can be divided. And no one can "resell" free tickets because they had no purchase price to begin with. If there is a rare instance where the reseller cannot determine if there is an initial purchase price, then the reseller can decline to resell the ticket and avoid liability. There is no need to "guess" about the statute's meaning and risk consequences. Pls.' Mot. at 12; *see Hoffman*, 455 U.S. at 498 ("[B]usinesses . . . can be expected to consult relevant legislation in advance of action."). The RESALE Act sets the conditions for ticket resales, and if regulated parties cannot satisfy those conditions, then they simply can forgo the resale. They have neither an obligation nor a right to engage in any and all resales. After all, the District could have banned ticket resales entirely. *See Ross*, 598 U.S. at 387–88 (op. of Gorsuch, J.) (discussing how states can ban a variety of goods).

Plaintiffs argue that in some instances they will not be able to verify the initial ticket price if they did not participate in the original transaction. Pls.' Mot. at 15. But Plaintiffs admit that even if a reseller buys a ticket from a consumer, the consumer could "report the price of the initial sale." *Id.* Nothing in the statute suggests that the District would hold a reseller liable for using an initial ticket price that it reasonably thought to be true. Moreover, the Department has

said that it will not, so Plaintiffs' concerns cannot support their claim. *See* DLCP Decl. ¶ 10; *Dirks*, 802 F.2d at 1471.

In all, Plaintiffs' arguments fail to show that the law is unconstitutionally vague. And they certainly fail to sustain a facial challenge in a pre-enforcement posture prior to the promulgation of the implementing regulations. At most, Plaintiffs have identified a few rare instances in which the Act's application may require some interpretation. That does not render the statute "impermissibly vague in *all* of its applications," as necessary for Plaintiffs to succeed. *Hoffman*, 455 U.S. at 495 (emphasis added). Moreover, Plaintiffs may seek guidance from the Department and will have the opportunity to participate in the statutorily mandated rulemaking process. "[V]agueness concerns are mitigated when regulated entities have the ability to clarify the meaning of the regulation by [their] own inquiry, or by resort to an administrative process." *Bellion Spirits, LLC v. United States*, 7 F.4th 1201, 1214 (D.C. Cir. 2021) (citation modified).

**B. Plaintiffs Are Unlikely to Succeed on Their Claim That the Price Cap Violates the Dormant Commerce Clause by Regulating Extraterritorially.**

Plaintiffs next invoke a supposed extraterritoriality principle under the dormant Commerce Clause. Pls.' Mot. at 16–20. The dormant Commerce Clause is a judicially created doctrine that recognizes only two "primary principles": "state regulations may not discriminate against interstate commerce," and "States may not impose undue burdens on interstate commerce." *South Dakota v. Wayfair, Inc.*, 585 U.S. 162, 173 (2018). Plaintiffs bear a heavy burden here too because "extreme caution is warranted before a court deploys this implied authority," and the Court may invalidate the RESALE Act only if "the infraction is clear." *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 390 (2023) (citation modified).

Plaintiffs contend that the RESALE Act violates the dormant Commerce Clause because it has the extraterritorial effect of controlling prices outside of the District. Pls.' Mot. at 16. In

*Ross*, however, the Supreme Court rejected the theory that—in addition to discriminatory or unduly burdensome laws—the dormant Commerce Clause has an extraterritoriality principle that prohibits state laws with the "practical effect of controlling commerce outside the State, even when those laws do not purposely discriminate against out-of-state economic interests." 598 U.S. at 371 (citation modified); *see also, e.g.*, *Asante v. Kennedy*, 133 F.4th 97, 102 (D.C. Cir. 2025) (recognizing, post-*Ross*, only the two "primary principles" identified in *Wayfair*), *cert. denied*, 146 S. Ct. 1820 (2026); *N.J. Staffing All. v. Fais*, 110 F.4th 201, 207 (3d Cir. 2024) ("[T]he dormant Commerce Clause does not prohibit laws solely because they have extraterritorial reach absent protectionist intent or effect." (citing *Ross*)). To the contrary, the Court recognized that, "[i]n our interconnected national marketplace, many (maybe most) state laws have the 'practical effect of controlling' extraterritorial behavior." 598 U.S. at 374.

In the face of *Ross*, Plaintiffs largely rely on a non-binding, out-of-Circuit case to argue that "the Dormant Commerce Clause bars legislation with 'the specific impermissible extraterritorial effect of controlling prices outside of' the enacting state." Pls.' Mot. at 16 (quoting *Ass'n for Accessible Meds. v. Ellison*, 140 F.4th 957, 960 (8th Cir. 2025)). The *Ellison* court relied on two prior Supreme Court cases—*Healy v. Beer Institute*, 491 U.S. 324 (1989) and *Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511 (1935)—for the proposition that "discrimination is not required when a statute has the specific extraterritorial effect of controlling the price of wholly out-of-state transactions." 140 F.4th at 961. But *Ross* specifically rejected the proposition that these two cases created a bar to the enforcement of statutes that impacted commerce outside of the legislating state. 598 U.S. at 371–72. Instead, the Court recognized that "each typifies the familiar concern with preventing purposeful discrimination against out-of-state interests." *Id.* at 371. That was because those cases involved state laws that required out-

of-state producers to match the prices of in-state producers to sell products in the state. *See id.* at 373–74. As a result, the problem was that "the challenged statutes had a *specific* impermissible 'extraterritorial effect'—they deliberately 'prevent[ed out-of-state firms] from undertaking competitive pricing' or 'deprive[d] businesses and consumers in other States of 'whatever competitive advantages they may possess.''" *Id.* at 374 (alterations and emphasis in original) (quoting *Healy*, 491 U.S. at 338–39).

Accordingly, the *Ellison* court erred by extracting from *Healy* and *Baldwin* a broader "price control" principle that the *Ross* Court rejected. *See Ass'n for Accessible Meds. v. Raoul*, 805 F. Supp. 3d 854, 860–61 (N.D. Ill. 2025) (discussing *Ellison*'s "misreading" of *Ross*), *appeal docketed*, No. 25-2960 (7th Cir. Oct. 31, 2025); *Healthcare Distrib. All. v. Boughton*, No. 3:25-cv-1724, 2025 WL 3725031, at *6 (D. Conn. Dec. 24, 2025) (rejecting a similar misreading), *aff'd*, No. 25-3216, 2026 WL 3135340 (2d Cir. Oct. 20, 2026). For that reason, too, Plaintiffs misplace reliance on pre-*Ross* cases that similarly relied on *Healy*, *Baldwin*, or other cases to fashion an extraterritoriality principle.[4] Correctly applied, *Healy* and *Baldwin* do not invalidate the RESALE Act because it does not require any price-matching between in-District and out-of-state businesses or lock out out-of-District firms from competing in the District.

Plaintiffs also point to *Ross*'s discussion of a plurality opinion in *Edgar v. MITE Corp.*, 457 U.S. 624 (1982). Pls.' Mot. at 17 (quoting *Ross*, 598 U.S. at 376 n.1). A plurality, of course, does not make law. Plus, as the *Ross* Court noted, the *Edgar* plurality "spoke to a law that *directly* regulated out-of-state transactions by those with *no* connection to the State," 598

---

[4] *See* Pls.' Mot. at 17–18; *Pharm. Research & Mfrs. of Am. v. District of Columbia*, 406 F. Supp. 2d 56, 67–71 (D.D.C. 2005), *aff'd on other grounds sub nom. Biotech. Indus. Org. v. District of Columbia*, 496 F.3d 1362 (Fed. Cir. 2007); *Ass'n for Accessible Meds. v. Frosh*, 887 F.3d 664, 672–73 (4th Cir. 2018); *cf. Just Puppies, Inc. v. Brown*, 123 F.4th 652, 667 n.10 (4th Cir. 2024) (*Ross* "cast[ ] doubt" on *Frosh*).

U.S. at 376 n.1 (citation modified), but "stopped short of recognizing this theory as a continuing strand of dormant Commerce Clause jurisprudence," *Raoul*, 805 F. Supp. 3d at 859; *see also R.I. Truck Ctr., LLC v. Daimler Trucks N. Am., LLC*, 180 F.4th 365, 375 (1st Cir. 2026). Thus, Plaintiffs cannot rely on *Edgar* to support a freestanding rule that the dormant Commerce Clause invalidates state statutes that control prices in out-of-state transactions.

None of Plaintiffs' other post-*Ross* cases—all non-binding—support their contention that discrimination is not required to invalidate a state statute if it controls prices in another state. *See* Pls.' Mot. at 17. In *Rhode Island Truck Center*, the court noted that *Ross* did not "resolve how we must address a Dormant Commerce Clause challenge to the enforcement of a law that . . . directly regulates out-of-state transactions" and instead relied on prior precedent upholding a law with extraterritorial effects that had a "strong in-state nexus." 180 F.4th at 375–76. In *Association for Accessible Medicines v. Bonta*, 766 F. Supp. 3d 1020 (E.D. Cal. 2025), the court found that the statute at issue violated the dormant Commerce Clause because it regulated settlement agreements in which none of the parties, the agreement, or the sales "have any connection" to the regulating state, *id.* at 1034. Similarly, in *Aylo Freesites Ltd. v. Utah Division of Consumer Protection*, No. 26-cv-340, 2026 WL 2874132 (D. Utah Sept. 24, 2026), the court invalidated a statute that "would regulate a massive amount of wholly out-of-state conduct with no connection to Utah," *id.* at *16.

Even if *Edgar* or any of these cases did establish a freestanding rule that the dormant Commerce Clause prohibits states from "*directly* regulat[ing] out-of-state transactions by those with *no* connection to the [District]," *Ross*, 598 U.S. at 376 n.1, the RESALE Act would not run afoul of it. As discussed above, the Act regulates the resale of tickets to events taking place in the District. District events certainly have a connection to the District. Moreover, resellers are

selling a "license" for purchasers "to enter a place of entertainment" in the District. D.C. Code § 28-5501(6). As such, a ticket usually originates in the District because it is directly issued by District venues or by entities contracting with District venues to handle sales on the primary market. And consumers use the ticket in the District and take title to it there. The ticket's lifecycle thus starts and ends in the District, even if it is resold. All this surely provides a sufficient connection to the District. *See Healthcare Distrib. All.*, 2026 WL 3135340, at *3 (rejecting dormant Commerce Clause challenge to Connecticut drug price cap because it applied to "drugs where title is taken in Connecticut"); *R.I. Truck*, 180 F.4th at 376 (explaining that a law that regulates transactions that "start and end" in the regulating state survived scrutiny under the dormant Commerce Clause). Indeed, the purpose of the RESALE Act is to "protect artists, venues, and consumers *in the District*." RESALE Act, pmbl. (emphasis added). So the Act seeks to "remedy specific harms occurring in [the District]" and thus does not offend the Commerce Clause. *R.I. Truck*, 180 F.4th at 376 (citation omitted).

For those reasons, all Plaintiffs' cases are inapposite because they do not address the unique nature of event tickets. Take their primary case, *Ellison*. The statute at issue concerned prescription drugs and could penalize an out-of-state manufacturer for selling drugs to an out-of-state distributor in violation of the statute if the drugs subsequently ended up in the state. 140 F.4th at 961. Here, on the other hand, the RESALE Act does not regulate the prices of fungible products that may end up in the District. The transactions at issue instead concern the resale of tickets for events in the District, *i.e.* a license to enter a venue in the District that can only be used in the District.

Plaintiffs resist this conclusion by arguing that some resales may occur between out-of-District resellers and buyers over the Internet, and the "regulatory target" of the Act is the

"transaction" on a "marketplace based outside the District" (the Internet). Pls.' Mot. at 18. But, as discussed above, even if the extraterritoriality doctrine has a continuing effect, it is based on whether transactions at issue have "no connection" to the regulating state, *Ross*, 598 U.S. at 376 n.1, not the supposed "regulatory target"—whatever that means. The transactions at issue concern a license to attend an event at a District business and property. *See IMS Health Inc. v. Mills*, 616 F.3d 7, 29 (1st Cir. 2010) (rejecting an argument that restrictions on the use of Maine consumers' data that applied to out-of-state transactions violated the dormant Commerce Clause and that the doctrine should apply to plaintiffs' "atomized transactions only"), *vacated sub nom. IMS Health, Inc. v. Schneider*, 564 U.S. 1051 (2011).[5] "The fact that an ordinary commercial transaction" for a ticket to a District event "happens to occur in cyberspace does not insulate it from otherwise applicable state consumer protection laws." *SPGGC, LLC v. Blumenthal*, 505 F.3d 183, 195 (2d Cir. 2007).

That would be an unsettling result considering that price controls have existed since ancient times, were prevalent at the Founding, and continued throughout American history; all the while, the Supreme Court upheld them in various forms. *See generally* Breck P. McAllister, *Price Control by Law in the United States: A Survey*, 4 Law & Contemp. Probs. 273 (1937); Note, *Price and Sovereignty*, 135 Harv. L. Rev. 755 (2021). This "[l]ong settled and established practice is a consideration of great weight." *Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 474 (2022) (quoting *The Pocket Veto Case*, 279 U.S. 655, 689 (1929)). It strains both history and law to suggest, as Plaintiffs do, that the price control measure they challenge here is suddenly unconstitutional because it applies to online transactions.

---

[5] Although *IMS Health* was vacated on other grounds, the First Circuit continues to apply its dormant Commerce Clause analysis. *R.I. Truck*, 180 F.4th at 370.

Unsurprisingly, then, Plaintiffs do not point to any cases invalidating price caps on ticket resales or adopting a theory that an online transaction is immune from state regulation. To the contrary, Plaintiffs' argument is at odds with other recent Supreme Court precedent and would call into question a host of state laws. For example, states may impose sales tax on out-of-state sellers even if the seller is not physically present in the state, as long as the seller has "a substantial nexus" to the state. *Wayfair*, 585 U.S. at 178. Plaintiffs agree that the District can impose sales tax on ticket resales, *see* Adler Testimony at 1, but their theory would seem to question that power. A sales tax, after all, is much like the price cap: It specifies a markup on the price of a product and thus "control[s]" the final "price" of an item. Pls.' Mot. at 16. At bottom, Plaintiffs' decisions to structure their businesses so that resales for tickets for District events occur online should not constitutionally insulate them from regulation by the District. *See Exxon Corp. v. Governor of Md.*, 437 U.S. 117, 127 (1978) (the dormant Commerce Clause does not "protect[ ] the particular structure or methods of operation in a retail market").

For all those reasons, Plaintiffs' extraterritoriality arguments are wrong. But even if the Court finds some merit to them (and it should not), Plaintiffs still have not carried their burden. For one, accepting Plaintiffs' arguments would require an expansion of the law. There is no extraterritoriality principle in this Circuit. Nor do Plaintiffs' out-of-Circuit cases address whether their extraterritoriality principles would apply to the unique context of online ticket sales for in-state events. In short, "not one of [Plaintiffs' cases] resolves these claims," so Plaintiffs "seek to extend the [dormant Commerce Clause] to new territory," and as a result, "the key premise of a preliminary injunction—a showing of a likelihood of success on the merits—is missing." *L.W. by & through Williams v. Skrmetti*, 83 F.4th 460, 471 (6th Cir. 2023) (Sutton, C.J.), *aff'd sub nom. United States v. Skrmetti*, 605 U.S. 495 (2025). That rings especially true

for a dormant Commerce Clause claim because the Court must proceed with "extreme caution." *Ross*, 598 U.S. at 390 (citation omitted), and not use the doctrine, as Plaintiffs implicitly suggest, "as 'a roving license for federal courts to decide what activities are appropriate for state and local government to undertake,'" *id.* at 380 (op. of Gorsuch, J.) (quoting *United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 343 (2007)).

For another, even if capping prices for resales between out-of-District participants violated the dormant Commerce Clause, Plaintiffs could not succeed on their facial challenge. Plaintiffs do not dispute that the Act could validly be applied at least to resales between two District-based participants. Thus, they cannot show that the price cap "regulates wholly extraterritorial conduct in every application of the statute." *Nat'l Shooting Sports Found., Inc. v. James*, 144 F.4th 98, 116 (2d Cir. 2025), *cert. denied*, 146 S. Ct. 2724 (2026). Further, one plaintiff, ASC, acknowledged that it "regularly sells tickets for events in the District" and its "transactions for events in the District have generated millions of dollars in revenue." Decl. of Lee Shenker (ASC Decl.) [9-3] ¶ 11. If an entity regularly sells tickets for events in the District and makes millions of dollars conducting those sales, that entity is doing business in the District. Applying the Act to that entity does not violate any extraterritoriality principle of the dormant Commerce Clause—even if one existed.

### C. <u>Plaintiffs Are Unlikely to Succeed on Their Home Rule Act Claim.</u>

Plaintiffs claim that the RESALE Act's alleged extraterritorial regulation also violates the Home Rule Act, which prevents the D.C. Council from "[e]nact[ing] any act . . . which is not restricted in its application exclusively in or to the District," D.C. Code § 1-206.02(a)(3). Pls.' Mot. at 20. As a threshold matter, the Court should not exercise jurisdiction over this claim. Section 1-206.02(a)(3) is a District—not federal—law. *D.C. Ass'n of Chartered Pub. Schs. v. District of Columbia*, 930 F.3d 487, 492–93 (D.C. Cir. 2019). As such, the Court should decline

to exercise supplemental jurisdiction over it because it "raises a novel or complex issue of [District] law." 28 U.S.C. § 1367(c)(1); *see Pheenix Ush LLC v. Dist. Dep't of Transp.*, No. 25-7060, 2025 WL 3013527, at *3 (D.C. Cir. Oct. 24, 2025) (per curiam); *Classic Cab, Inc. v. District of Columbia*, 288 F. Supp. 3d 218, 230 (D.D.C. 2018). Plaintiffs point to no case from the D.C. Court of Appeals stretching Section 1-206.02(a)(3) as far as they would. The claim is thus too novel for supplemental jurisdiction. *See Araya v. JP Morgan Chase Bank, N.A.*, 775 F.3d 409, 418 (D.C. Cir. 2014); *Women Prisoners of D.C. Dep't of Corr. v. District of Columbia*, 93 F.3d 910, 922 (D.C. Cir. 1996).[6]

If the Court entertains the claim, it fails. The Home Rule Act granted the Council "broad authority to legislate." *Banks v. Hoffman*, 346 A.3d 665, 669 (D.C. 2025) (citation modified). Congress added Section 1-206.02(a)(3) to ensure that this broad authority did not interfere with "the integrity of the federal domain as it relates to administration of federal legislation having nationwide implications." *District of Columbia v. Greater Wash. Cent. Lab. Council, AFL-CIO*, 442 A.2d 110, 116 (D.C. 1982); *see also Thomas v. Securiguard Inc.*, 412 F. Supp. 3d 62, 75 (D.D.C. 2019) (Section 1-206.02(a)(3) "was intended to proscribe laws with potential national implications"). The RESALE Act does not violate the Home Rule Act because it regulates sales and resales tickets for events solely in the District and does not interfere with the "administration of federal legislation." *Greater Wash.*, 442 A.2d at 116. Plaintiffs have not even tried to identify a conflict between the RESALE Act and "the operations of the federal government on the national level." *Id.*

---

[6] The Court may also decline to exercise supplemental jurisdiction over the Home Rule Act claim if it "predict[s] that it would likely dismiss [Plaintiffs'] meritless constitutional claims." *Pheenix*, 2025 WL 3013527, at *3.

Moreover, the Act regulates tickets to events in the District, so it applies "in or to the District." D.C. Code § 1-206.02(a)(3). Applying Section 1-206.02(a)(3), courts have held that the D.C. Council has authority to regulate entities "doing business in the District." *Am. Council of Life Ins. v. District of Columbia*, 645 F. Supp. 84, 89 (D.D.C. 1986). Resale of a license to enter a place of entertainment constitutes doing business in the District. Indeed, Plaintiffs do not take issue with the Act's requirements that they obtain District business licenses.

Plaintiffs point to no D.C. Court of Appeals precedent suggesting otherwise or holding that the District cannot regulate transactions for District events (or District-destined products for that matter) simply because the transaction occurs online between out-of-District buyers and sellers. *See* Pls.' Mot. at 20. "[B]ecause [the Court's] role in deciding a pendent District of Columbia claim is only to ascertain what District law is, not what it ought to be, [the Court is] unable to do for [Plaintiffs] what the D.C. Court of Appeals has never done for any plaintiff." *Daskalea v. District of Columbia*, 227 F.3d 433, 447 (D.C. Cir. 2000) (citation modified). At the least, Plaintiffs have not shown that the Act applies extraterritorially in all its applications, so their claim fails. *See* p. 22, *supra*.

### D. Plaintiffs Are Unlikely to Succeed on Their Claim That the Price Cap Violates the Dormant Commerce Clause by Discriminating Against Out-of-District Commerce.

Plaintiffs claim that the RESALE Act separately violates the dormant Commerce Clause because it discriminates against interstate commerce. Pls.' Mot. at 21. The question for such a claim is whether the Act "discriminates on its face" by imposing "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *United Haulers*, 550 U.S. at 338 (citation modified). Plaintiffs argue that the Act is facially discriminatory because it does not regulate the price that ticket issuers can charge in the primary

market. Pls.' Mot. at 21. Plaintiffs contend that this distinction burdens resellers—"a predominantly out-of-state group"—and benefits local interests like venues. *Id.* at 22.

This argument fails for either of two reasons. First, the Act's definition of reseller is not limited to out-of-state resellers. So the Act does not discriminate *on its face* based on out-of-state status. *See Metro. Wash. Chapter, Associated Builders & Contractors, Inc. v. District of Columbia*, 62 F.4th 567, 577 (D.C. Cir. 2023) ("[T]he [C]ourt 'must be careful not to go beyond the statute's facial requirements . . . .'" (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449–50 (2008))); *Electrolert Corp. v. Barry*, 737 F.2d 110, 113 (D.C. Cir. 1984) (no facial discrimination when a District statute banned all radar-detection devices). As Plaintiffs acknowledge, some resellers are based in the District, and primary ticketers include both local venues and "ticketing partners like Ticketmaster." Pls.' Mot. at 22. Plaintiffs have not and could not show that Ticketmaster is a District business. The RESALE Act treats all resellers alike and all primary ticketers alike, whether they are based in the District or not. That is equal treatment—not discrimination.

Second, resellers and issuers are not similarly situated. "[A]ny notion of discrimination assumes a comparison of substantially similar entities." *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 298 (1997) (internal footnote omitted). "[I]n the absence of actual or prospective competition between the supposedly favored and disfavored entities in a single market there can be no local preference, whether by express discrimination against interstate commerce or undue burden upon it, to which the dormant Commerce Clause may apply." *Id.* at 299. Resellers and issuers do not compete in the same market. Quite the opposite, issuers sell tickets on the primary market, while resellers sell tickets on the secondary market. Those markets are "distinct" in their

functions. Comm. Rep. at 3. The District does not discriminate by applying different policies to each.

Despite the facial neutrality of the RESALE Act, Plaintiffs argue that it harbors a discriminatory purpose that renders it invalid. *See* Pls.' Mot. at 21–23. "[T]he Commerce Clause regulates effects, not motives." *Comptroller of the Treas. of Md. v. Wynne*, 575 U.S. 542, 561 n.4 (2015); *see, e.g.*, *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 508 (1975) ("[I]n determining the legitimacy of a congressional act we do not look to the motives alleged to have prompted it."). While courts may consider a discriminatory purpose in "evaluating whether state legislation constitutes economic protectionism," "[t]he principal focus of inquiry is the practical operation of the statute, since the validity of state laws must be judged chiefly in terms of their probable effects." *Just Puppies*, 123 F.4th at 666 (citation modified). "Were the law otherwise, it would invalidate many more state statutes, given that many legislators routinely claim to have crafted statutes to accommodate local interests." *Am. Trucking Ass'ns, Inc. v. R.I. Tpk. & Bridge Auth.*, 123 F.4th 27, 36–37 (1st Cir. 2024). Plaintiffs do not pair their purpose arguments with effects arguments, so their claim fails.

Even if Plaintiffs could rely on a discriminatory purpose, Plaintiffs misconstrue the Act and legislative record. The purpose of the Act is to "protect artists, venues, and consumers in the District from unfair and deceptive practices in live event ticket purchases." RESALE Act, pmbl.; *see also* Comm. Rep. (discussing the purpose of the RESALE Act "to govern the sale and resale of tickets to live entertainment events such as concerts and theatrical performances"); July 14, 2026 H'rg at 16:50–17:10, tinyurl.com/3jhsj8ba (Councilmember Allen discussing the consumer protection purpose of the bill). None of those articulations of the Act's purposes

mentions or even suggests "burdening out-of-state competitors," so the Act is a far cry from "economic protectionism." *Metro. Wash. Chapter*, 62 F.4th at 576 (citation omitted).

To contend otherwise, Plaintiffs point to comments from one councilmember and a venue owner. Pls.' Mot. at 22–23. Even if these statements brimmed with protectionism (and they do not), they hardly amount to a "clear showing" based on "substantial proof" that the *entire Council* voted for the Act for discriminatory reasons. *Winter*, 555 U.S. at 20–22; *Mazurek*, 520 U.S. at 972. The Court does not find unconstitutional intent in the statements of legislators because "[w]hat motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high . . . to eschew guesswork." *United States v. O'Brien*, 391 U.S. 367, 384 (1968); *see also Edwards v. Aguillard*, 482 U.S. 578, 636–39 (1987) (Scalia, J., dissenting) (identifying myriad problems with discerning an unconstitutional purpose from statements by legislators); *S. Wine & Spirits of Am., Inc. v. Div. of Alcohol & Tobacco Control*, 731 F.3d 799, 808 (8th Cir. 2013) (rejecting dormant Commerce Clause claim that relied on supposedly discriminatory statement of one legislator (citing *O'Brien*)). The other legislators are entitled to a "presumption of legislative good faith" that Plaintiffs do not even acknowledge, let alone rebut. *Abbott v. Perez*, 585 U.S. 579, 603 (2018). And Plaintiffs cite no binding precedent—and the District is aware of none—holding that a court can impute the motives of someone who is not even a legislator to the legislature. *Cf. Bell Atl. Tel. Cos. v. FCC*, 131 F.3d 1044, 1048 (D.C. Cir. 1997) (statements by lobbyists "carry little or no weight" in interpreting a statute). Doing so here would be especially unwise because hundreds of interested parties submitted written testimony to the Council supporting the RESALE Act. *See* Comm. Rep. at 10–29.

Even if considered, the statements that Plaintiffs invoke do not show protectionist discrimination. A state may enact laws with "the purpose and effect of encouraging domestic industry." *Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 271 (1984). The dormant Commerce Clause only limits "the means by which a State can constitutionally seek to achieve that goal." *Id.* In the main, the state cannot "favor local businesses *over* out-of-state businesses." *Id.* at 272 (emphasis added). In *Bacchus*, for example, Hawaii could promote its local beverage industry, but it could not do so by exempting certain locally produced beverages from taxation. *Id.* at 271–72. Unconstitutional discrimination thus occurs when states give preferential treatment based on geography: in-state versus out-of-state. *See id.*[7]

There is no geography-based discrimination here. Plaintiffs first take issue with comments by Councilmember Allen that they construe as evidence that the Council "wanted to help local venues by making life harder for resellers." Pls.' Mot. at 23. As discussed above, resellers are located both inside and outside the District, so comments about "scalpers" or the resale system being "rigged" do not suggest any intent to discriminate against out-of-state actors simply because they are out-of-state. *Cf. S. Wine & Spirits*, 731 F.3d at 808–09 (finding no discriminatory intent in a statement that a law "was intended to prevent a few big national distillers from monopolizing the wholesale liquor business in Missouri"); *Maplebear Inc. v. City*

---

[7] *See, e.g.*, *Ass'n to Pres. & Protect Loc. Livelihoods v. Sidman*, 147 F.4th 40, 64 (1st Cir. 2025) (relying on *Bacchus* to find no discrimination in an ordinance that capped cruise ship disembarkations because "what was salient" to voters were cruise ships' "externalities," not the fact that they were from out-of-state); *Wash. Bankers Ass'n v. State*, 495 P.3d 808, 818 (Wash. 2021) (en banc) (no discrimination when a tax was "dependent on income rather than a uniquely in-state factor such as *Bacchus Imports*' liquor and fruit wine"); *DIRECTV v. Utah State Tax Comm'n*, 364 P.3d 1036, 1043 (Utah 2015) (under *Bacchus*, "the focus is on geographic location"); *Quality Brands, Inc. v. Barry*, 715 F. Supp. 1138, 1138, 1140 (D.D.C. 1989) (applying *Bacchus* to find a statute discriminatory because on its face it prohibited the sale of liquor if it had been stored "outside the District"), *aff'd*, 901 F.2d 1130 (D.C. Cir. 1990).

*of New York*, No. 25-cv-9979, 2026 WL 181637, at *11 (S.D.N.Y. Jan. 22, 2026) (rejecting argument that legislators' mention of "companies like Instacart and its competitors" reflected a discriminatory purpose), *appeal docketed*, No. 26-172 (2d Cir. Jan. 27, 2026).

Plaintiffs' reliance on testimony by I.M.P., the owner of several District venues, is similarly unavailing. *See* Pls.' Mot. at 22. I.M.P. discussed the benefits to the District that the Act would provide. *See* Pls.' Ex. C [9-8] at 3–4. That is not discriminatory because legislation typically is supposed to benefit the community that enacts it. *See Milk Control Bd. v. Eisenberg Farm Prods.*, 306 U.S. 346, 351 (1939) ("One of the commonest forms of state action is the exercise of the police power directed to the control of local conditions and exerted in the interest of the welfare of the state's citizens."). While I.M.P. discussed the abuses of resellers and secondary ticket exchanges, it was not criticizing them simply because they are out-of-District. And while I.M.P. predicted that the Act would lead consumers to events in the District rather than "neighboring states," that was not a goal of the legislation. Pls.' Ex. C at 4. Nor does that evince discrimination between ticket issuers and resellers—which is the alleged discrimination that underlies Plaintiffs' claim. That, at most, shows competition between venues, which are both issuers.

The non-binding cases that Plaintiffs point to do not support them. *See* Pls.' Mot. at 23. In *DoorDash Inc. v. City of New York*, 692 F. Supp. 3d 268 (S.D.N.Y. 2023), the court found that plaintiffs had plausibly alleged a dormant Commerce Clause claim—not succeeded on a claim—because of statements by legislators that showed favoritism for local businesses *at the expense of* out-of-state businesses, such as "it's more important that we protect [New York restaurants] *instead of* . . . Grubhub or the other providers," *id.* at 302 (emphasis added) (alteration in original). And, in *South Dakota Farm Bureau, Inc. v. Hazeltine*, 340 F.3d 583 (8th Cir. 2003),

the court relied on statements that the amendment at issue would prevent "desperately needed profits [from being] skimmed out of local economies and into the pockets of distant corporations," *id.* at 594. The problem in both cases was that legislators seemed motivated by the out-of-state character of businesses and protectionism. But here, the Act regulates resellers and secondary ticket exchanges based on their practices—not their home state—and it regulates all resellers and secondary ticket exchanges the same regardless of where they are based. Thus, Plaintiffs' claim fails.

**E. <u>Plaintiffs Are Unlikely to Succeed on Their Equal Protection Claim.</u>**

Plaintiffs argue that the price cap violates equal protection because it only applies to resales, not original ticket sales, and this differential treatment lacks a rational basis. Pls.' Mot. at 25–26. "To succeed on a rational-basis challenge, [Plaintiffs] must meet a demanding standard." *Sanchez v. Off. of State Superintendent of Educ.*, 45 F.4th 388, 395 (D.C. Cir. 2022). The price cap "must be upheld 'if there is any reasonably conceivable state of facts that could provide a rational basis' for the legislative choice." *Id.* at 396 (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993)). Under rational-basis review, the District "may select one phase of one field and apply a remedy there, neglecting the others" because "[e]qual protection does not require that a State must choose between attacking every aspect of a problem or not attacking the problem at all." *Id.* at 398 (citation modified). "[T]he policy choices of the political branches are 'not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data.'" *Id.* (quoting *Beach*, 508 U.S. at 315). Thus, the question is not whether the Council "cited" "evidence" for its "distinction." Pls.' Mot. at 25 (citation modified). The question is instead whether Plaintiffs have "refut[ed] 'every conceivable basis which might support'" the price cap. *Sanchez*, 45 F.4th at 396 (quoting *Beach*, 508 U.S. at 315).

Plaintiffs have not. The District could rationally choose to cap resale ticket prices but not original ticket prices because the markets operate differently. A problem with the secondary market is that professional resellers snatch up tickets from issuers and then mark them up for resale while providing no value to the consumer. A *resale* price cap addresses this problem by capping the permissible markup. But ticket issuers on the primary market are not *reselling* tickets, so there is no markup to cap. In addition, initial ticket sales are often priced low, Comm. Rep. at 5, so the District could rationally choose to focus on the secondary market for regulation, where prices are higher. *See Sanchez*, 45 F.4th at 398.

It makes no difference that the Committee considered that a price cap on resales *could* have unintended consequences for consumers. *See* Pls.' Mot. at 25–26. All policies have pros and cons, and a law does not flunk rational-basis review simply because the legislature found that the pros outweighed the cons. *See Sanchez*, 45 F.4th at 396 ("Judicial intervention under [the rational-basis] standard 'is generally unwarranted no matter how unwisely . . . a political branch has acted.'" (quoting *Beach*, 508 U.S. at 314)). Even under intermediate scrutiny, "it is not within this Court's purview to predict second- or third-order effects of enacted legislation based on the premise that a law could have unintended consequences which could undermine its ultimate effectiveness." *Real Est. Bd. of N.Y., Inc. v. City of New York*, 182 F.4th 140, 159 (2d Cir. 2026).

Nor does the exemption for sporting events and movies render the price cap irrational. *See* Pls.' Mot. at 26. The Council was focused on live events in music and the arts, *see* Comm. Rep. at 1–2, so obviously the Act would not apply to sports or movies. Moreover, the economics of ticket pricing differ in material ways for live-entertainment events versus sports or movies, warranting different policy priorities. *See* GAO Rep. at 6–12. For example, sporting events and

movie screenings generally are less scarce than live-entertainment events. A sports team will play dozens of home games each season; and a movie will generally show at several times, at several theaters, for several weeks; but a concert tour will usually only stop once in the District. "[L]imited supply combined with high demand drives prices upward." James Chen, *Understanding the Scarcity Principle: Definition, Importance, and Examples*, Investopedia (Mar. 2, 2026), tinyurl.com/2ze6h4t5. And a high-demand-low-supply market can make consumers vulnerable to exploitation. Accordingly, the Council could rationally conceive that high ticket prices and consumer exploitation are less pressing in the sports and movie sectors, such that the Council should target live entertainment. *See Sanchez*, 45 F.4th at 398.

## II. <u>Plaintiffs Fail to Establish Irreparable Harm in the Absence of an Injunction.</u>

Even if Plaintiffs have shown a likelihood of success on the merits, they fail to show irreparable harm, and that failure "is grounds for refusing to issue a preliminary injunction, even if the other three factors merit such relief." *Clevinger v. Advoc. Holdings, Inc.*, 134 F.4th 1230, 1236 (D.C. Cir. 2025) (citation modified). The "standard" for irreparable harm is "high." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a preliminary injunction are not enough." *Clevinger*, 134 F.4th at 1234 (citation modified). Rather, the injury must be "certain," "great," "actual and not theoretical," "beyond remediation," and "of such *imminence* that there is a clear and present need for equitable relief." *Chaplaincy*, 454 F.3d at 297 (citation modified).

Moreover, "'[i]rreparable harm,' in this context, refers to harm within a specific timeframe." *Hanson v. District of Columbia*, 120 F.4th 223, 244 (D.C. Cir. 2024) (per curiam), *cert. denied*, 145 S. Ct. 2778 (2025). It is harm that threatens a court's ability to "grant meaningful relief following trial." *Id.*; *see Coal. for Humane Immigrant Rts. v. Mullin*, 185 F.4th

1275, 1280 (D.C. Cir. 2026) (per curiam) ("[T]he very question is whether relief is needed now to preserve the court's ability to grant effectual relief later."). And so, "[c]ourts may withhold this extraordinary remedy if a plaintiff's alleged injury does not threaten to moot the case." *Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.* (*DSSA*), 108 F.4th 194, 201 (3d Cir. 2024) (cited favorably in *Hanson* and *Coalition*), *cert. denied sub nom. Gray v. Jennings*, 145 S. Ct. 1049 (2025).

Plaintiffs fail to meet this standard because they do not "explain why [their] requested relief will be unavailable later." *Dotson v. District of Columbia*, No. 24-cv-1864, 2024 WL 5046282, at *7 (D.D.C. Dec. 9, 2024). Plaintiffs ask the Court to enjoin the District's enforcement of the price cap and declare the cap invalid and unenforceable. Compl., Prayer. But that relief will be available in the ordinary course of litigation. *See Turner Broad. Sys., Inc. v. FCC*, 507 U.S. 1301, 1301 (1993) (Rehnquist, C.J., in chambers) (explaining that implementation of a statute would not prevent the Supreme Court from deciding a constitutional challenge later); *Dotson*, 2024 WL 5046282, at *7 (similar). A preliminary injunction is not supposed to be a "shortcut" to that relief. *Hanson*, 120 F.4th at 243 (quoting *DSSA*, 108 F.4th at 197); *see also Dorfmann v. Boozer*, 414 F.2d 1168, 1173 n.13 (D.C. Cir. 1969).

Nor is there a "clear and present need for equitable relief" warranting this Court's intervention because any harms from complying with the price cap will occur even if the Court enjoins the District's enforcement. *Chaplaincy*, 454 F.3d at 297 (citation modified). The basis of Plaintiffs' alleged need for emergency relief is that unless the price cap is enjoined before January 1, they will suffer harms from having to comply with it. Pls.' Mot. at 2, 27. The fundamental problem for Plaintiffs is that they will have to comply with the Act even if the Court grants a preliminary injunction. The Act is enforceable not just by the District but by a private

right of action. D.C. Code §§ 28-5508(b), 47-2890.05(b), 28-3905(k)(1). Yet, a preliminary injunction here could only prevent the District's enforcement of the price cap—not enforcement by individuals who are not parties to this case. That is because a federal court "may enjoin named defendants from taking specified unlawful actions" but cannot enjoin "the world at large," "challenged laws themselves," or "all unnamed private persons who might seek to bring their own" suits to enforce the Act. *Whole Woman's Health v. Jackson*, 595 U.S. 30, 44 (2021) (citation modified); *see* Fed. R. Civ. P. 65(d)(2) (limiting whom an injunction may bind). Thus, even if the District is enjoined from enforcing the price cap, Plaintiffs still will need to comply with it come January 1 or face liability from private suits. Indeed, Plaintiffs aver that they will comply with the law to avoid legal exposure—while recognizing that the law is enforceable by "private consumer suits." ASC Decl. ¶ 30; Decl. of Gary Adler (NATP Decl.) [9-2] ¶ 23. As a result, Plaintiffs cannot show irreparable harm because a preliminary injunction "would not actually remedy" their harms. *Sierra Club v. U.S. Dep't of Energy*, 825 F. Supp. 2d 142, 153 (D.D.C. 2011); *see also, e.g.*, *Navistar, Inc. v. EPA*, No. 11-cv-449, 2011 WL 3743732, at *3 (D.D.C. Aug. 25, 2011) (Wilkins, J.).

Nor is the District's enforcement of the Act imminent. *See* DLCP Decl. ¶ 11. Plaintiffs primarily complain about complying with supposed "undefined" terms in the Act. Pls.' Mot. at 1. But, as mentioned above, the Department will engage in rulemaking, and Plaintiffs can seek guidance then or even before from the agency. DLCP Decl. ¶¶ 5, 11–12. Thus far, Plaintiffs have not even tried. *Id.* ¶ 12. Yet, "a party requesting a preliminary injunction must generally show reasonable diligence." *Benisek v. Lamone*, 585 U.S. 155, 159 (2018) (per curiam). Because Plaintiffs have not tried first to obtain answers to their questions from the agency, a federal court does not need to get involved at this premature stage.

Plaintiffs overlook or ignore all the above. Instead, they spend only one page on irreparable harm and offer just two theories—neither of which shoulders their "considerable burden." *Nat'l Immigr. Project of Nat'l Laws. Guild v. Exec. Off. of Immigr. Rev.*, 456 F. Supp. 3d 16, 33 (D.D.C. 2020) (Nichols, J.) (citation omitted). First, Plaintiffs argue that constitutional violations establish irreparable harm. Pls.' Mot. at 26–27. That is not the law. Courts "do not 'axiomatically' find that a plaintiff will suffer irreparable harm simply because it alleges a violation of its [constitutional] rights." *Hanson*, 120 F.4th at 244 (citing *Chaplaincy*, 454 F.3d at 302). Rather, the plaintiff must show that the purported constitutional violations and accompanying injuries meet the standard for irreparable harm: "injury that is sufficiently certain, persuasively demonstrated, and so clearly irremediable that it warrants" judicial intervention now. *Hanson*, 120 F.4th at 244. In each case, "the Court must look to the nature of [P]laintiffs' claims" and "the specific context of the facts of this case" to determine if the constitutional harms are in fact "irreparable." *Ayele v. District of Columbia*, 704 F. Supp. 3d 231, 240 (D.D.C. 2023); *see Nat'l Treasury Emps. Union v. United States*, 927 F.2d 1253, 1254–55 (D.C. Cir. 1991) (Thomas, J.) (no irreparable harm in a First Amendment case because plaintiffs had not shown that they "will cease speaking or writing before the district court resolves their constitutional challenges").

Accordingly, Plaintiffs' cases that involved quite different facts—or even different claims—do not establish that Plaintiffs have shown irreparable harm *here*.[8] Moreover, with one

---

[8] *See* Pls.' Mot. at 26–27; *Taylor v. Trump*, 823 F. Supp. 3d 17, 22, 40 (D.D.C. 2026) (procedural due process—not vagueness; transfer of inmates to most restrictive prison); *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (Fourth Amendment); *Karem v. Trump*, 960 F.3d 656, 662–63 (D.C. Cir. 2020) (procedural due process—not vagueness; suspension of a press pass that prevented journalist from timely reporting); *Talbott v. United States*, 176 F.4th 720, 748–49 (D.C. Cir. 2026) (op. of Wilkins, J.) (inability of military members

exception, Plaintiffs' cases do not grapple with *Hanson* and *Chaplaincy*, which refute a rule that constitutional violations always establish irreparable harm. The exception is *Taylor v. Trump*, 823 F. Supp. 3d 17 (D.D.C. 2026), which suggests that a likelihood of success on any constitutional claim establishes irreparable harm, *id.* at 40. The *Taylor* court relied on *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009), for that proposition, but "the D.C. Circuit has since refuted [*Mills*'s] unconditional language" in *Hanson*. *Santos v. Collins*, No. 24-cv-1759, 2025 WL 1823471, at *6 n.10 (D.D.C. Feb. 26, 2025); *see Ayele*, 704 F. Supp. 3d at 237–39 & n.11 (explaining that *Mills* "does not accurately summarize the law in this circuit"). The *Taylor* court tried to distinguish *Hanson* as only applying when a plaintiff "merely allege[s] a violation" but does not show a likelihood of success. 823 F. Supp. 3d at 40. But the court overlooked that *Hanson* had an evidentiary record that the D.C. Circuit carefully parsed to conclude that the plaintiffs had not shown irreparable harm. 120 F.4th at 244–46. Further, *Hanson* applied *Chaplaincy*, *id.* at 244, which instructs that "[w]ithin the irreparable harm analysis itself—which assumes, without deciding, that the movant has demonstrated a likelihood that the non-movant's conduct violates the law—we examine only whether that violation, if true, inflicts irremediable injury," 454 F.3d at 303. Thus, the *Taylor* court misunderstood that it was required to determine whether the particular constitutional violation—assuming it was shown—and facts established irreparable harm. *See, e.g.*, *Alpine Sec. Corp. v. Fin. Indus. Regul. Auth.*, 121 F.4th 1314, 1335–37 (D.C. Cir. 2024) (concluding that a constitutional violation would not amount to an irreparable injury, even if shown), *cert. denied*, 145 S. Ct. 2751 (2025).

---

to serve their country), *pet. for cert. docketed*, No. 26-272 (Sept. 1, 2026); *Ellison*, 140 F.4th 957 (did not analyze irreparable harm; restrictions on sales of prescription drugs).

Thus, "there is no *per se* rule that the violation of any constitutional right is inherently irreparable." *Ayele*, 704 F. Supp. 3d at 239. After all, "rigid rules and equity principles mix like oil and water." *Clevinger*, 134 F.4th at 1234. So the question becomes whether Plaintiffs' alleged harms meet the D.C. Circuit's high standard for "irreparable"—even if they hide inside a Trojan Horse of constitutional claims.

Besides constitutional harms, Plaintiffs argue that if they must comply with the price cap, they will have to "pass up economic opportunities," "sell tickets at a loss," and "spend significant resources" on compliance. Pls.' Mot. at 27. "These claimed harms are best characterized as economic in character." *Cmty. Oncology All. v. Becerra*, No. 23-cv-2168, 2023 WL 9692027, at *4 (D.D.C. Dec. 21, 2023) (Nichols, J.). But this Court, the D.C. Circuit, and the Supreme Court have held that the same or similar harms are not irreparable. *See, e.g.*, *id.* ("loss of business opportunities, market share, and customer goodwill" (citation omitted)); *Hines Immigr. L., PLLC v. Exec. Off. for Immigr. Rev.*, No. 26-cv-1018, 2026 WL 969020, at *13 n.1 (D.D.C. Apr. 10, 2026) (Nichols, J.) ("operational disruptions and inefficiencies" (citation omitted)); *Clevinger*, 134 F.4th at 1234 ("loss of customers"); *id.* at 1235 ("reputational injury"); *Petroleum Expl. v. Pub. Serv. Comm'n*, 304 U.S. 209, 220–21 (1938) (costs of complying with a law and litigation costs). Such financial and economic injuries "are presumptively remediable through monetary damages." *Clevinger*, 134 F.4th at 1234. There is an exception "*only* where the loss threatens the very existence of the movant's business." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam) (emphasis added). Yet Plaintiffs do not argue that the existence of their businesses is threatened.

Plaintiffs admit that these are "financial harm[s]" that "ordinar[ily]" would "not count as irreparable." Pls.' Mot. at 27. Nonetheless, Plaintiffs argue that their losses are not recoverable

because "[i]dentifying and valuing the transactions they avoided would be 'inherently speculative.'" *Id.* (quoting *O'Donnell Constr. Co. v. District of Columbia*, 963 F.2d 420, 428 (D.C. Cir. 1992)). But Plaintiffs do not "substantiate that claim" beyond two conclusory statements that they would not be able to reconstruct forgone transactions. *Clevinger*, 134 F.4th at 1234; *see* NATP Decl. ¶ 21; ASC Decl. ¶ 29. Yet ASC also states that it can estimate its revenues in the District and "would expect" to "continue earning similar revenue but for the Price Cap." ASC Decl. ¶ 11. So, at a minimum, Plaintiffs could compare their revenues in years without the price cap to years with the price cap to estimate their damages.

Moreover, boiled down, Plaintiffs' alleged harms are loss of business opportunities and customers (*i.e.*, ticket resales)—categories of loss that can be estimated and compensated through damages. *E.g.*, *Clevinger*, 134 F.4th at 1234–35; *Econ. Rsch. Servs., Inc. v. Resol. Econ., LLC*, 140 F. Supp. 3d 47, 52–53 (D.D.C. 2015).[9] Such damages inherently involve estimating and valuing transactions that would have occurred but for a defendant's unlawful conduct, but that does not make them unrecoverable. Civil plaintiffs regularly use economic modeling and expert witnesses to estimate such damages in far more complex scenarios than here (for example, antitrust). *See, e.g.*, *In re Nat'l Football League's "Sunday Ticket" Antitrust Litig.*, --- F.4th ----, ----, No. 24-5493, 2026 WL 3266788, at *2 (9th Cir. Oct. 30, 2026) ("Antitrust claims often depend on expert testimony to prove a crucial counterfactual: that injury and damages would not have occurred in a world without the claimed anticompetitive conduct."). Yet Plaintiffs' conclusory declarations do not explain why no expert could create a model to estimate their damages. Ultimately, the standard for irreparable harm is high and "even

---

[9] *O'Donnell* is inapposite because it dealt with government procurement and explained why—in that unique context—courts have found injunctions necessary. 963 F.2d at 428–29.

the '*possibility*'" of compensatory relief "'weighs heavily against a claim of irreparable harm.'" *Ayele*, 704 F. Supp. 3d at 241 (emphasis added) (quoting *Wis. Gas*, 758 F.2d at 674). It is certainly possible that Plaintiffs will be able to estimate losses from the Act in a damages phase, should they prevail.

Even if that were not true, irreparable harm is not "automatically" established "when financial losses are unrecoverable," as this Court recently explained. *Corewell Health William Beaumont Univ. Hosp. v. Kennedy*, No. 26-cv-3111, 2026 WL 3257581, at *6 (D.D.C. Oct. 29, 2026) (Nichols, J.). Plaintiffs must still show that their "losses are *certain, great and actual*," and Plaintiffs must "adequately describe and quantify the level of harm" they face. *Id.* (emphasis in original) (citation modified). "[C]ritically," Plaintiffs do not "offer any evidence to show how" their losses "actually affect [their] bottom line, *e.g.*, what percentage of [their] annual revenues the losses constitute." *Id.*; *see also Cmty. Oncology All.*, 2023 WL 9692027, at *5. What is more, Plaintiffs operate nationally. NATP Decl. ¶ 10. Even if Plaintiffs stand to face losses in one city, those losses are not so "significant" when judged against the rest of Plaintiffs' business. *Corewell*, 2026 WL 3257581, at *6 (citation omitted).

Plaintiffs' own conduct confirms as much. Several states have enacted similar laws. *See* p. 4, *supra*. Yet there is no evidence that Plaintiffs have pulled out of other states or that those states' laws have significantly affected Plaintiffs' bottom line. *See* Vanderbilt Rep. at 20–21. Plaintiffs have not, to the District's knowledge, even challenged any other price cap. Such "willingness to put up with" price caps "serve[s] as an indication that [Plaintiffs'] injury is not as serious as alleged." *Ams. for Prosperity*, 191 F.4th at 175 (citation modified).

Then there is Plaintiffs' delay, which further "implies a lack of urgency and irreparable harm." *Miller v. Gruenberg*, No. 21-cv-3035, 2022 WL 20699638, at *1 (D.D.C. Aug. 24, 2022)

(Nichols, J.) (citation omitted), *aff'd*, No. 22-5256, 2023 WL 6206247 (D.C. Cir. Sept. 25, 2023). Plaintiffs have known the final provisions of the RESALE Act since July 14, when the Council passed it. Although the Act required approval from the Mayor and Congress, Plaintiffs could have begun preparing their motion so they could file the day the Act went into effect. *See Save Long Beach Island, Inc. v. U.S. Dep't of Com.*, No. 25-cv-2214, 2025 WL 2996157, at *5 (D.D.C. Oct. 24, 2025) (Nichols, J.) ("When evaluating whether a delay implies a lack of irreparable harm, courts consider the date an action was authorized—not just when it takes effect."). But Plaintiffs waited three weeks after the Act became effective to file their motion. Similar delays have undercut motions for a preliminary injunction. *E.g.*, *Douglas v. NPS*, 835 F. Supp. 3d 159, 169 (D.D.C. 2026) (two weeks). Worse still, while delaying, Plaintiffs used the time to piggyback off the *Ticket Policy Forum* plaintiffs' filings. *See, e.g.*, Pls.' Mot. at 18 (relying on evidence submitted in *Ticket Policy Forum*). If Plaintiffs could delay filing to crib from another case, they were not experiencing the sort of urgency that justifies emergency relief.

## III. <u>The Balance of Harms and Public Interest Alone Support Denying an Injunction.</u>

If the Court concludes that Plaintiffs made clear showings on the merits and irreparable harm, it should nonetheless deny an injunction because the District's and the public's interests outweigh Plaintiffs'. *See, e.g.*, *Benisek*, 585 U.S. at 158 (holding that the balance of harms and public interest alone supported denial of an injunction); *Winter*, 555 U.S. at 31–32 (similar); *Kim v. Fin. Indus. Regul. Auth., Inc.*, 698 F. Supp. 3d 147, 172 (D.D.C. 2023) ("[A] court can deny preliminary injunctive relief solely on the balance of equities and public interest factors even in cases, like this, involving constitutional claims.").

"On the District's side of the balance is the governmental interest in enforcing its duly enacted law." *Hanson*, 120 F.4th at 246. "A ruling of unconstitutionality frustrates the intent of the elected representatives of the people" and "threaten[s] to short circuit the democratic process

by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution." *Wash. State Grange*, 552 U.S. at 451 (citation modified). Thus, it is settled that "[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Labrador v. Poe by & through Poe*, 144 S. Ct. 921, 923 (2024) (Gorsuch, J., concurring) (citation omitted).

Here, the elected branches of District government have determined that the RESALE Act serves the public interests in "protect[ing] artists, venues, and consumers." RESALE Act, pmbl. That is a determination entitled to respect while this litigation proceeds. *See Cmty. Oncology All.*, 2023 WL 9692027, at *6 (declining to "upset" Congress's "deliberate policy choice while the parties litigate the merits"); *Thompson v. DeWine*, 959 F.3d 804, 812 (6th Cir. 2020) ("[G]iving effect to the will of the people by enforcing the laws they and their representatives enact serves the public interest."). And the fact that this law is aimed at "consumer protection" further adds to the public interest in respecting its enactment while litigation proceeds. *John Doe Co. v. CFPB*, 849 F.3d 1129, 1135 (D.C. Cir. 2017) (per curiam).

The will of the people plus their interests in protecting consumers and vital, cultural industries far outweigh the pecuniary interests of a handful of corporations who add no value to the economy. Plaintiffs provide no evidence that they will be unable to absorb their losses from complying with one city's law while litigation proceeds. Plaintiffs may later be able to recover those losses, but the harms to the District and its people from a preliminary injunction are truly irreparable.

Further tipping the balance against an injunction is "the legal uncertainty" surrounding Plaintiffs' claims. *Benisek*, 585 U.S. at 160; *see Mass. State Grange v. Benton*, 272 U.S. 525, 527 (1926) (Holmes, J.) ("[N]o injunction ought to issue" in challenges to democratically

enacted state laws unless the legal issues are "reasonably free from doubt."). Even if the Court finds that Plaintiffs are likely to succeed on the merits, that conclusion will require extending existing precedent because no case has held that regulations of online secondary ticket exchanges are unconstitutional. "Constitutionalizing new areas of American life is not something federal courts should do lightly"—and on a preliminary injunction—"particularly when 'the States are currently engaged in serious, thoughtful' debates about the issue." *L.W.*, 83 F.4th at 471.

The states are indeed in a thoughtful debate about how to bring down ticket resale prices, as legislative activity across the country demonstrates. "Failure to allow these laws to go into effect would start to grind these all-over-the-map gears to a halt." *Id.* at 472. Yet, "sound government usually benefits from more rather than less debate, more rather than less input, more rather than less consideration of fair-minded policy approaches." *Id.* Thus, a preliminary injunction is decidedly against the *national* public interest because it prematurely moves this healthy debate over ticket policy into court, instead of letting states and the District serve their constitutional roles as "laborator[ies]" of democracy. *Whalen v. Roe*, 429 U.S. 589, 597 n.20 (1977) (citation omitted). The harm to the national debate and democratic processes from a preliminary injunction cannot be undone if the Court later determines that the price cap is constitutional. Until vacated, a preliminary injunction will cast legal doubt on other states' efforts and may cause them to forgo pro-consumer policy choices that are in fact constitutional.

Ignoring all these weighty considerations, Plaintiffs try to carry their burden on this factor with just two arguments. Neither suffices.

First, Plaintiffs argue that they automatically establish that the equities and public interest weigh in their favor because enforcing an unconstitutional law is contrary to the public interest. Pls.' Mot. at 27–28. But "the mere fact" that Plaintiffs bring constitutional claims "does not

decide [the Court's] balance-of-the-equities inquiry. To the contrary, this [C]ourt must balance the equities of the parties and the public even when a party seeks to restrain the enforcement of an allegedly unconstitutional law." *Hanson*, 120 F.4th at 247; *see Benisek*, 585 U.S. at 158 (affirming denial of an injunction only on the equities despite constitutional claims). After all, a preliminary injunction is "not in any sense intended as a final decision as to the constitutionality of the challenged statute." *Brown v. Chote*, 411 U.S. 452, 456 (1973). So Plaintiffs cannot claim that denying an injunction allows an unconstitutional law to be enforced. "Without the clarity of a full trial on the merits, . . . [courts] must err on the side of respecting state sovereignty." *DSSA*, 108 F.4th at 206; *accord L.W.*, 83 F.4th at 472.

Thus, there is simply no rule that likelihood of success on a constitutional claim *per se* establishes a right to a preliminary injunction. "In equity, as nowhere else, courts eschew rigid absolutes and look to the practical realities and necessities inescapably involved in reconciling competing interests, notwithstanding that those interests have constitutional roots." *Lemon v. Kurtzman*, 411 U.S. 192, 201 (1973) (plurality); *see Appalachian Voices v. FERC*, 139 F.4th 903, 930 (D.C. Cir. 2025) (Henderson, J., concurring) (criticizing courts that "roll[ ] each independent inquiry into a blanket 'likelihood of success on the merits' test"). Although Plaintiffs point to statements in cases that could be misinterpreted to suggest a rule, the D.C. Circuit has clarified that those statements indicate that "a likelihood of success on the merits . . . can bear on the balancing of the equities" by "'*lighten[ing]* the Executive's stated interests.'" *Nat'l Tr. for Historic Pres. in the United States v. NPS*, 185 F.4th 1185, 1238 & n.14 (D.C. Cir. 2026) (emphasis added) (quoting *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 734 (D.C. Cir. 2022)), *stayed*, 609 U.S. 1068 (2026). But it does not *eliminate* the government's

interests. *See id.* Rather, the Circuit reaffirmed that "[o]f course" the balancing-of-equities and merits factors still must "do separate work." *Id.* at 1238 n.14.

In this case especially, any finding of a likelihood of success on the merits should not do much work deciding the balance of equities. Success on the merits would require a significant extension of precedent, from resurrecting a rejected extraterritoriality principle to adopting a novel interpretation of the Home Rule Act. All the while, Plaintiffs' claims depend on an understanding of the complexities of the ticket industry; yet there has been no discovery, Plaintiffs' factual assertions are disputed, and the District has had mere weeks to gather facts to mount a defense. *See, e.g.*, Def.'s Ex. 5, Future of Music Coal. Testimony at 3–14 (refuting each of the resale industry's objections to price caps). The upshot of all this is that, even if the Court finds a likelihood of success on the merits, that conclusion will necessarily rest on shaky ground, both legal and factual. Accordingly, a likelihood of success on the merits should not decide the balance of equities. *See Talbott v. United States*, 176 F.4th 720, 749 (D.C. Cir. 2026) (op. of Wilkins, J.) (concluding that the balance of equities did not support a preliminary injunction against certain applications of a policy, even though plaintiffs were likely to succeed, because "we must also consider that this is only a preliminary determination of the merits"), *pet. for cert. docketed*, No. 26-272 (Sept. 1, 2026).

Second, Plaintiffs use the public-interest prong to launch still more policy criticisms of the RESALE Act. Pls.' Mot. at 27–28. But, as this Court has explained several times, it is not the Court's role on a preliminary injunction to reweigh the pros and cons of government policies. *See Nat'l Immigr. Proj.*, 456 F. Supp. 3d at 34; *Cmty. Oncology All.*, 2023 WL 9692027, at *6; *Am. Foreign Serv. Ass'n v. Trump*, 768 F. Supp. 3d 6, 25 (D.D.C. 2025) (Nichols, J.). The elected branches have already struck that balance. And the Court "must be wary of plaintiffs

who seek to transform federal courts into weapons of political warfare that will deliver victories that eluded them in the political arena." *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 11 (2024) (citation modified).

Anyway, Plaintiffs' criticisms are misguided. Plaintiffs argue that a secondary market in which "resellers can participate" "benefits consumers." Pls.' Mot. at 28. And they tout a few studies allegedly showing that resales have saved consumers money. NATP Decl. ¶¶ 12–13.[10] But it is important for the Court to understand the difference between consumer-to-consumer resales and what Plaintiffs do. Secondary markets do serve a pro-consumer function when fans who purchased tickets can no longer attend an event and need to offload their ticket by reselling. Comm. Rep. at 5. Those resales will be unaffected by the price cap because most consumers sell around or below the original ticket price. *See id.* It is common sense that a regular fan is just trying to recoup the cost of their ticket—not make a profit. But that does not describe Plaintiffs. Plaintiffs are *professional* resellers who acquire and resell tickets purely to make a profit. Plaintiffs' arguments and declarations attempt to obscure that distinction, but the Court should not be fooled. The price cap will allow the "legitimate function[s]" of secondary markets to continue (*i.e.*, consumer-to-consumer resales priced around face value), while cutting down on "scalpers who are extracting a profit." *Id.* It thus benefits consumers.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' Motion for a Preliminary Injunction.

Date: November 9, 2026. Respectfully submitted,

---

[10] To support their alleged concerns for consumers, Plaintiffs rely on testimony from the National Consumers League. Pls.' Mot. at 7. But Plaintiffs fail to mention that the group and other purportedly pro-consumer groups opposed to resale legislation are funded by secondary ticket exchanges and professional resellers. Def.'s Ex. 7, Fix the Tix Testimony at 3.

BRIAN L. SCHWALB
Attorney General for the District of Columbia

CHAD COPELAND
Deputy Attorney General
Civil Litigation Division

*/s/ Matthew R. Blecher*
MATTHEW R. BLECHER [1012957]
Chief, Civil Litigation Division, Equity Section

*/s/ Adam J. Tuetken*
ADAM J. TUETKEN [242215]
HELEN M. RAVE [90003876]
Assistant Attorneys General
Civil Litigation Division
400 6th Street, NW
Washington, D.C. 20001
(202) 735-7474
adam.tuetken@dc.gov

*Counsel for Defendant District of Columbia*