**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

NATIONAL ASSOCIATION OF TICKETING PROFESSIONALS, et al.,
Plaintiffs,

-v-

DISTRICT OF COLUMBIA,

Defendant.

Case No. 1:26-cv-03620 (CJN)

# BRIEF OF ARTIST AND FAN ORGANIZATIONS AS *AMICI CURIAE* IN SUPPORT OF DEFENDANT

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ..... iii

CORPORATE DISCLOSURE STATEMENT ..... vi

CERTIFICATION OF COUNSEL ..... vii

INTERESTS OF AMICI ..... 1

INTRODUCTION ..... 4

I. A BRIEF HISTORY ..... 5

II. LEGAL STANDARD ..... 9

III. ARGUMENT ..... 10

A. Plaintiffs Are Brokers, Not Fans ..... 10

B. The Act Protects Fans, Artists, and Workers Across the Country ..... 12

1. The caps remove the profit incentive that drives bots and speculation. ..... 12

2. The caps stop brokers from capturing the discounts intended for fans. ..... 13

3. The caps protect artists' relationships with their fans. ..... 14

4. Caps ensure more of each ticket dollar reaches the artists and crew. ..... 15

5. Fans whose plans change can still resell their tickets. ..... 16

6. The price disclosure creates a transparent market for fans. ..... 16

C. Uncapped Resale Does Not Constrain Ticketmaster ..... 17

D. Plaintiffs' Predictions of Harm Are Speculative and Contradicted by Real-World Experience ..... 21

1. Deregulation did not deliver what it promised. ..... 21

2. Plaintiffs are flexible and sophisticated businesses. ..... 22

3. Capped resale works at scale. ..... 22

4. The evidence of fraud is contested. ..... 23

E. The Motion Turns on Disputed Facts, and the Equities Favor Denying Plaintiffs' Motion ........ 24

IV. CONCLUSION ........ 25

CERTIFICATE OF SERVICE ........ 25

## TABLE OF AUTHORITIES

### Cases

*Am. Foreign Serv. Ass'n v. Trump*, 768 F. Supp. 3d 6 (D.D.C. 2025) .................................. 24

*Berman v. Parker*, 348 U.S. 26 (1954) .................................................................................. 10

*Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290 (D.C. Cir. 2006)................. 21

*Cmty. Oncology All. v. Becerra*, No. 23-cv-2168, 2023 WL 9692027 (D.D.C. Dec. 21, 2023) .................................................................................................................... 24

*Estell v. City of Birmingham*, 286 So. 2d 866 (Ala. Crim. App.), *aff'd*, 286 So. 2d 872 (Ala. 1973) ...................................................................................................................... 7

**FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307 (1993) ............................................ 10, 19, 23

**Gold v. DiCarlo*, 235 F. Supp. 817 (S.D.N.Y. 1964) (three-judge court), *aff'd mem.*, 380 U.S. 520 (1965)................................................................................. 7, 8, 14, 25

**Hanson v. District of Columbia*, 120 F.4th 223 (D.C. Cir. 2024) (per curiam), *cert. denied*, 145 S. Ct. 2778 (2025) ........................................................................ 10, 21

*Hicks v. Miranda*, 422 U.S. 332 (1975)...................................................................................... 8

*Kelly-Sullivan, Inc. v. Moss*, 22 N.Y.S.2d 491 (Sup. Ct.), *aff'd*, 24 N.Y.S.2d 984 (App. Div. 1940) ............................................................................................................. 7

*Kirtley v. State*, 84 N.E.2d 712 (Ind. 1949) .............................................................................. 7

*Mandel v. Bradley*, 432 U.S. 173 (1977) (per curiam) .............................................................. 8

*Maryland v. King*, 567 U.S. 1301 (2012) ................................................................................ 10

*N.J. Ass'n of Ticket Brokers v. Ticketron*, 543 A.2d 997 (N.J. Super. Ct. App. Div. 1988) .......................................................................................................................... 7

*Nat'l Immigr. Project of Nat'l Laws. Guild v. Exec. Off. of Immigr. Rev.*, 456 F. Supp. 3d 16 (D.D.C. 2020) ............................................................................................... 24

**Nebbia v. New York*, 291 U.S. 502 (1934)............................................................................. 7

*Nken v. Holder*, 556 U.S. 418 (2009) ...................................................................................... 10

*People v. Patton*, 309 N.E.2d 572 (Ill. 1974) ............................................................................ 7

*People v. Salmon*, 478 N.Y.S.2d 780 (Dist. Ct. 1984)............................................................. 7

*Rumber v. District of Columbia*, No. 04-cv-1170 (RMU), 2005 WL 1903727 (D.D.C. July 19, 2005) ........ 10

*State v. Major*, 253 S.E.2d 724 (Ga. 1979) ........ 7

*State v. Spann*, 623 S.W.2d 272 (Tenn. 1981) ........ 7

*State v. Youker*, 585 P.2d 43 (Or. Ct. App. 1978) ........ 7

*Tyson & Brother–United Theatre Ticket Offices, Inc. v. Banton, 273 U.S. 418 (1927)* ........ 7

**United States v. Live Nation Ent., Inc.*, 838 F. Supp. 3d 337 (S.D.N.Y. 2026), *reconsideration denied*, No. 24-cv-3973, 2026 WL 563024 (S.D.N.Y. Feb. 27, 2026) ........ 17, 18, 19

**Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ........ 10, 12, 20, 21

**Statutes**

Ark. Code Ann. § 5-63-201, *repealed by* 2023 Ark. Laws Act 590, § 2 (H.B. 1650) ........ 6

Conn. Gen. Stat. § 53-289, *repealed by* Act of July 5, 2007, Pub. Act No. 07-206, § 5, 2007 Conn. Acts (Reg. Sess.) ........ 6

Conn. Gen. Stat. Ann. § 53-289c ........ 9

*D.C. Code § 28-5506 ........ 16

D.C. Code § 28-5507 ........ 24

Fla. Stat. Ann. § 817.36, *amended by* 2006 Fla. Sess. Law Serv. ch. 2006-105 (H.B. 6003) ........ 6, 9

Ga. Code Ann. § 43-4B-25 ........ 9

Ga. Code Ann. § 43-4B-28 ........ 9

Ky. Rev. Stat. Ann. § 518.070 ........ 9

Me. Stat. tit. 8, § 1301 ........ 8, 22

N.J. Stat. Ann. § 56:8-33, *amended by* 2008 N.J. Laws ch. 55 ........ 7, 9

N.Y. Arts & Cult. Aff. Law § 25.24 ........ 13

R.I. Gen. Laws Ann. § 5-22-26 ........ 9

Vt. Stat. Ann. tit. 9, § 2479f ........ 8, 22

**Session Laws and Pending Bills**

2007 Conn. Pub. Acts 07-206 .......... 8

2007 Minn. Laws ch. 47, § 1 .......... 8

2008 N.J. Laws ch. 55 .......... 8

Assemb. B. 1720, 2025–2026 Reg. Sess. (Cal. 2026) .......... 9

H.B. 77, 2026 Leg., Reg. Sess. (Md. 2026) .......... 9

Restricting Egregious Scalping Against Live Entertainment (RESALE) Amendment Act of 2026, 73 D.C. Reg. 11,351 (Aug. 14, 2026) .......... 9

S. 3228, 194th Gen. Ct. (Mass. 2026) .......... 9

S. Substitute 2 for S.B. 181, 153d Gen. Assemb. (Del. 2026) .......... 9

**Other Authorities**

3 John Forster, *The Life of Charles Dickens* (Boston, James R. Osgood & Co. 1875) .......... 5

Brett Goldberg, *How the Ticket Industry Works: From the Artist to TicketMaster to Brokers to You*, TickPick Blog (June 28, 2019) .......... 6, 11

Brian Shearer, Vanderbilt Policy Accelerator, *How to Save Audiences $11 Billion on Live Events* (Aug. 2026) .......... 9, 11, 12

Conn. Office of Legislative Research, OLR Research Report No. 98-R-0382, Ticket Scalping (1998) .......... 22

Milton Esterow, *Lefkowitz's Aide Says 'Ice' Is Back*, N.Y. Times (Apr. 28, 1964) .......... 5

*N.Y. State Att'y Gen., Obstructed View: What's Blocking New Yorkers from Getting Tickets (2016) .......... 8, 11, 12, 13, 17, 21

Steve Knopper, *Scalped! A History of Ticket Reselling*, Saturday Evening Post (Feb. 16, 2023) .......... 5, 6

*U.S. Gov't Accountability Off., GAO-18-347, *Event Ticket Sales: Market Characteristics and Consumer Protection Issues* (2018) ... 8, 11, 12, 13, 15, 16, 21, 22, 23

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Local Civil Rule 7(o)(5), Amici state as follows:

1. The American Federation of Musicians of the United States and Canada is a 501(c)(5) labor organization. It has no parent corporations, and no publicly traded corporations have an ownership interest in the organization.

2. The Artist Rights Alliance is a nonprofit corporation operating under 501(c)(4). It has no parent corporations, and no publicly traded corporations have an ownership interest in the organization.

3. Common Good, Inc. d/b/a Fan Alliance is a 501(c)(3) nonprofit corporation. It has no parent corporations, and no publicly traded corporations have an ownership interest in the organization.

4. The Future of Music Coalition is a nonprofit, non-stock corporation. It has no parent corporations, and no publicly traded corporations have an ownership interest in the corporation.

5. The Music Artists Coalition is a 501(c)(6) nonprofit organization. It has no parent corporations, and no publicly traded corporations have an ownership interest in the organization.

6. Music Managers Forum-US is a 501(c)(6) organization. It has no parent corporations, and no publicly traded corporations have an ownership interest in the organization.

7. The National Academy of Recording Arts & Sciences, Inc. is a 501(c)(6) nonprofit organization. It has no parent corporations, and no publicly traded corporations have an ownership interest in the organization.

8. The National Independent Talent Organization is a 501(c)(6) organization. It has no parent corporations, and no publicly traded corporations have an ownership interest in the organization.

9. The Screen Actors Guild–American Federation of Television and Radio Artists is a 501(c)(5) labor union. It has no parent corporations, and no publicly traded corporations have an ownership interest in the labor union.

10. Songwriters of North America is a 501(c)(6) nonprofit. It has no parent corporations, and no publicly traded corporations have an ownership interest in it.

## CERTIFICATION OF COUNSEL

In accordance with Local Civil Rule 7(o)(5), Counsel for Amici hereby certifies on this 13th day of November, 2026 that (1) this brief was authored entirely by Amici's counsel and not by counsel for any party in the above-captioned matter, in whole or in part; (2) no party or counsel for any party contributed money to fund preparing or submitting this brief; and (3) apart from Amici, their members, and their counsel, no other person contributed money to fund preparing or submitting this brief.

*s/ Katherine Van Dyck*
Katherine Van Dyck

## INTERESTS OF AMICI

Amici Curiae are organizations that advocate for artists' and fans' economic rights across the United States. Their stakeholders have direct interests in the Restricting Egregious Scalping Against Live Entertainment (RESALE) Amendment Act of 2026 (hereinafter "RESALE Act" or "Act") and Plaintiffs' attempt to block it. Amici include:

*American Federation of Musicians of the United States and Canada (AFM).* AFM was founded in 1896 and is the largest union of professional musicians in the world. It represents tens of thousands of musicians who perform in orchestras, theaters, clubs, recording sessions, and touring productions across the United States and Canada, and it is affiliated with the AFL-CIO. AFM's members earn their living from live performances and are directly affected by resale practices that inflate ticket prices, drain fan spending away from the shows they play, and push artists and presenters to price live music beyond reach. AFM Local 171-710 Organizer Rohin Ghosh testified before the D.C. Council's Committee on Public Works and Operations (the "Committee") in favor of the RESALE Act.

*Artist Rights Alliance (ARA).* ARA is a nonprofit coalition of working musicians, performers, and songwriters, founded in 2014 by artists including Rosanne Cash and John McCrea of CAKE. Guided by the principle that "the people who make music should shape its future," ARA works to help creators build lasting careers while retaining control over their work, and empowers artists to advocate for themselves before lawmakers and policymakers. ARA's members earn a substantial share of their livelihoods on the road, and they have a direct stake in ensuring that the value of a ticket flows to the artists who create the music and the fans who come to hear it, not to brokers and exchanges.

*Common Good, Inc. d/b/a Fan Alliance.* Fan Alliance is a national, independent, grassroots nonprofit made up of music fans dedicated to a sustainable music ecosystem. It represents

thousands of fans across the country and accepts no funding from industry sources. Fan Alliance testified in support of the RESALE Act on behalf of fans who are crowded out of initial sales by bots and brokers and then charged inflated prices for "sold out" shows.

*Future of Music Coalition (FMC)*. FMC is a national nonprofit founded by musicians, artist advocates, technologists, and lawyers to build a music ecosystem in which artists flourish and are paid fairly and transparently for their work. For 25 years, FMC has pursued this goal through research, advocacy and educational work illuminating the practical realities faced by diverse musicians and composers across live and recorded music industries. FMC testified before the Committee in support of the RESALE Act that is the subject of this litigation.

*Music Artists Coalition (MAC)*. MAC is an artist advocacy organization founded in 2019 by artists and their managers to give music creators a voice on the policy issues that shape their careers. Its board includes recording artists across genres, and it advocates at the state and federal levels on issues affecting artists' rights and livelihoods. That work includes ticketing, where MAC supports reforms like the RESALE Act that protect the prices artists set for their fans.

*Music Managers Forum-US (MMF-US)*. MMF-US is a professional organization, founded in 1993, that represents professional artist managers and self-managed creators. Managers oversee every aspect of the artists' careers, including planning tours, setting ticket prices, and fielding fans' complaints when tickets are resold at multiples of face value. MMF-US has advocated for managers and the artists they represent across the live, publishing, recording, and streaming sectors, including before the Committee in favor of the RESALE Act.

*The National Academy of Recording Arts & Sciences, Inc. (Recording Academy)*. The Recording Academy is a 501(c)(6) nonprofit membership organization representing thousands of recording artists, songwriters, producers, engineers, and other music professionals. The Recording

Academy's primary purposes include advancing the arts and sciences of recording, recognizing outstanding creative achievement through the GRAMMY AWARDS®—music's only peer-recognized accolade—and advocating for the interests of recording artists, songwriters, studio professionals, and other music makers before national, state, and local policymakers. The Recording Academy has long pushed for transparency and fairness in ticketing for both artists and fans. It supported the RESALE Act before the D.C. Council and was also among the stakeholders the Government Accountability Office (GAO) consulted for its 2018 report on event ticket sales.

*National Independent Talent Organization (NITO)*. NITO is a nonprofit trade association of independent talent agencies and artist managers, formed in 2020. Its members book tens of thousands of concerts a year across the country, for thousands of touring artists. NITO's members set ticket prices with their artists and see firsthand how speculative and inflated resale undermines the pricing artists choose for their fans. NITO has conducted national studies of resale markups and testified in support of the RESALE Act.

*The Screen Actors Guild–American Federation of Television and Radio Artists (SAG-AFTRA)*. SAG-AFTRA is the world's largest labor union representing performers, broadcasters, and recording artists. Its approximately 160,000 members include recording artists and singers who perform and tour live. SAG-AFTRA supported the RESALE Act before the D.C. Council. It explained that capping resale removes the profit motive for using bots to buy up tickets before fans can, while still preserving a secondary market so that fans are not stuck with tickets they cannot use. It also explained that capping resale ensures more of the money spent on live entertainment reaches the singers, performers, crew, and engineers who make it.

*Songwriters of North America (SONA)*. SONA is a membership-based advocacy organization formed in 2015. SONA is run by and for professional songwriters. The organization

advocates on behalf of songwriters' interests before legislative bodies, administrative agencies, and the courts. SONA is an open and diverse community that unites enthusiastic music creators and thoughtful business leaders to create a unified voice to protect artistic expression, compensation, and the rights of songwriters in North America.

## INTRODUCTION

The RESALE Act passed by the D.C. Council earlier this year is an important victory for artists and fans facing a live event industry characterized by monopolization, declining earnings for artists, and price gouging of fans. The Act is not, however, a novel or landmark use of legislative power to regulate the ticketing industry. Fans of artists from Charles Dickens to Taylor Swift have battled ticket speculators for over 150 years. States have used their police power throughout that history to stop the predatory and deceptive behavior that plagues the secondary market, and those laws have overwhelmingly survived judicial scrutiny when faced with constitutional challenges.

The only thing that has changed since the days of Charles Dickens is where the ticket speculation happens. It has moved from the sidewalk to online secondary ticket exchanges, where Plaintiffs—the National Association of Ticketing Professionals, formerly the National Association of Ticket Brokers, and two of its broker members—resell tickets to fans across the country. The D.C. Council passed the RESALE Act to address it directly. Plaintiffs ask the Court to set aside the Council's policy judgments before the Act takes effect, ignoring the many equities in favor of its implementation. Plaintiffs are the brokers who dominate the secondary market—businesses that buy tickets in bulk to crowd out fans and resell them at gross markups. *See infra* Section III.A. The RESALE Act removes this profit incentive by banning bots and speculative listings, implementing caps to stop brokers from capturing the discounts artists build into their prices, and allowing fans whose plans change to resell their tickets and be made whole. It does not entrench

Ticketmaster's monopoly power, and Plaintiffs' predictions of harm are contradicted by real-world experiences in New York, New Jersey, Maine, Vermont, and Australia. Plaintiffs' motion for a preliminary injunction turns largely on disputed facts, and the harm they claim is the loss of the very markups the D.C. Council set out to stop. Plaintiffs have not made the clear showing a preliminary injunction requires, and the Court should deny their motion.

## I. A BRIEF HISTORY

Ticket speculation in the United States is as old as the American book tour. When Charles Dickens returned to the United States for a reading tour in 1867, demand for tickets far outstripped supply. Dickens wrote, "[I]t is impossible to keep out speculators who immediately sell at a premium."[1] Eyewitnesses described long lines of speculators.[2] They paid bystanders to hold places in lines nearly a mile long, and resale prices climbed from $5 to $50.[3] Writing from Boston, Dickens complained that he and his staff were "at our wits' end how to keep tickets out of the hands of speculators."[4]

Little changed over the next century. In 1964, the *New York Times* reported that Broadway insiders were illegally reselling tickets through a practice known as "ice," selling tickets for $100 each and netting $10 million a year on the black market.[5] The Rolling Stones tried to sell tickets

---

[1] 3 John Forster, *The Life of Charles Dickens* 392 (Boston, James R. Osgood & Co. 1875), https://www.gutenberg.org/cache/epub/25851/pg25851-images.html.

[2] *Id.* at 393.

[3] Steve Knopper, *Scalped! A History of Ticket Reselling*, Saturday Evening Post (Feb. 16, 2023), https://www.saturdayeveningpost.com/2023/02/scalped-a-history-of-ticket-reselling.

[4] Forster, *supra* note 1, at 391.

[5] Milton Esterow, *Lefkowitz's Aide Says 'Ice' Is Back*, N.Y. Times (Apr. 28, 1964), https://www.nytimes.com/1964/04/28/archives/lefkowitzs-aide-says-ice-is-back-pair-of-tickets-to-hit-show-can.html?unlocked_article_code=1.P1E.-ZRY.SL1SzTkeHxbZ&smid=url-share; Knopper, *supra* note 3.

to their 1972 tour through a lottery, but "[r]ampant fraud broke down the system."[6] And when tickets to Bruce Springsteen's 1980 tour were pushed from $12.50 at the box office to as much as $200 on the street, the artist protested that "[t]ickets should go to the fans, not the scalpers."[7]

Today is no different. The CEO and founder of TickPick, a secondary ticket exchange and a plaintiff in the related *Ticket Policy Forum* case before this Court,[8] defines "scalping" as "[t]he reselling of tickets to an event on the premises or near the venue at which that event is set to take place at."[9] As he puts it, the only thing that separates "scalpers" from TickPick is the location.[10] Yet he still lists himself among them as "ticket brokers, ticket scalpers, and other middlemen like myself."[11] Artists' and fans' complaints about secondary ticket exchanges today therefore mirror the ones we heard from Dickens and Springsteen. Speculators take the tickets meant for fans and sell them back at a premium.

State laws capping ticket resale prices have existed as a bulwark against this for more than a century. *See*, *e.g.*, Ark. Code Ann. § 5-63-201 (prohibiting resale above face value plus a reasonable handling fee), *repealed by* 2023 Ark. Laws Act 590, § 2 (H.B. 1650); Conn. Gen. Stat. § 53-289 (limiting resale to $3 above the printed price), *repealed by* Act of July 5, 2007, Pub. Act No. 07-206, § 5, 2007 Conn. Acts (Reg. Sess.); Fla. Stat. Ann. § 817.36 (limiting resale to $1 above admission price), *amended by* 2006 Fla. Sess. Law Serv. ch. 2006-105 (H.B. 6003); N.J.

---

[6] Knopper, *supra* note 3.

[7] *Id.*

[8] *Ticket Policy Forum, et al. v. District of Columbia*, No. 1:26-cv-03577 (D.D.C.).

[9] Brett Goldberg, *How the Ticket Industry Works: From the Artist to TicketMaster to Brokers to You*, TickPick Blog (June 28, 2019), https://www.tickpick.com/blog/ticket-industry-ticket-resale-ticketmaster/ [hereinafter "TickPick Blog"].

[10] *Id.*

[11] *Id.*

Stat. Ann. § 56:8-33 (capping resale at the greater of $3 or 20% above face value), *amended by* 2008 N.J. Laws ch. 55. During the *Lochner* era, a few were struck down on the premise that a state could not regulate prices in a business not "affected with a public interest." *Tyson & Brother–United Theatre Ticket Offices, Inc. v. Banton*, 273 U.S. 418, 430 (1927). But that view was abandoned in *Nebbia v. New York*, which said "a state is free to adopt whatever economic policy may reasonably be deemed to promote public welfare, and to enforce that policy by legislation adapted to its purpose." 291 U.S. 502, 537 (1934).

Resale caps have almost universally survived due process, equal protection, Commerce Clause, and confiscation challenges since then. *See Gold v. DiCarlo*, 235 F. Supp. 817, 819–21 (S.D.N.Y. 1964) (three-judge court) (rejecting due process and equal protection challenges to New York's cap on resale markups), *aff'd mem.*, 380 U.S. 520 (1965); *N.J. Ass'n of Ticket Brokers v. Ticketron*, 543 A.2d 997 (N.J. Super. Ct. App. Div. 1988) (rejecting ticket brokers' due process, confiscation, Commerce Clause, Contract Clause, and equal protection challenges to New Jersey's cap); *People v. Salmon*, 478 N.Y.S.2d 780, 782–85 (Dist. Ct. 1984) (rejecting vagueness and equal protection challenges); *State v. Spann*, 623 S.W.2d 272, 273 (Tenn. 1981) (rejecting due process challenge); *State v. Major*, 253 S.E.2d 724 (Ga. 1979) (rejecting due process and freedom-of-contract challenges); *State v. Youker*, 585 P.2d 43, 44 (Or. Ct. App. 1978) (rejecting equal protection and due process claims); *People v. Patton*, 309 N.E.2d 572, 574 (Ill. 1974) (rejecting due process claims); *Estell v. City of Birmingham*, 286 So. 2d 866 (Ala. Crim. App.) (same), *aff'd*, 286 So. 2d 872 (Ala. 1973); *Kelly-Sullivan, Inc. v. Moss*, 22 N.Y.S.2d 491, 495 (Sup. Ct.) (rejecting due process, confiscation, and Home Rule challenges), *aff'd*, 24 N.Y.S.2d 984 (App. Div. 1940). *But see Kirtley v. State*, 84 N.E.2d 712, 715 (Ind. 1949) (declining to follow the majority rule).

The *Gold* decision is particularly instructive. A three-judge district court panel read the law's "declaration … that the admission prices for public amusements are a matter of public interest *as an expression of the legislature's concern with the price the public must ultimately pay, absent fraudulent manipulations*, which of course permits regulation of broker's re-sale prices." *Gold*, 235 F. Supp. at 820 (emphasis added). The Supreme Court issued a summary affirmance of that decision. *Gold*, 380 U.S. at 520. That binds this Court on the constitutional questions it decided, *Hicks v. Miranda*, 422 U.S. 332, 344–45 (1975); *Mandel v. Bradley*, 432 U.S. 173, 176 (1977) (per curiam). Plaintiffs ask this Court to ignore it and *Lochner*-ize regulation of the ticketing industry.

Many states later repealed or relaxed their resale caps, but not because of constitutional concerns. *E.g.*, 2007 Conn. Pub. Acts 07-206; 2007 Minn. Laws ch. 47, § 1; 2008 N.J. Laws ch. 55. Legislators were attempting to adapt their laws to emerging secondary markets on the internet.[12] But the secondary exchanges did not become the democratic marketplaces for fans that lawmakers envisioned. They became tools for middlemen—the brokers and the exchanges themselves—to extract profits from fans.[13] As a result, legislatures are now reversing course. Beyond the District, resale caps are in effect in Maine and Vermont. *See* Me. Stat. tit. 8, § 1301(2-A)(G) (capping resale marketplace fees at 10% of the original price); Vt. Stat. Ann. tit. 9, § 2479f(c) (capping resale prices at 110% of the original price for events at certain independent

[12] *See* N.Y. State Att'y Gen., *Obstructed View: What's Blocking New Yorkers from Getting Tickets*, at 6–7 (2016) [hereinafter "Obstructed View"], https://ag.ny.gov/sites/default/files/reports/Ticket_Sales_Report.pdf (quoting the sponsor's prediction that "greater competition for the resale dollar" would lower resale prices); U.S. Gov't Accountability Off., GAO-18-347, *Event Ticket Sales: Market Characteristics and Consumer Protection Issues*, at 40 & n.85 (2018) [hereinafter "GAO Report"], https://www.gao.gov/assets/gao-18-347.pdf (noting that several states "repealed their price cap laws in the 2000s," including New York in 2007).

[13] Obstructed View, *supra* note 12, at 6, 27.

venues).[14] A cap on resale at 110% of the original price is pending in Massachusetts, *see* S. 3228, 194th Gen. Ct. (Mass. 2026), and similar bills were introduced this year in California, Delaware, and Maryland, *see* Assemb. B. 1720, 2025–2026 Reg. Sess. (Cal. 2026); S. Substitute 2 for S.B. 181, 153d Gen. Assemb. (Del. 2026); H.B. 77, 2026 Leg., Reg. Sess. (Md. 2026).

Finally, many states continue to regulate secondary market prices in other ways. Some prohibit resale of any kind within a certain distance of the venue where the event is being held. *E.g.*, Conn. Gen. Stat. Ann. § 53-289c; Ga. Code Ann. § 43-4B-28(c)–(d). Others limit resale for profit to licensed brokers. *E.g.*, Ga. Code Ann. § 43-4B-25; N.J. Stat. Ann. § 56:8-33(a). Still others restrict resale above the original price, unless authorized by the issuer or sold on the internet. *E.g.*, Fla. Stat. Ann. § 817.36(1)(d); Ky. Rev. Stat. Ann. § 518.070; N.J. Stat. Ann. § 56:8-33(c); R.I. Gen. Laws Ann. § 5-22-26. Though applied to different forums (the sidewalk) or market participants (unlicensed brokers), these laws restrict the same type of economic activity as the RESALE Act before this Court. They also have the same public interest goal the D.C. Council identified when it adopted the RESALE Act: to "protect artists, venues, and consumers … from unfair and deceptive practices in live event ticket purchases." RESALE Act, pmbl., 73 D.C. Reg. 11,351 (Aug. 14, 2026).

## II. LEGAL STANDARD

Preliminary injunctions are granted only when plaintiffs show "[1] that [they are] likely to succeed on the merits, [2] that [they are] likely to suffer irreparable harm in the absence of

[14] Many countries go further and prohibit resale above face value altogether, including Ireland, France, Italy, Belgium, Denmark, Norway, Japan, Brazil, Hong Kong, Poland, and Portugal. Brian Shearer, Vanderbilt Policy Accelerator, *How to Save Audiences $11 Billion on Live Events*, at 15–16 (Aug. 2026), https://cdn.vanderbilt.edu/vu-URL/wp-content/uploads/sites/412/2026/08/03190151/How-to-Save-Audiences-11-Billion-on-Live-Events.pdf. Ontario adopted a similar prohibition this year. *Id.*

preliminary relief, [3] that the balance of equities tips in [their] favor, and [4] that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (cleaned up). A preliminary injunction "is an extraordinary remedy never awarded as of right." *Id.* at 24. And in this case against the District, the last two elements merge into one. *Nken v. Holder*, 556 U.S. 418, 435 (2009). This merged element involves "weighing the harm to the moving party and the public if there is no injunction against the harm to the government and the public if there is." *Hanson v. District of Columbia*, 120 F.4th 223, 246 (D.C. Cir. 2024) (per curiam), *cert. denied*, 145 S. Ct. 2778 (2025).

"On the District's side of the balance is the governmental interest in enforcing its duly enacted law," *id.*, a law that protects substantial economic interests of artists and fans. Indeed, "the legislature, not the judiciary, is the main guardian of the public needs to be served by social legislation, whether it be Congress legislating concerning the District of Columbia or the States legislating concerning local affairs." *Berman v. Parker*, 348 U.S. 26, 32 (1954) (citations omitted); *Rumber v. District of Columbia*, No. 04-cv-1170 (RMU), 2005 WL 1903727, at *7 (D.D.C. July 19, 2005). "[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (citation omitted). Legislation involving social and economic policy is presumptively valid. *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 314 (1993).

## III. ARGUMENT

### A. Plaintiffs Are Brokers, Not Fans

Plaintiffs tell the Court that resellers "give fans a way into sold-out shows and a way out of tickets they cannot use." Memo. of Law in Supp. of Pls.' Mot. for Prelim. Inj. (Dkt. 9-1) at 1 [hereinafter "PI Memo."]. They describe the fan who "cannot attend a show" and needs to "quickly

reach buyers across the country." *Id.* at 4–5. But Plaintiffs are not fans. They are professional ticket brokers—businesses that buy tickets, often months before an event, and resell them at a markup. ASC Decl. (Dkt. 9-3) ¶¶ 6, 12; Stage Front Decl. (Dkt. 9-4) ¶¶ 6, 8. And brokers "have a competitive advantage over individual consumers because they have the technology and resources to purchase large numbers of tickets as soon as they go on sale."[15] The Committee put it plainly. Fans who pay inflated resale prices "subsidize a reseller who provided no value to the artist, the venue, or the event." Committee on Public Works and Operations, Committee Report (Dkt. 9-6) at 4 (June 22, 2026) [hereinafter "Comm. Rep."]. That is the system Plaintiffs ask this Court to protect.

The sellers on secondary ticket exchanges are overwhelmingly professional ticket brokers like Plaintiffs. Multiple reports, including by the CEO and founder of TickPick, estimate that 70–80% of tickets sold on those exchanges are listed by brokers.[16] And the GAO learned from secondary exchanges themselves that "professional brokers represent either the majority or overwhelming majority of ticket sales on their sites."[17] Brokers are also the largest ticket *buyers* by volume. From 2013 to 2015, twelve brokers bought more than $3 million each in tickets from Ticketmaster for events in New York and the surrounding area, counting only purchases made with American Express cards.[18] A New York Attorney General study of six brokers found that they marked up their tickets "an estimated 49% on average, ranging by broker from an average of

---

[15] GAO Report, *supra* note 12, at 19.

[16] TickPick Blog, *supra* note 9; Shearer, *supra* note 14, at 7.

[17] GAO Report, *supra* note 12, at 12.

[18] Obstructed View, *supra* note 12, at 23–24.

15% to 118%."[19] The GAO found an average markup of 74% on the secondary market.[20] And a survey by Amicus NITO of 65 shows found an average markup of 91%.[21] Plaintiffs are not fans whose plans have changed. They are speculators who buy tickets for profit.

**B. The Act Protects Fans, Artists, and Workers Across the Country**

Courts considering preliminary injunctions "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24. The consequences here will fall on the fans who buy tickets, the artists who set the prices, and the musicians and crews who put on the show. Amici represent them, and the Committee heard directly from them before the Council passed the law Plaintiffs challenge. Artists, managers, unions, fan organizations, and venues from across the country told the Committee how uncapped resale works in practice. Brokers capture the discounts artists build into their prices. Bots and speculative listings crowd fans out of the initial sale. And the resulting markups damage the relationship between artists and their audiences. The RESALE Act directly addresses those concerns.

***1. The caps remove the profit incentive that drives bots and speculation.***

Fans who try to buy tickets when a show goes on sale are routinely "crowded out" by resellers using "algorithms or other forms of 'bots' to secure large numbers of tickets—only to resell them at highly inflated prices." Ex. B, Committee on Public Works and Operations, Hearing Rec., Donald Cohen (Amicus Fan Alliance), at 101 (Oct. 22, 2025). Others pay for "spec tickets" the seller does not yet have, creating "false scarcity." Ex. D, Hearing Rec., Ron Gubitz, at 327 [hereinafter "Amicus MAC"]. Bans on bots and speculative sales help, but they have not been

---

[19] *Id.* at 25.

[20] GAO Report, *supra* note 12, at 28; *see also id.* (comparing white-label resale sites, with an average markup of about 180%, to other resale sites).

[21] Shearer, *supra* note 14, at 19.

enough on their own. New York banned ticket bots in 2010. N.Y. Arts & Cult. Aff. Law § 25.24. Six years later, its Attorney General found that "[t]he average fan vying to purchase a ticket to a popular concert has little hope of competing against brokers" because bot use had "reached epidemic proportions in the ticketing industry."[22] The profits bots generate are simply too high. The caps mandated by the RESALE Act eliminate this incentive "while also allowing a healthy secondary market to continue to exist." Ex. H, Hearing Rec., SAG-AFTRA, at 617 [hereinafter "Amicus SAG-AFTRA"]; *see* Ex. C, Hearing Rec., Kevin Erickson, at 623 [hereinafter "Amicus FMC"] (caps "complement efforts to crack down on bots by taking the profit out of the use of bots").

### 2. *The caps stop brokers from capturing the discounts intended for fans.*

The GAO found that artists "knowingly set" prices below the level "that would provide the greatest revenue" for sound business reasons: to avoid being "perceived as gouging fans," to sell out the show, to draw "the most enthusiastic fans … rather than just those able to pay the most," and to increase merchandise and concession sales.[23] Artists and their advocates told the Committee the same thing. *See* Ex. C, Amicus FMC at 621 ("artists may want to price their tickets affordably to keep tickets accessible to a broad audience"); Ex. D, Amicus MAC at 326 ("Artists want diverse audiences, not just those with the deepest pockets."). The Committee found that "[t]his gap between face value and market value is what creates the scalping opportunity." Comm. Rep. at 5.[24]

---

[22] Obstructed View, *supra* note 12, at 15, 19; *see also id.* at 6 ("Bot use is a major reason why New Yorkers cannot get tickets at face value.").

[23] GAO Report, *supra* note 12, at 8.

[24] *See also id.* at 12 (finding that this decision to price below what the market will bear "creates greater opportunities for profit on the secondary market").

Uncapped resale lets brokers capture the discounts meant for fans by arbitraging the gap between the artist's price and the market-clearing price. One prominent country artist who "intentionally keeps ticket prices low so more fans can attend" saw 7,767 tickets to a single stadium show resold at a 313% markup that grossed resellers $2.3 million. Ex. F, Hearing Rec., Randy Nichols, at 697 [hereinafter "Amicus NITO"]. Smaller venues tell the same story. Shortly before the Committee hearing on the RESALE Act, resale listings for a sold-out show at the Black Cat, with an original price of $65.80, ranged from $156 to $1,047.02 on Ticketmaster, SeatGeek, and StubHub. Ex. A, Hearing Rec., Catherine Ferrando, at 58 [hereinafter "Black Cat"]. For another show with tickets still available from the venue at $41.40, StubHub listed tickets at $64, and SeatGeek and Vivid Seats listed them at $70 to $90. *Id.* Those are the same secondary exchanges where Plaintiff ASC resells its tickets. ASC Decl. (Dkt. 9-3) ¶ 9.

Plaintiffs complain that the RESALE Act leaves a venue free to "charge whatever the market will bear" for its remaining tickets while capping what resellers can charge. PI Memo. at 21. But that is the point. The artist and the venue decide what the original ticket costs, and many deliberately set prices low for sound business reasons. The price cap protects that discount from being captured by brokers who get to the tickets first. And as the *Gold* court explained, "the legislature need not cover the whole field of possible abuses in order to render constitutional a more limited form of regulation." 235 F. Supp. at 820.

***3. The caps protect artists' relationships with their fans.***

Inflated resale prices do not just cost fans money. They damage artists' relationships with their audiences. As one Grammy-nominated artist and governor for Amicus Recording Academy told the Council, when resellers "buy up all the tickets, only to flip them for three, five, or ten times the price, it creates the illusion that the artists are the ones cashing in." Ex. G, Hearing Rec.,

KOKAYI, at 240 [hereinafter "KOKAYI"]. Artist managers report the same "fan backlash over ticket pricing and availability—problems often caused by hidden fees, [] bots, and inflated resale prices, not by the artists themselves." Ex. E, Hearing Rec., Sharon Tapper (Amicus MMF-US), at 718. And when a resold ticket fails at the event, fans "blame the person at the door." Ex. F, Amicus NITO at 697.

***4. Caps ensure more of each ticket dollar reaches the artists and crew.***

Brokers are not additive to the live event economy. They do not perform, manage talent or venues, or produce the shows. They simply buy tickets and resell them to fans at a markup. As the GAO reported, event organizers have long objected that "the profits from the higher resale price accrue to brokers who have not played a role in creating or producing the event."[25] "[N]ot a single cent of those additional revenues flow to the artists, their crews, the venues or the local businesses supporting a performance." Ex. D, Amicus MAC at 326; *see also* Ex. G, KOKAYI at 240 (artist's fee is "locked in for months before ticket sales happen"). Plaintiffs say this is justified because they must "offset losses from transactions involving lower-demand events with profits on higher-demand inventory." NATP Decl. (Dkt. 9-2) ¶ 14; *see* ASC Decl. (Dkt. 9-3) ¶¶ 15–16. But that is a risk brokers voluntarily assume. It is why they are called "speculators." When the bets pay off, fans pay a markup, and brokers keep the profit. When the bets fail, brokers unload their tickets below the price set by the artist, undercutting the seats still on sale in the primary market. Secondary ticket exchanges collect fees either way. The people who put on the show never receive a cut. The RESALE Act's price cap corrects this, "ensur[ing] that more of the money flowing into live entertainment will make it to workers, including singers, performers, crew, sound & light engineers." Ex. H, Amicus SAG-AFTRA at 617.

[25] GAO Report, *supra* note 12, at 19.

### *5. Fans whose plans change can still resell their tickets.*

In Australia, where several states cap resale at face value plus 10%, a survey of more than 3,500 consumers found that tickets are typically resold "due to ordinary life changes such as schedule conflicts or illness, not profit motives." Ex. I, Hearing Rec., Jason Webb, at 546–47 [hereinafter "Tixel Exchange"]. The RESALE Act explicitly allows this. Fans whose plans change can still resell their tickets for up to 10% above the initial ticket price, and secondary ticket exchanges can still collect fees of up to 10% of the initial ticket price. D.C. Code § 28-5506(b)–(c); *see also* Ex. H, Amicus SAG-AFTRA at 617 (caps still allow "a healthy secondary market to continue to exist, so fans don't get stuck with tickets they can't use"). The only thing hindered is pure profiteering by brokers.

Plaintiffs tout studies claiming that resale saves fans money because many tickets resell below face value. PI Memo. at 5; NATP Decl. (Dkt. 9-2) ¶¶ 12–13. But the price cap does not affect those sales. It caps resale above the original price, not below it. As the Committee recognized, below-face resales largely "involve sellers who need to offload tickets, not scalpers who are extracting profit." Comm. Rep. at 5. And Plaintiffs' D.C. savings figure comes from Protect Ticket Rights, which is funded by the National Association of Ticket Brokers, Plaintiff NATP's former name. Ex. J, Hearing Rec., Fix the Tix Coalition, at 224.

### *6. The price disclosure creates a transparent market for fans.*

The Act also requires disclosure of the original price paid for the ticket. D.C. Code § 28-5506(a)(2). As the GAO explained, this "makes the reseller's markup transparent" and "can help consumers assess the quality of the seat location."[26] Plaintiffs say the original price is often impossible for a reseller to know. PI Memo. at 10–16. But Plaintiffs are themselves the original

[26] GAO Report, *supra* note 12, at 36, 45.

buyer of many of the tickets they sell, and when they are not, the original buyer receives an order confirmation displaying the original purchase price, which brokers can require before they buy a ticket. This is just common sense. Indeed, the New York Attorney General implored ticket resale exchanges to disclose this information to potential customers, noting it was already required by the State of New York and that exchanges "are in the best position to ensure that their broker customers follow the law."[27]

### C. Uncapped Resale Does Not Constrain Ticketmaster

This is not an antitrust case, but Plaintiffs raise antitrust principles to rebut the public interests identified by the D.C. Council when it passed the RESALE Act. Quoting the Committee Report, they argue that a resale-only cap risks "further consolidating monopoly power in the primary market." PI Memo. at 1, 8. According to Plaintiffs, resellers "compete with [Ticketmaster] on price." ASC Decl. (Dkt. 9-3) ¶ 8. Going further, Plaintiffs accuse the D.C. Council of protecting local venues and Ticketmaster at resellers' expense. PI Memo. at 21–24. The Court need look no further than ongoing antitrust litigation against Ticketmaster and its parent company Live Nation to unravel this argument.

In the *Live Nation* antitrust litigation, the district court set out "to identify the market participants and competitive pressures that restrain[ed] [Ticketmaster]'s ability to raise prices or restrict output," asking whether "a hypothetical monopolist in a proposed market could turn a profit by persistently 'worsening … terms' for its customers on one of its products … by a small but significant amount." *United States v. Live Nation Ent., Inc.*, 838 F. Supp. 3d 337, 354–55 (S.D.N.Y. 2026) (citations omitted), *reconsideration denied*, No. 24-cv-3973, 2026 WL 563024 (S.D.N.Y. Feb. 27, 2026). Applying that test, the court allowed the government to go to trial on its

---

[27] Obstructed View, *supra* note 12, at 5.

theory that Ticketmaster unlawfully monopolized the market for primary ticketing services to major concert venues (the "MCV Primary Ticketing Market"). *Id.* at 355.

A jury ruled in favor of the plaintiff States, finding that "Ticketmaster willfully acquired or maintained monopoly power in the [MCV Primary Ticketing Market]." Verdict Form at 2, *United States v. Live Nation Ent., Inc.*, No. 24-cv-3973 (S.D.N.Y. Apr. 15, 2026), Dkt. 1417 [hereinafter "Jury Verdict"]. The States' theory was that "Live Nation can threaten to withhold concert content from MCVs (through its promotion arm) unless they pick Ticketmaster as their primary ticketer." *Live Nation*, 838 F. Supp. 3d at 372, 386. They proffered evidence that Ticketmaster's share of the MCV Primary Ticketing Market has been "well over 80%" since 2017. *Id.* at 374. Their expert testified that Ticketmaster foreclosed the MCV Primary Ticketing Market with exclusive contracts covering 65–71% of major concert venues. *Id.* at 384. The result, according to the jury, was overcharges of $1.72 per ticket for primary concert tickets at major concert venues. Jury Verdict at 6. Ticketmaster's power, in other words, is exercised through exclusive contracts with venues, before any ticket is sold to a fan.

The States also alleged a market for primary ticketing services sold directly to fans. The court granted summary judgment for Live Nation on that claim, explaining:

> Fans buy tickets to a concert once the primary ticketer has already been decided. If you want to attend a Taylor Swift concert happening nearby and Ticketmaster has an exclusive ticketing contract with the venue, you may not have any option but to use Ticketmaster—and the same would be true if AXS had the contract instead. The competition, Live Nation argues, happens upstream in the market between venues and ticketers. Not downstream between fans and ticketers. So even though fans might ultimately be injured by those upstream dynamics, they aren't participating directly in the market that's causing that injury.

*Id.* at 375. Under the district court's reasoning, competition for primary ticketing contracts, and by extension restraints on monopolistic pricing power in the MCV Primary Ticketing Market, would only exist and benefit fans in an "open-distribution" environment where multiple primary ticketing

agents sold tickets to the same event and competed for fans' business. *Id.* The Committee saw the market the same way, describing the primary and secondary markets as "two distinct segments" of the ticket market, each with "a distinct role." Comm. Rep. at 3. That is not how tickets to major concerts are sold, and it is not what Plaintiffs do. By the time a broker resells a ticket, the venue has already chosen its primary ticketer, and the original purchaser has already paid that ticketer's fees. In fact, Plaintiff ASC resells tickets through Ticketmaster's resale marketplace. ASC Decl. (Dkt. 9-3) ¶ 9. Clearly, brokers are not competitors who discipline Ticketmaster. They are its customers, both as buyers and as sellers. Only rival primary ticketers can compete for the venue contracts Ticketmaster monopolized. The RESALE Act does nothing to stop that competition, and future remedies the *Live Nation* court imposes may make it more feasible.

Plaintiffs, for their part, offer no evidence that a small but significant change in prices on Ticketmaster's primary ticketing platform will drive customers to resellers. They even rely on the Committee's observation that "evidence on the effect of resale price caps was 'uncertain.'" PI Memo. at 1 (quoting Comm. Rep. (Dkt. 9-6) at 8). In other words, Plaintiffs have not shown that resellers are substitutes capable of constraining Ticketmaster at all. And the uncertainty they refer to is a reason to defer to the D.C. Council's judgment, not to enjoin it. *See Beach*, 508 U.S. at 315.

In any event, uncapped resale does not constrain Ticketmaster's monopoly power. It feeds it. Uncapped resale tells artists they are "leaving money on the table," pushing them to raise their own prices. Ex. C, Amicus FMC at 621–22. And the fees Ticketmaster can collect in the primary market, by virtue of its monopoly power in the MCV Primary Ticketing Market, drive up the original purchase price of concert tickets and by extension the markup and fees charged in the

secondary market.[28] Finally, Ticketmaster's fees are the "moneymaker" that allows Live Nation to make bids for concert promotion that rival promoters cannot match. *Id.* at 622. Limiting what Ticketmaster can collect, via the RESALE Act, on "multiple rounds of resale" would "help loosen some of the company's grip on the industry." *Id.*

The price cap mandated by the RESALE Act likewise does not harm competition among brokers or secondary ticket exchanges. It simply changes the terms on which Plaintiffs will compete. Resellers and exchanges that can no longer profit from extreme markups will compete on what fans actually need—verification, guarantees, and support—rather than on how much they can extract from each sale. *See id.* at 623 ("Platforms can run successful businesses; they just can't make the windfalls that extraction-based business models would enable."). Plaintiffs' own "FAN Guarantee," which promises buyers their tickets or a 200% refund, is an example of that. NATP Decl. (Dkt. 9-2) ¶ 7. And exchanges that voluntarily cap fees, like Tixel, already compete that way. *See* Ex. I, Tixel Exchange at 548 (describing fraud-prevention systems that blocked more than 25,000 fraudulent listings in a year).

In short, resellers are not a substitute in the MCV Primary Ticketing Market, and the evidence of their effect on ticketing prices as a whole is intensely disputed. This is not the sort of "clear showing" that *Winter* requires to obtain a preliminary injunction. 555 U.S. at 22. And on

---

[28] The Federal Trade Commission alleges that when Ticketmaster resells a ticket it originally sold, it "collect[s] three sets of fees on the same ticket": fees on the original purchase, which average "24% to 44% of the total price"; a listing fee that ranges "from 13-15% of the resale price for consumers and 5-8% for brokers"; and a fee to the resale buyer that ranges "from 17-23% of the resale price." Complaint ¶¶ 36, 77, *FTC v. Live Nation Ent., Inc.*, No. 2:25-cv-08884 (C.D. Cal. Sept. 18, 2025), Dkt. 1. Resale listings for a sold-out D.C. show appeared on Ticketmaster alongside StubHub and SeatGeek at nearly sixteen times face value. Ex. A, Black Cat at 58.

the other side of the balance is the District's interest in enforcing a law that loosens, rather than tightens, Ticketmaster's grip. *See Hanson*, 120 F.4th at 246.

### D. Plaintiffs' Predictions of Harm Are Speculative and Contradicted by Real-World Experience

Plaintiffs predict that the price cap will force them to sell at a loss, drive them out of the District, push fans to riskier channels, and increase fraud. PI Memo. at 7, 27–28; NATP Decl. (Dkt. 9-2) ¶¶ 17, 20, 25–26. A preliminary injunction cannot rest on predictions. The movant must make a "clear showing," *Winter*, 555 U.S. at 22, and the harm must be "certain and great," "actual and not theoretical," *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). There is significant evidence here that Plaintiffs' fears are unfounded.

#### ***1. Deregulation did not deliver what it promised.***

When New York lifted its resale cap in 2007, the bill's sponsor predicted that "greater competition for the resale dollar" could bring "a decrease in secondary prices."[29] Nine years later, the State's Attorney General found that "competition-driven savings intended to benefit fans have instead been converted to profits for a handful of savvy middlemen using multiple employees or computers, or illegal Bots."[30] Some resales exceeded 1,000% of face value.[31] The Attorney General recommended bringing back a "reasonable limit" on resale markups.[32]

New Jersey's experience was similar. After an eighteen-month experiment with uncapped resale, the State's Division of Consumer Affairs found "no persuasive evidence that suggests that the so-called free market approach to ticket resales has lowered prices or made more tickets

---

[29] Obstructed View, *supra* note 12, at 7.

[30] *Id.* at 6.

[31] *Id.* at 4.

[32] *Id.* at 37; GAO Report, *supra* note 12, at 40.

available to consumers."[33] And in 2018, the GAO identified as an advantage of price caps that they "[k]eep[] prices down for consumers by restricting markups" while "preserv[ing] consumers' ability to resell and recoup costs."[34]

### ***2. Plaintiffs are flexible and sophisticated businesses.***

Plaintiffs present themselves as unable to adapt to the RESALE Act. But NATP's members already sell tickets to events "in just about every state." NATP Decl. (Dkt. 9-2) ¶ 5. Two of those states cap resale prices or fees today. *See* Me. Stat. tit. 8, § 1301(2-A)(G); Vt. Stat. Ann. tit. 9, § 2479f(c). Brokers also adjust their prices constantly, as demand rises and falls and as an event approaches. ASC Decl. (Dkt. 9-3) ¶¶ 14–15. Businesses that adjust this easily can adjust to the RESALE Act as well.

### ***3. Capped resale works at scale.***

In the last year, one secondary ticket exchange voluntarily capped the resale of "hundreds of thousands of tickets at no more than face value plus 10 percent, across thousands of events in Australia," with "near zero" reported fraud. Ex. I, Tixel Exchange at 546. It sold more than 4,000 tickets within Australia's mandated cap to sold-out Coldplay shows in 2024. *Id.* at 548. And when StubHub's parent company, which operates as Viagogo in Australia, stepped aside from three Oasis concerts in Melbourne because of Victoria's cap, a capped exchange helped more than 5,000 fans get into those shows instead. *Id.* at 547. If some marketplaces choose not to operate under a

---

[33] Conn. Office of Legislative Research, OLR Research Report No. 98-R-0382, Ticket Scalping (1998), https://www.cga.ct.gov/PS98/rpt%5Colr%5Chtm/98-R-0382.htm (quoting N.J. Div. of Consumer Affairs, Report on the Effects of the Ticket Resale Moratorium (Apr. 1997) (submitted by Att'y Gen. Peter Verniero & Dir. Mark S. Herr to Gov. Christine Todd Whitman)).

[34] GAO Report, *supra* note 12, at 36. Lower profits for Plaintiffs were not among the disadvantages identified by the GAO. *Id.*

cap, fans do not lose the ability to resell. There are competitors ready to serve them, within the bounds of the law.

In 2018, the GAO reported that some government studies had found resale caps "difficult to enforce" and "rarely complied with," and that critics said caps "might force resale activity underground."[35] But the caps the GAO described were enforced against individual sellers, one transaction at a time. The RESALE Act reaches the secondary ticket exchanges themselves—the formal marketplaces where, as the GAO recognized, "transactions can be monitored and regulated."[36] Maine's and Vermont's caps and the capped exchanges described above show that caps and a secondary market can coexist.

#### *4. The evidence of fraud is contested.*

Plaintiffs' fraud prediction rests on a single study by Bradshaw Advisory. PI Memo. at 7; NATP Decl. (Dkt. 9-2) ¶ 26. That study was "commissioned by StubHub International," and its authors "could not establish any causal relationship between price caps and fraud rates." Ex. I, Tixel Exchange at 546. There simply is no "stampede to a social media black market." Ex. C, Amicus FMC at 623. The share of reported fraud that occurred on social media was 27% in the United Kingdom, 27% in Ireland, and 30% in Victoria, and the study that generated the figures included tickets not subject to a cap. *Id.* During the Australian leg of Taylor Swift's Eras Tour, Australia's consumer agency received only 273 reports of falsely advertised tickets, despite total attendance exceeding 600,000. Ex. I, Tixel Exchange at 547–48. The Council heard this evidence and the Mayor's office's contrary warning, PI Memo. at 7, and it made a choice. That choice "is not subject to courtroom factfinding." *Beach*, 508 U.S. at 315.

---

[35] GAO Report, *supra* note 12, at i, 40–41.

[36] *Id.* at 41.

### E. The Motion Turns on Disputed Facts, and the Equities Favor Denying Plaintiffs' Motion

Every one of Plaintiffs' claims rests on factual disputes about how the ticket industry works—whether brokers can learn a ticket's original price, how buyers and sellers will respond to the price cap, and whether fraud will rise. Plaintiffs' evidence consists of three declarations from their own executives, Dkts. 9-2 to 9-4, untested by depositions and document productions. And the harm those declarations describe is the loss of the very markups the RESALE Act was designed to stop. ASC says that, but for the price cap, it would keep selling tickets "at prices likely above the 110% limit." ASC Decl. (Dkt. 9-3) ¶ 14. Stage Front says the same. Stage Front Decl. (Dkt. 9-4) ¶ 8. A broker's lost markup is not a harm to the public and certainly not a harm to fans and artists. It is the public benefit the D.C. Council intended. The declarations also ignore the portion of the RESALE Act that, beginning on January 1, 2028, allows the Mayor to adjust the price cap upward or downward through rulemaking. D.C. Code § 28-5507(b). A clear showing cannot rest on these self-serving claims, particularly when they contradict a public legislative record.

The Council enacted the RESALE Act after a public hearing at which dozens of witnesses testified, and after months of committee review. It heard from Plaintiffs, artists and fans, venues, economists, and consumer groups on both sides. It weighed the evidence on price caps, fraud, and competition, and it made a choice that balanced the RESALE Act's consumer-protection goals against whatever benefits uncapped resale offers. It is not the Court's prerogative to reweigh the pros and cons of those policy choices. *See Nat'l Immigr. Project of Nat'l Laws. Guild v. Exec. Off. of Immigr. Rev.*, 456 F. Supp. 3d 16, 34 (D.D.C. 2020); *Cmty. Oncology All. v. Becerra*, No. 23-cv-2168, 2023 WL 9692027, at *6 (D.D.C. Dec. 21, 2023); *Am. Foreign Serv. Ass'n v. Trump*, 768 F. Supp. 3d 6, 25 (D.D.C. 2025). That is especially true here, where the law mirrors caps on resale markups that have existed and survived similar constitutional challenges for more than a

century, including before the Supreme Court. *Gold*, 235 F. Supp. at 819–21, *aff'd mem.*, 380 U.S. at 520. The status quo Plaintiffs ask the Court to preserve is the one the Council found was harming artists, venues, and fans. Plaintiffs' contrary position cannot support the extraordinary remedy they seek. The public interest clearly favors letting the RESALE Act take effect.

## IV. CONCLUSION

For these reasons, and those stated by the District, the Court should deny Plaintiffs' motion for a preliminary injunction.

Dated: November 13, 2026

Respectfully submitted,

*s/ Katherine Van Dyck*
Katherine Van Dyck (D.C. Bar No. 981272)
KVD Strategies PLLC
1717 N Street NW, Suite 1
Washington, D.C. 20036
(202) 798-1948
katie@kvdstrategies.com

*Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record via the Court's ECF System to their respective email addresses disclosed on the Notice of Electronic Filing on November 13, 2026.

*s/ Katherine Van Dyck*
Katherine Van Dyck