# EXHIBIT C

# Future of Music Coalition

## DC City Council Hearing: Resale Act October 22, 2025

Testimony of FMC director Kevin Erickson (DMV musician, recording engineer, producer and antimonopoly activist)

DC's music community has made many powerful and enduring contributions to the broader world. One of its most important contributions its historic emphasis on treating music fans well, not merely as passive consumers, but as partners in creating live music experiences. I know this in a personal way—years before I heard a note of music by DC artists like Fugazi, I benefited from the ways that these artists' example had inspired and influenced musicians and independent promoters across the country to aim to run their live events in inclusive and community-oriented ways, not just as a business but as reflection of egalitarian values. Accessibility and affordability are important for all arts disciplines; as our friend Betrand Evans-Taylor of Dance/USA has said, tickets are "a physical symbol of access to the arts."

At Future of Music Coalition, we've worked to put DC music community values into practice, as we seek to ensure that musicians have a voice on the issues that impact them. For 25 years, FMC has started with the assumption that— properly understood— the interests of fans and the interests of musicians are fundamentally aligned, and we advocate for business practices and public policies that reflect and deepen that alignment.

That's partly what has led us to become one of the leading voices from the artist community regulating predatory practices by commercial ticket resellers, but also for breaking up Ticketmaster. Ownership consolidation can alter the scope and character of competition, centralizing power and creating incentives for abuse, at times forcing artists to choose between working with companies whose practices they find objectionable or skipping certain markets entirely. Simultaneously, while unfair and deceptive practices are nothing new in the ticket resale business, that business is now largely morphed into a technology-driven industrial scale extraction machine fueled by private equity, platform power, small-time grifters, and big tech greed. Too often, we've seen business models shift away from contributing value to local music communities and shift toward extracting value from fans, artists, and local venues and arts nonprofits, ultimately siphoning resources to distant investors with no connection to local creativity.

And too often, policy debates have been framed as a false choice, with Live Nation on one side and the predatory resale industry on the other side, each pointing fingers at each other as solely responsible for the problems in live event ticketing. The journalist Andy

Cush has described this as a Godzilla vs King Kong battle. He points out "Just because the two monsters are fighting doesn't mean one of them is the good guy."

This is especially true in light of the revelations in the latest FTC lawsuit against Live Nation, which details Ticketmaster's direct complicity in some of the predatory resale practices that this very bill seeks to address. Both Live Nation and predatory resellers are part of the problem.

We think of the effort to "fix ticketing" as consisting of two distinct pieces which together add up to a complementary and holistic public policy approach. The first piece is market regulation: the rules of the road that apply to every firm to address potentially harmful practices and behavioral concerns. That's largely what this bill is about; it's a tough bill that reflects best practices and consumer protection approaches that have worked well in states and nations that have adopted them. The second piece is about structural competition issues and the harms that follow from consolidated ownership. This is what the Department Of Justice is seeking to address in its antitrust lawsuit against Ticketmaster/Live Nation which we and our allies fought hard to make happen.

One of the biggest barriers to progress on this issue set has been Godzilla and King Kong's well-funded PR and lobbying efforts. Former Assistant Attorney General Jonathan Kanter was responsible for bringing the antitrust lawsuit against Live Nation, and in his farewell speech last year upon leaving the DOJ, he offered an urgent warning:: "All over the world, money from powerful actors is finding its way into the academic and expert communities. This insidious influence has contributed to the decline of our intellectual infrastructure." He warned of "the problem of paid influencers posing as neutral observers."

We will see that problem in full force in the debate over the Resale Act, and given the virtually unlimited resources available to predatory resellers, even well-meaning observers can easily get duped. So I want to warn the council about a series of bad arguments that I expect the opposition to be using.

It can be confusing to see certain groups that represent consumers in other contexts taking stances sharply at odds with small businesses and workers and that seem to clearly degrade the ticketbuying experience for fans, contributing to higher prices. Some consumer groups, joining with reseller advocates under the banner of "Ticket Buyers' Bill of Rights Coalition" have a history of accepting significant donations from resale platforms and brokers, something they often fail to conspicuously disclose. While we understand the challenges of funding policy work in the public interest, groups like Sports Fans Coalition and National Consumers League consistently take stances that are nearly indistinguishable from the resale platforms and brokers, raising serious questions about the quality and independence of their analysis. (This is apparently not a concern unique to the ticketing issue set, as the presidents of the United Food and Commercial Workers

(UFCW), the Communications Workers of America (CWA), and the United Auto Workers (UAW) all exited NCL's board over the NCL's involvement with and financial support from Amazon in 2021. These unions felt that NCL was taking policy cues from Amazon just as we have observed that they appear to be in lockstep with their funders at Stubhub and Vivid Seats.)

Other legitimately well-intentioned consumer advocates that don't have in-depth issue area expertise or bandwidth to get into the details of the live events industry may end up outsourcing their policy analysis to these reseller-backed groups. Some groups may not even be aware that they've joined hands with what appears to be pure astroturf organizations like Fan Freedom (which is really just Stubhub) and Protect Ticket Rights (which is really just National Association of Ticket Brokers).

The most generous reading of the apparent capture of certain consumer advocacy groups by the ticket resale industry would be to regard it as an odd artifact of the historical alignment between consumer advocates and resellers that came together to oppose the Ticketmaster/Live Nation merger in 2009. Since then, the explosive growth trajectory of the resale industry empowered the resellers with new resources to fund advocacy and disincentivize consumer groups from updating their analysis to address harms that follow from this explosive growth of business models built on extraction. This capture appears to be mostly unique to the United States. For example, in Europe, both consumer protection authorities and NGOs have more evenhandedly criticized bad behavior by both Ticketmaster and by Stubhub (which is the same company as Viagogo outside, most recently with an October 22 complaint by Euroconsumers alleging 5 different categories of violation of the EU's Digital Service Act.

Thankfully, consumer groups are not a monolith. Notably, Consumer Reports, the nation's leading consumer organization that accepts no corporate funding has supported Fans First Act, the federal legislation backed by artist groups, independent venues and arts nonprofits. Consumer Reports has also offered testimony in support of fan-to-fan marketplaces like those offered by The Cure and Billie Eilish. Likewise, US PIRG shares artists' position in favor of strong itemization requirements in all-in pricing requirements. And we've been encouraged to see the growth of Fan Alliance, a genuinely grassroots organization of fans who want to support musicians' preferred policies and business structures.

At times, consumer groups that don't accept corporate donations may struggle to prioritize this issue among the many very important issues in the marketplace. Meanwhile, some of the national antimonopoly groups have focused their attention on structural matters and have had limited capacity to learn about the market regulation details; they haven't weighed in on much beyond the importance of a breakup. That makes sense given the complexity of the issue set, and the many very important antitrust issues demanding

attention across the economy, but it can leave lawmakers and regulators in need of more guidance. Our hope is that the music community can help bridge the gap.

## On Price Caps

You'll hear resellers and various proxies claim that resale price caps result in fraud: this has just not been the international experience in countries like Belgium, Denmark, France, Italy, Poland, Norway, Portugal, Japan, and Brazil.

Europe has led the way on this issue. In 2019, BEUC, the umbrella organization for 45 independent consumer groups argued "the current situation where big companies are making huge profits on re-selling tickets to consumers at excessively inflated prices is unacceptable. Consumers should also have a real chance to buy a ticket from the primary seller for the face value. Unfortunately, this is often impossible due to tickets disappearing almost instantly from the primary market in order to be resold minutes later for much higher prices on unauthorised ticket reselling websites. A solution, already used in some countries, is to restrict the field of action of resellers, e.g. by allowing ticket resale at no more than the original seller's price of the ticket. In some countries there are websites which allow a fair resale of event tickets for not more than the price initially paid for them."

Since then, laws that cap resale price at or near face value have become increasingly common in many of our peer nations. They used to be more common in the US at the state level before the rise of the industrialized resale lobby, and some of the challenges with enforcement have faded with improved technologies and innovative platforms like Tixel and Twickets that are built on voluntarily negotiated interoperability principles.

As the music and arts community has started to push for price caps, we've seen individual US states begin to readopt such policies this year with the passage of Maine's LD 913. In part, this is motivated by observing the impact of similar policies abroad; multiple media accounts have documented that American fans have had an easier and more affordable time acquiring tickets for American artists' tour dates abroad rather than catching a US date[1]. Price caps may not be the only factor (it's certainly plausible that a generally more competitive primary ticketing marketplace and stronger enforcement in Europe also plays a role) but this experience does indicate that price caps can disincentivize the use of bots that inflate prices.

Price caps also potentially address a dilemma that artists face. Many artists may want to price their tickets affordably to keep tickets accessible to a broad audience, but if they price at below what the market will bear, they're told they're leaving money on the table

[1] https://www.billboard.com/business/touring/taylor-swift-eras-tour-tickets-cheaper-europe-1235671760/

that a third party with no involvement with the event will end up collecting on the secondary market. Faced with the unhappy reality that many fans will end up paying more either way, some artists feel pressure to increase the price of their tickets. Price caps thus make it more attractive for artists to keep face prices low.

You'll hear claims that resale price caps entrench Ticketmaster's monopoly or conflict with the DOJ case. This is rooted in a fundamental misunderstanding of the antitrust case against Ticketmaster, and in a fundamental ignorance of how the cross-susbidization within the different parts of the live event business works.

This merits some unpacking. The claim is made that Ticketmaster's monopoly allows it to bear the impact of a price cap more easily than rivals. In fact, those of us who pay closer attention to the mechanics of Ticketmaster's monopoly understand that Live Nation's high-margin ticket business cross-subsidizes its lower-margin concert promotion business, rather than the other way around. Ticket fees are the moneymaker that allow Live Nation to offer supracompetive bids rival promoters can't match. At times this allows to even be able to take a loss on the promotions part of the business, and that's especially true when Ticketmaster is able to triple dip. Capping resale is primarily a consumer protection measure, but eliminating Ticketmaster's ability to make so much extra money in fees on multiple rounds of resale and use this extra profit to sustain its monopoly would actually help loosen some of the company's grip on the industry.

We understand there can be some confusion about whether Ticketmaster supports price caps. To put this in context, understand that in our experience, some of Live Nation's public-facing policy stances may reflect desperate and cynical attempts to look like an ally to musicians at a time when the company is under threat of a breakup and under fire for its complicity with predatory resale.

Consider that every artist group active in ticketing policy endorsed Maryland's ticketing bill in 2024, which included price cap provisions. The price cap made it through one of two chambers in Maryland, but the final bill omitted this language. Still, support for price caps emerged as a new consensus position for the entire artist community. (Ticketmaster took no position on the bill.) Months later, Live Nation's CEO suggested for the first time in an interview that the company could support price caps. But he floated a higher figure than what artists had called for, and we have seen no signs of any serious commitment to the idea. We believe the company's public statements are consistent with a longstanding strategy of trying to discourage music community stakeholders from cooperating with the DOJ lawsuit, even as the company quietly continues to work to undermine key artist policy goals (as with its consistent opposition to strong fee itemization language of the sort included in the RESALE ACT). In fact, the company may strategically understand that it's so unpopular that having the CEO say something positive about price caps actually makes price caps less likely to happen.

Caps need not eliminate the secondary market entirely, but (depending on how they are structured) they can take some of the most harmful forms of unfair and deceptive competition off of the table by removing the profit incentive from such activity. They can also complement efforts to crack down on bots by taking the profit out of the use of bots. Resale platforms can still sustain themselves either on capped fees, and indeed we've seen testimony to that effect from Tixel. Platforms can run successful businesses; they just can't make the windfalls that extraction-based business models would enable.

Advocates for predatory resale naturally oppose price caps. Some point to a study by a UK consultancy called Bradshaw Advisory,(which is funded by Stubhub International, though advocates may conveniently neglect to mention this). The study purports to compare rates of ticket fraud in the UK with Ireland and the state of Victoria, Australia, and attributes higher rates of fraud in Ireland and Victoria to price cap legislation in those countries.

Close inspection of that study casts doubt on the validity of its conclusions and methodology. For example, it is suggested that price caps drive people to an unregulated black market on social media sites where fraud is supposedly rampant. But the percentage of fraud-reporting respondents who experienced it happening on social media platforms was consistent from country to country: 27% in the UK, 27% in Ireland, and 30% in Victoria —there is no stampede to a social media black market. The study also claims an astonishingly high 20.8% fraud rate for film tickets in Ireland, but this cannot be attributed to the Irish price cap law, because as best we can tell, that law doesn't appear to cover film tickets. It only covers designated venues (above 1000 cap) and designated events where the promoter applies for the designation. More likely: the rate of fraud appears inflated because the data point used to calculate it badly underestimates the number of film screenings. This points to general sloppiness in this research.

## On savings from the secondary market

You'll hear claims that uncapped resale saves consumers money. First, if a consumer is paying less than the face price on a ticket, it's usually the product of a broker losing money via miscalculation—they erroneously thought they could resell for more than they paid, but misjudged the demand. If brokers collectively saved consumers more money than they charge in markups, they'd go out of business, of course. So while it is true that last minute savings can sometimes be found when brokers screw up, it isn't the case that consumers on balance save money as a result of an unchecked resale industry.

Secondly, it's worth interrogating the specific data offered in support of their claims of lower prices. Often, supporting data or methodology is only weakly disclosed and/or not broadly representative. Typically, they tally the tickets sold below face value and offer a number they claim represents total savings. But they don't include in this count the many tickets sold above face value. In other words, they count tickets where fans spend less, but

not the tickets where fans spend more, and then present this as if it represents net savings. It should be obvious that this is deeply dishonest as a representation of what consumers are ultimately spending.

Similarly, we've seen data making claims about how many events have tickets available below face value, reported as a percentage of overall events. One example is a "study" by the American Consumer Institute in June 2024 which found that of 80,000 live events sampled, 55% had tickets listed for below "face value." They won't tell you who funded this study, and details about methodology are scarce, but it's worth noting that a single ticket in the 400 section would count as "listed below face value", even if 500 floor seats at the same event were listed at a 1000% markup. This "study" tells you nothing about overall "savings" by consumers nor about availability.

The UK's advertising standards authority recently found that Stubhub was misleading UK consumers about how much of its inventory is sold before face value, and so policymakers need to be careful not to be similarly deceived.

## On Competition from the resale market

You'll see predatory resellers say they're only source of competition in the ticketing market, but this is wrong on two counts: it erases places where competition is happening successfully and creating some good outcomes for consumers, and it confuses competition for wealth extraction.

Currently, primary ticketing firms compete with other primary ticketing firms for the business of venues, promoters, festivals, arts organizations, and artists. While we've argued that Ticketmaster has monopolistic power over the general live events market, we can see submarkets where healthier competition is happening. Small clubs (with lower capacity rooms that are less likely to need Live Nation-promoted tours to stay afloat) and non-profit arts organizations (that similarly aren't reliant on Live Nation for talent bookings) are submarkets where we can see what healthier competition looks like in practice. In these submarkets, Ticketmaster market share is decidedly lower, and a range of innovative primary ticket services have more of a foothold to better serve these venues and their patrons, including firms like Tessera, Dice, eTix, and many others.

Crucially, one axis of competition among primary ticketing firms is offering innovative tools to get tickets to real fans and away from professional resellers, which means a more affordable and less frustrating experience for fans. For example, some of these firms offer waitlist functions, fan-to-fan marketplaces, and app-based transferability security protections. This is a dimension of competition that reseller advocates would rather see outlawed.

We've also seen promising competition emerge among face value or price-capped secondary resale services which accomplish artists goal to make sure no one gets stuck with a ticket they can't use, and balance this with the desire to protect fans from having to pay more than they should.

As we wrote in our 2023 US Senate testimony alongside other music community antimonopolists:

> While artists and fans alike would benefit from efforts to increase competition in the primary ticketing marketplace, there's nothing inherently anti-competitive about artists choosing to work with ticketing companies to limit the availability of tickets on the secondary market, or to ensure tickets make it to real fans rather than brokers and resellers. Ticketbuyers' frustration with Ticketmaster/LiveNation should not be used to advance policies that would primarily benefit extractive secondary sellers.[2]

Uncapped resale sites don't really compete with Live Nation (or any other primary seller) in ways that serve the public good. Every ticket that ends up on the resale market is still sourced from the same primary seller regardless of where it is resold. Rather, brokers "compete" with fans for inventory, using whatever technology is available to them to acquire tickets before real fans get a chance, and those fans are forced to buy on the resale market. They also use their advertising budgets and various deceptive practices to reach fans online ahead of the actual venue in search results. They "compete" to efficiently siphon the wealth to investors and brokers and big tech— away from local businesses and nonprofits, away from artists, and away from other live music workers including crew and hospitality staff (and by the way we stand in solidarity with workers unionizing at IMP, and regard their efforts to improve conditions and wages as interconnected with our fight). This is not really competition, it's just parasitic wealth extraction.

Various resale stakeholders and their proxies attempts to argue that regulating resale helps Ticketmaster often refect ignorance of basic business practices and incuriosity about the submarkets in live music where healthy competition exists. Diana Moss describes her organization PPI as "the leading voice in advocating for the DOJ's monopolization case against Live Nation-Ticketmaster" but neglects to mention that DOJ's case as filed almost completely rejected Moss's suggested theories of harm in favor of more relevant antitrust thinkers, who unlike Moss, actually took the time to talk to artists and other music stakeholders and understand how the business works. Moss and other pro-reseller academics seem to be throwing spaghetti at the wall; it's hard to even respond to these

2 Joint written testimony of Artist Rights Alliance, Future of Music Coalition, American Association of Independent Music, Music Workers Alliance, United States Senate Committee on the Judiciary Hearing (January 24, 2023) "That's the Ticket: Promoting Competition and Protecting Consumers in Live Entertainment"

claims because they're so incoherent. Moss says RESALE act would interfere with the DOJ prosecution "because outcomes are distorted by controls" but can't name what evidentiary base would be sullied, or which of the many antitrust charges in the complaint would be interfered with. She also claims resale act would "creat[e] immunity from antitrust liability, but doesn't point to anything in the text that creates immunity, because no such provision exists.

## On fee transparency:

You'll hear calls to weaken some of the proposed fee transparency provisions to "align" with the FTC rule or a proposed piece of federal legislation called Ticket Act. I urge you to resist this. What they're asking for is less information presented to consumers.

FMC supported the adoption of the FTC's rule on unfair and deceptive fees: we strongly support all-in pricing, and want consumers to be spared unpleasant surprise fees at the end of the transaction. At the same time, the rule doesn't go far enough. All-in pricing has to be accompanied by itemization, so consumers can see how much they're paying in fees, as is the case in RESALE act. As US PIRG has argued: "Both the Total Price and list of mandatory fees are important for consumers to make an informed decision and to have the ability to price shop and compare apples to apples."

Clear and conspicuous upfront disclosure of fee amounts alongside total prices allows two important forms of healthy competition to happen simultaneously. These are: competition between various entertainment providers on the basis of total price, and competition between various venues and ticketing services on the basis of how much they're charging in fees. This is especially important for artists because artists have no control over fees, and are only typically able to negotiate pricing and compensation based on the face price of the ticket, not the fee amounts. Yet they can face reputational harms as a result of high fee-inflated prices they can't control. Beyond that, many are frustrated with seeing their fans saddled with high fees.

In another sign of complicated coalition politics, our support for itemization puts us at odds with both Ticketmaster and predatory resellers—this is an issue where they are closely aligned in preferring only the current weak version of all-in pricing with no itemization requirement. Ticketmaster once employed up front itemization in New York State, in compliance with NY's strong disclosure law. Not long after a 2023 Biden White House event where Live Nation pledged to offer all-in pricing at its venues, Ticketmaster quietly stopped presenting itemized fees up front in the transaction. It's easy to understand why. They began arguing (without evidence) that consumers don't care how much they're paying in fees and only want to see the total price. By not disclosing fees, Ticketmaster no longer has to wrangle with the disincentive to keep inching fee amounts ever-upward. And small upstart competitors to Ticketmaster who've been working to

| Under FTC junk fee rule alone | |
|---|---|
| At ticket selection: | $99 |
| At Checkout: | $99 |

| Under TICKET Act | |
|---|---|
| At ticket selection: | $99 |
| At checkout: (itemized breakdown may be unavailable until you've entered your credit card info, or hidden behind drop down menu or require additional clicks to view, so many consumers will never see how much of the price consists of fees.) | $65 +$34 fees = $99 |

| Under RESALE act | |
|---|---|
| At ticket selection: | $65 +$34 fees = $99 |
| At checkout: | $65 +$34 fees = $99 |

keep fees lower have lost much of the consumer-facing competitive advantage associated with keeping those fees down, since consumers aren't easily able to compare fee amounts since up-front fee disclosure wasn't required.

The reasons why the FTC landed at a weaker rule than is optimal involve complicated procedural issues of administrative law, as the FTC initially hoped to achieve a rule that would cover the entire economy rather than apply industry-specific approaches. The challenges of negotiating a rule that would succeed on a bipartisan vote after the 2024 Presidential election limited what was possible. But the FTC also explicitly made it clear that state governments can go farther than the FTC rule, and the draft provisions in this

bill appropriately go beyond the floor set by the FTC rule to offer additional consumer protection.

Advocates for predatory resellers and their proxies have repeatedly told state legislators that proposed state laws on price transparency that include upfront fee itemization alongside the total price are somehow in conflict with the FTC rule. This is completely untrue, as the current rule expressly makes clear that states are free to offer stronger consumer protections than exist in the FTC rule, as long as businesses can comply with both state law and the FTC rule simultaneously.[3] But this has not stopped reseller advocates from seeking to mislead. For example, Brian Hess of Sports Fans Coalition falsely claimed in written testimony to Connecticut on its HB7182 that "the language as drafted would likely fall into conflict with the FTC's junk fee rule." Sports Fans Coalition, which is financially supported by Stubhub among others, has made similar misrepresentations about the FTC rule in other states including Oregon and New York while arguing to weaken proposed itemization provisions.

Meanwhile, the Ticket Act is stalled in Congress and faces opposition from artists and indie venues because it offers only weak protections. That bill reflects the limitations of what's possible in an environment where Ted Cruz is running the relevant committee. DC voters didn't elect Ted Cruz and shouldn't restrict consumer protections to what Ted Cruz would want to support.

## On what resale marketplace fees pay for:

You'll hear claims that resale marketplace fees fund fraud prevention and customer support. Stubhub's IPO filing offers a valuable window into how that company and similar platforms operate. It revealed that last year about 47% of the company's overall revenue was spent on sales and marketing. In contrast, about 3% of revenue was spent on operations and support. In other words, they spend 14 times as much on marketing as they do on operations and support! Much of that goes to Google and Meta ads to get to consumers before the actual presenter, duping fans into paying more than they should.

Now we're not opposed to all resale, just the predators; artists are okay with reasonable fees that would allow for a healthy capped resale marketplace to exist. We do want to ensure that people don't get stuck with tickets they can't use. There are ethical resale platforms like Cash or Trade or Tixel, and many primary ticketing companies are rolling out face-value resale and waitlist technologies. Resale price caps coupled with strong up

3 As the rule notes: "Proposed § 464.4(b) specified that a State law providing consumers with greater protections than the rule does not, solely for that reason, make the State law inconsistent with the rule. When a State law offers greater (or,in some circumstances, even lesser) protection than the rule, if businesses can comply with both, they are not inconsistent. Thus, as commenters noted, the rule would establish a regulatory floor rather than a ceiling"

front fee disclosure mean that secondary market would refocus on competition to better serve fans and artists safely & efficiently.

## On transferability:

You will hear dishonest mischaracterizations of the language in this bill on transferability restrictions, claiming that the bill contains new restrictions on transferability that somehow benefits Ticketmaster. In reality, transferability restrictions are already legal in DC at the discretion of the event presenter, as is the case in 44 other states. The RESALE Act only proposes adding additional consumer-facing disclosure requirements whenever limitations are applied, to ensure that ticketbuyers are fully informed when they buy a ticket. It doesn't allow venues, presenters, or ticketsellers to do anything they can't do now. It seems that reseller advocates are trying to confuse the council into adopting

We have never encountered a situation where Ticketmaster has forced any artist to adopt transferability restrictions or use a fan-to-fan marketplace against their will. In fact, we've seen the opposite problem: artists would like to have access to the fan to fan marketplace technology that allows on platform resale at face value with no fees, but lack the leverage to get Ticketmaster to turn that function on. Generally, Ticketmaster prefers to have above-face-value resale as an option on as many shows as possible because the company can profit from fees on multiple rounds of resale. This is consistent with the revelations in the recent FTC lawsuit.

Transferability restrictions are important for many reasons: An arts nonprofit that has a special grant funded program offering a block of reduced price tickets for young audiences wants those tickets to go to the target population, and may make impose transferability restrictions to ensure that this happens.

Some resale-backed groups may have invented sneaky ways of opposing transferability restrictions. For example, in written testimony, we have National Consumers League proposing that presenters that employ transferability limitations face addtional refund requirements. This would have the obvious effect of making it financially impossible for presenters to use fan-to-fan marketplaces, which have clear moneysaving benefits for fans as NITO has demonstrated.

## On complicated coalition politics

Achieving good outcomes for workers and fans sometimes requires strange bedfellows politics and some of the confusion around live entertainment policy is a result of different coalitions forming around the different problems. Artist groups may frequently partner with different overlapping sets of stakeholders in working on different parts of the problems. Examining the ways different stakeholders' interest align and diverge can be helpful in developing a complete picture of the state of the field.

Artists are a diverse population, but every artist group actively involved in ticketing policy broadly agrees with Live Nation's public stance that brokers, bots, and above-face-value secondary platforms create serious problems and need to be reined in. We are therefore aligned on some narrow issues like banning speculative tickets, defining a ticket as a license, banning deceptive URLs, and strengthening enforcement of purchase limits. But to understand this alignment, it may be helpful to know that these views are shared by nearly all Live Nation competitors in the venue/promoter markets as well as Ticketmaster's competitors in the primary ticketing market (including companies like AEG, Dice, Eventbrite, Tixr, Etix, etc.). All of these firms experience their own struggles with brokers and above-face-value resale platforms

And of course, bad behavior by other firms doesn't justify Live Nation's own bad behavior. The fact that other firms engage in industrial scale resale practices that harm artists, venues, nonprofits and fans is not a defense against Live Nation's anticompetitive practices and illegal behavior as alleged in the Justice Department's lawsuit.

Additionally, Live Nation's criticism of predatory resale is hypocritical in light of its participation in the market as the third biggest reseller of tickets, even setting aside its own alleged violations of the BOTS Act as detailed in the new FTC suit. Ticketmaster could voluntarily exit the resale-above-face-value marketplace as it has chosen to do in the UK. Ticketmaster could also cease resale of third-party tickets for independent venues' events where it is not the original primary seller. That has not happened, presumably because these are especially profitable activities.

## On economic learning

What do impartial economists think of the uncapped resale market? The late Alan Krueger, a Princeton economist, Obama White House official, and research associate at the National Bureau of Economic Research, summarized the research this way:

> Leslie and Sorensen[4] built a sophisticated model of consumer and broker behavior to model the effect of resale markets on consumer welfare. They reached the provocative conclusion that while the opportunity to resell tickets on the secondary market does increase the allocative efficiency of ticket distribution, this benefit is partly offset by increased competition for tickets in the primary market and by transaction costs in the secondary market. When the dust settles, the big winners are the professional ticket brokers. As a whole, fans are likely made worse off by the existence of the resale market. Leslie and Sorensen conclude,"If the narrow

4 Phillip Leslie, Alan Sorensen, Resale and Rent-Seeking: An Application to Ticket Markets, The Review of Economic Studies, Volume 81, Issue 1, January 2014, Pages 266–300, https://doi.org/10.1093/restud/rdt033

goal is to maximize the surplus of those who ultimately attend the event, then restrictions on resale may be warranted."
In other words, it is not irrational or contrary to economic wisdom for artists or lawmakers to take steps to constrain ticket resellers and squash the secondary market to help fans.[5]

## Possible changes to the bill:

One simple improvement to the bill would be to modify the refund policy section to address a longstanding practice of arts nonprofit organizations, and make it clear that this pro-consumer policy is permissible. Some arts organizations in the event of a cancellation offer patrons a choice between a full refund, a ticket for another upcoming event, or the option to donate the price they paid for their ticket to the nonprofit. As long as the refund is the default option, this seems like a good policy that has worked well, and it would be very simple to modify the text to accommodate this.

Our friend Catherine from Black Cat flagged a concern about the data reporting requirements attached to broker registration. It might be worth looking at the specifics of that language to ensure that the language is appropriately tailored, both to avoid inadvertently imposing data submission requirements on entities that aren't really engaging in marked-up resale, but also to ensure that the such provisions don't create headaches for event presenters and nonprofits that facilitate lots of ticket exchanges but aren't really engaging in . A well-enforced price cap provision makes the broker registration part of the bill less important, so there is some room for flexibility here.

In general, we urge caution about modifications to the text, because we know that changes that look like minor technical tweaks can actually be substantive efforts to profoundly weaken consumer protections.

## On dishonesty

I am struck by the cynicism of many of these arguments, but I am especially struck by the cruelty of groups like Chamber of Progress and whoever is running that anonymous astroturf campaign with Instagram and Facebook ads and paying for that video billboard truck circling the block—saying this is a Ticketmaster bill or accusing the small businesses and artists and nonprofits behind this bill of carrying water for Ticketmaster. Please understand that these are consensus reforms backed by every single artist organization active in live ticketing policy. That includes many people in my community locally and in the broader community of touring musicians who are most getting crushed by Live Nation — some of whom have spoken out against Ticketmaster at significant personal and

5 Excerpted from Rockonomics by Alan B. Krueger. (2019, Currency Books: pp. 143-145)

professional risk. It’s a profoundly dishonest tactic and I hope the council will see through it, and that these lobbyists will reconsider the life choices that brought them to this point.