**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

NATIONAL ASSOCIATION OF TICKETING PROFESSIONALS *et al.*,

Plaintiffs,

v.

DISTRICT OF COLUMBIA,

Defendant.

Case No. 26-cv-3620

# REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

# TABLE OF CONTENTS


INTRODUCTION ..... 1

ARGUMENT ..... 1

I. Plaintiffs Are Likely to Succeed on the Merits ..... 1

A. The Price Cap Is Unconstitutionally Vague ..... 1

1. The District's D.C.-Events Interpretation Is Untethered to the Act. ..... 2

2. The District's Rejoinders Are Unavailing. ..... 4

i. DLCP's Declaration ..... 4

ii. Statutory Context ..... 5

iii. Implausibility and Avoidance ..... 6

iv. Atmospherics ..... 8

3. Other Aspects of the Price Cap Are Unconstitutionally Vague. ..... 9

i. The Sports Exemption ..... 9

ii. Initial Ticket Price ..... 10

4. Plaintiffs Have Met Their Burden ..... 11

B. The Price Cap Violates the Dormant Commerce Clause by Directly Regulating Out-of-State Transactions. ..... 12

1. The Dormant Commerce Clause Prohibits States from Directly Regulating Out-of-State Conduct Lacking a Sufficient Nexus to the Regulating State. ..... 12

2. The Price Cap Violates the Extraterritoriality Principle. ..... 13

C. The Price Cap Violates the Home Rule Act. ..... 16

D. The Price Cap Violates the Dormant Commerce Clause's Anti-Discrimination Rule. ..... 16

E. The Price Cap Violates Equal Protection ..... 17

F. Plaintiffs Bring Facial and As-Applied Claims. ..... 18

II. A Preliminary Injunction Is Necessary to Prevent Irreparable Harm. ..... 19

A. Plaintiffs Will Suffer Irreparable Harm Tied to Constitutional Injuries. ..... 19

B. Plaintiffs Will Suffer Irreparable Harm Tied to Irrecoverable Financial Loss. ..... 21

C. The District's Other Arguments Fall Short ..... 22

III. The Balance of the Equities and the Public Interest Favor Preliminary Relief. ..... 24

CONCLUSION ..... 25

# TABLE OF AUTHORITIES

## Cases

*Archdiocese of Wash. v. WMATA*,
897 F.3d 314 (D.C. Cir. 2018) .......... 19

*Ass'n for Accessible Meds. v. Frosh*,
887 F.3d 664 (4th Cir. 2018) .......... 13, 14

*Ayotte v. Planned Parenthood of N. New England*,
546 U.S. 320 (2006) .......... 18

*Bacchus Imports, Ltd. v. Dias*,
468 U.S. 263 (1984) .......... 17

*Bates v. United States*,
522 U.S. 23 (1997) .......... 11

*Bellion Spirits, LLC v. United States*,
7 F.4th 1201 (D.C. Cir. 2021) .......... 9

*Braidwood Mgmt., Inc. v. EEOC*,
70 F.4th 914 (5th Cir. 2023) .......... 20

*Browne v. United States*,
332 A.3d 512 (D.C. 2025) .......... 7, 16

*CFTC v. Schor*,
478 U.S. 833 (1986) .......... 2

*Conchatta Inc. v. Miller*,
458 F.3d 258 (3d Cir. 2006) .......... 4

*Corley v. United States*,
556 U.S. 303 (2009) .......... 3

*Craigmiles v. Giles*,
312 F.3d 220 (6th Cir. 2002) .......... 18

*Crooks v. Harrelson*,
282 U.S. 55 (1930) .......... 7

*Dirks v. SEC*,
802 F.2d 1468 (D.C. Cir. 1986) .......... 5

*Douglas v. Nat'l Park Serv.*,
835 F. Supp. 3d 159 (D.D.C. 2026) ........ 24

*Endocrine Soc'y v. FTC*,
832 F. Supp. 3d 1 (D.D.C. 2026) ........ 19

*FCC v. Fox Television Stations, Inc.*,
567 U.S. 239 (2012) ........ 4, 5

*Fed. Express Corp. v. Dep't of Com.*,
39 F.4th 756 (D.C. Cir. 2022) ........ 3

*Gen. Motors Corp. v. Tracy*,
519 U.S. 278 (1997) ........ 17

*Genus Med. Techs. LLC v. FDA*,
994 F.3d 631 (D.C. Cir. 2021) ........ 4

*Giaccio v. Pennsylvania*,
382 U.S. 399 (1966) ........ 11

*Gordon v. Holder*,
721 F.3d 638 (D.C. Cir. 2013) ........ 19, 25

*Grecian Magnesite Mining, Indus. & Shipping Co., SA v. Comm'r of IRS*,
926 F.3d 819 (D.C. Cir. 2019) ........ 10

*Gross v. United States*,
771 F.3d 10 (D.C. Cir. 2014) ........ 18

*Hanson v. District of Columbia*,
120 F.4th 223 (D.C. Cir. 2024) ........ 19, 20

*Hood v. United States*,
28 A.3d 553 (D.C. 2011) ........ 7

*Iancu v. Brunetti*,
588 U.S. 388 (2019) ........ 8

*Imperial Sovereign Ct. of Mont. v. Knudsen*,
170 F.4th 820 (9th Cir. 2026) ........ 22

*In re Nat'l Football League's "Sunday Ticket" Antitrust Litig.*,
2026 WL 3266788 (9th Cir. Oct. 30, 2026) ........ 21

*In re NTE Conn., LLC*,
26 F.4th 980 (D.C. Cir. 2022) .......... 22

*Jennings v. Rodriguez*,
583 U.S. 281 (2018) .......... 8

*Karem v. Trump*,
960 F.3d 656 (D.C. Cir. 2020) .......... 19, 25

*Lamie v. United States Trustee*,
540 U.S. 526 (2004) .......... 2

*Nat'l Wildlife Fed. v. Nat'l Marine Fisheries Serv.*,
886 F.3d 803 (9th Cir. 2018) .......... 22

*Nat'l Pork Producers Council v. Ross*,
598 U.S. 356 (2023) .......... 12, 13

*O'Donnell Constr. Co. v. District of Columbia*,
963 F.2d 420 (D.C. Cir. 1992) .......... 21

*Pharm. Rsch. & Mfrs. of Am. v. District of Columbia*,
406 F. Supp. 2d 56 (D.D.C. 2005) .......... 7, 13, 14

*Phillips v. Del Toro*,
2022 WL 1597583 (D.D.C. May 19, 2022) .......... 16

*R.I. Truck Ctr., LLC v. Daimler Trucks N. Am., LLC*,
180 F.4th 365 (1st Cir. 2026) .......... 13, 14, 15

*Sam Francis Found. v. Christie's, Inc.*,
784 F.3d 1320 (9th Cir. 2015) .......... 7

*Seila Law LLC v. CFPB*,
591 U.S. 197 (2020) .......... 8, 9

*Serafine v. Branaman*,
810 F.3d 354 (5th Cir. 2016) .......... 5

*Sessions v. Dimaya*,
584 U.S. 148 (2018) .......... 18

*South Dakota v. Wayfair*,
585 U.S. 162 (2018) .......... 15

*SPGGC, LLC v. Blumenthal*,
505 F.3d 183 (2d Cir. 2007) ... 15

*St. Joseph Abbey v. Castille*,
712 F.3d 215 (5th Cir. 2013) ... 17

*State v. Zurawski*,
690 S.W.3d 644 (Tex. 2024) ... 8

*Styczinski v. Arnold*,
46 F.4th 907 (8th Cir. 2022) ... 7

*Talbott v. United States*,
176 F.4th 720 (D.C. Cir. 2026) ... 19

*Trump v. Hawaii*,
585 U.S. 667 (2018) ... 3

*Trump v. United States*,
603 U.S. 593 (2024) ... 4

*United States ex rel. Totten v. Bombardier Corp.*,
380 F.3d 488 (D.C. Cir. 2004) ... 2

*United States v. Bronstein*,
849 F.3d 1101 (D.C. Cir. 2017) ... 9

*United States v. Cook*,
594 F.3d 883 (D.C. Cir. 2010) ... 7

*United States v. Stevens*,
559 U.S. 460 (2010) ... 1, 2

*Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
455 U.S. 489 (1982) ... 11

*Whitman-Walker Clinic, Inc. v. HHS*,
485 F. Supp. 3d 1 (D.D.C. 2020) ... 22

*Whole Woman's Health v. Jackson*,
595 U.S. 30 (2021) ... 22

*Winter v. Nat'l Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ... 22

*Wuxi Apptec Co. v. Dep't of Def.*,
2026 WL 2279624 (D.D.C. Aug. 7, 2026) .................... 22

**Statutes & Regulations**

5 R.I. Gen. Laws Ann. § 5-22-26.................... 24

8 Me. Rev. Stat. Ann. § 1301.................... 24

9 Vt. Stat. Ann. § 2479f(a)(7).................... 2

9 Vt. Stat. Ann. § 2479f(c).................... 24

D.C. Code § 1-206.02(a).................... 16

D.C. Code § 28-3901(c).................... 6

D.C. Code § 28-3904....................6

D.C. Code § 28-3905 .................... 12

D.C. Code § 28-3909 .................... 12, 23

D.C. Code § 28-5501(6).................... 2, 3, 9

D.C. Code § 28-5506(b).................... 10

D.C. Code § 28-5508 .................... 12

D.C. Code § 28-5508(a).................... 10, 23

D.C. Code § 28-5508(c).................... 4

D.C. Code § 47-2890.02 .................... 3

D.C. Code § 47-2890.03 .................... 3

D.C. Code § 47-2890.04 .................... 3, 4

D.C. Code § 47-2890.05 .................... 12, 23

16 DCMR § 3200.1.................... 12

16 DCMR § 3201.1.................... 12, 23

## INTRODUCTION

The District's opposition confirms the core problem with the RESALE Act (the "Act"). The Act bans reselling a ticket for more than its initial price plus 10% (the "Price Cap"), yet the District cannot point to any statutory text that tells regulated parties which transactions the Price Cap reaches. Its fix is asking this Court to add words that the D.C. Council left out. That is no cure for the Act's failure to give fair notice of what it prohibits.

The District's other defenses fare no better. Even with the District's rewrite, the Price Cap regulates deals between out-of-District sellers and out-of-District buyers. It burdens resellers—located predominantly outside the District—while letting local venues charge whatever they want. And the District's only justification for that disparate treatment falls flat. Plaintiffs will soon endure these constitutional violations and face ruinous penalties under a price control lacking fair notice. Those harms cannot be undone, and no equitable considerations favor allowing the District to enforce its unconstitutional Price Cap while this litigation unfolds. This Court should preliminarily enjoin the District from doing so against Plaintiffs and NATP's members.

## ARGUMENT

### I. Plaintiffs Are Likely to Succeed on the Merits.

#### A. The Price Cap Is Unconstitutionally Vague.

The District identifies no statutory text specifying the conduct that the Price Cap proscribes. Instead, its defense is that the Court should construe the Price Cap as limited to "the sale and resale of tickets for events in the District." Dkt. 17 ("Opp.") at 22. But that would be the kind of "rewrite" that "constitute[s] a serious invasion of the legislative domain." *United States v. Stevens*, 559 U.S. 460, 481 (2010) (citation omitted). The Act doesn't support—and in fact contradicts—that construction.

### 1. The District's D.C.-Events Interpretation Is Untethered to the Act.

The District proposes (at 22) a limiting construction to save the Price Cap, claiming that it applies only to resales of tickets for events in D.C. But the "Court may impose a limiting construction on a statute only if it is readily susceptible to such a construction." *Stevens*, 559 U.S. at 481 (citation omitted). As the District acknowledges (at 22), the ordinary "tools of statutory interpretation" guide the inquiry. Those tools must show that the District's interpretation is a reasonable way "to construe [the] legislation" rather than a request to "judicially rewrit[e] it." *CFTC v. Schor*, 478 U.S. 833, 841 (1986) (citation omitted). For three reasons, the District's proposal falls on the wrong side of the line.

*First*, the District "would have" this Court "read . . . absent word[s] into the statute." *Lamie v. United States Trustee*, 540 U.S. 526, 538 (2004). Again, the District points to nothing that tells regulated parties how to determine whether the Price Cap covers a transaction. Rather, the District's interpretation of the Price Cap depends on adding several words to the definition of "ticket" that the Council omitted. In the District's view, the term "ticket"—that is, "evidence that grants the possessor . . . license to enter a place of entertainment," D.C. Code § 28-5501(6)—really means "evidence that grants the possessor . . . license to enter a place of entertainment ***in the District***." But there's "a basic difference between filling a gap left by [the legislature's] silence and rewriting the rules that [the legislature] has affirmatively and specifically enacted." *United States ex rel. Totten v. Bombardier Corp.*, 380 F.3d 488, 494 (D.C. Cir. 2004) (citation omitted). And the District never explains why the Council would not have added those simple words if it meant them—just as Vermont did, for example. 9 Vt. Stat. Ann. § 2479f(a)(7) (defining "ticket" to mean a "license to enter a place of entertainment *within the State*" (emphasis added)).

*Second*, the Council's omission is especially telling because the Act uses geographic references elsewhere. When a legislature "includes particular language in one section of a statute

but omits it in another section of the same Act, courts presume that [the legislature] knew what it was doing and meant for the omission to have significance." *Fed. Express Corp. v. Dep't of Com.*, 39 F.4th 756, 768 (D.C. Cir. 2022) (citation omitted). In the *same definition* of "ticket" that omits a geographic qualifier, the Council exempted "sporting event[s] organized by a professional or intercollegiate sports team *located in the District* or professional athletic association *with an event located in the District*." D.C. Code § 28-5501(6) (emphases added). It is hard to imagine a clearer signal that the Council knew how to use the words the District now ascribes to it yet chose not to.

But the Act supplies more evidence still that when the Council "wishes to" deploy a geographic limitation, "it knows how to say just that." *Trump v. Hawaii*, 585 U.S. 667, 692 (2018). The Act requires secondary ticket exchanges to maintain records for "ticket[] resales *in the District*" and to report "unlicensed or non-compliant resellers" offering tickets "to an event being held *in the District*." D.C. Code § 47-2890.04(c)(1)–(2) (emphases added). And the licensing provisions require exchanges and resellers to obtain licenses to "operate *in the District*." *Id.* §§ 47-2890.02(a)(1), 47-2890.03 (emphasis added).

*Third*, the District's interpretation would violate "one of the most basic interpretive canons" by creating all kinds of superfluity within the Act. *Corley v. United States*, 556 U.S. 303, 314 (2009). Start with sports. If "ticket" naturally (or impliedly) covered only events in D.C., then the geographic language within the sports exemption would be "superfluous." *Id.* The Price Cap would already be limited to events in D.C., so it would be redundant to specify that a professional athletic association's "event located *in the District*" is exempted. D.C. Code § 28-5501(6) (emphasis added). So too for the exemption for "sporting event[s] organized by a professional or intercollegiate sports team located *in the District*," *id.*, which the District says (at 25) excludes "tickets for events located in the District" (as opposed to those organized by teams located in the

District). And if a "ticket" whose resale triggers the Price Cap is always a ticket for an event in the District, then why require marketplaces to report resellers that offer "tickets *to an event being held in the District*"? D.C. Code § 47-2890.04(c)(2) (emphasis added). The District's interpretation would render everything after "tickets" "superfluous, void or insignificant." *Genus Med. Techs. LLC v. FDA*, 994 F.3d 631, 638 (D.C. Cir. 2021) (citation omitted).

### 2. The District's Rejoinders Are Unavailing.

The District tries to prop up its interpretation in four ways. None persuades.

#### i. DLCP's Declaration

The District cites a declaration that the Department of Licensing and Consumer Protection (the "Department" or "DLCP") "interprets the Act to apply to the sale and resale of tickets for events in the District." Opp. at 22 (citing DLCP Decl. ¶ 6). But the District cannot so blithely wave away due-process concerns. All the declaration says is that the Department currently interprets the Act to cover resales of tickets for events happening in D.C. DLCP Decl. ¶ 6. That is not a commitment that the Department will always interpret the Act that way; it "does not bind the enforcement agency, which could, at some point in the future, decide to" adopt another interpretation given the Act's lack of clarity. *Conchatta Inc. v. Miller*, 458 F.3d 258, 265 (3d Cir. 2006). Nor is it a commitment that the D.C. Attorney General—who wields significant enforcement power, *see* D.C. Code § 28-5508(c)—shares (or will share) that interpretation.

Even if the District's enforcers committed more comprehensively to that interpretation, it still wouldn't save the Price Cap. That is because the "Government's promises of good faith" cannot ward off "significant constitutional questions." *Trump v. United States*, 603 U.S. 593, 637 (2024). After all, "the due process protection against vagueness does not leave regulated parties . . . at the mercy of *noblesse oblige*." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 255 (2012) (cleaned up). And allowing the District to salvage a law through a litigating position and the

declaration of one agency official would be especially inappropriate in the vagueness context. The vice of vague legislation is that it fails to provide "fair notice of what is prohibited" or exposes individuals to "standardless" laws subject to arbitrary enforcement—or sometimes both. *Id.* at 253. So a conclusory post hoc statement of an agency official during litigation is no panacea for those harms, especially where, as here, that official's agency is not the law's only enforcer.

The District's reliance (at 22) on *Dirks v. SEC* only underscores the point. The "narrowing, authoritative interpretation" there was a holding in a published SEC adjudication, issued years before the litigation, by the statute's sole enforcer. 802 F.2d 1468, 1470–71 (D.C. Cir. 1986). A one-sentence, mid-litigation declaration from one of several enforcers is a far cry from that.

**ii. Statutory Context**

The District's foray into statutory text exacerbates the vagueness problems. As explained, by pointing (at 23) to different provisions within the Act that include a geographic limitation, the District shows that the Council knew how to use that language but chose not to when defining the Price Cap's reach. Undeterred, it insists (at 23) that a reporting requirement for non-compliant resellers offering "tickets to an event being held in the District" makes no sense unless the Price Cap mirrors that scope. That theory inverts settled rules of statutory interpretation; it renders statutory language superfluous and ignores the Council's presumptively intentional decision to include nexus language in some provisions but not others. Indeed, "if anything," "the presence of" explicit geographic limitations in some provisions "suggests that any[]" provision without such a limitation lacks one—not that this Court should provide "an additional extra-textual limiting construction in a frantic attempt to rescue" the Price Cap. *Serafine v. Branaman*, 810 F.3d 354, 369 (5th Cir. 2016). And in all events, a liability proscription that is broader (or narrower) than a reporting requirement is hardly remarkable. Such a mismatch may signal priorities for enforcement or data collection that differ from the scope of the prohibition itself.

Next, the preamble illustrates only the menu of D.C. connections that the Council *could have* (but did not) incorporate into the operative statutory text. It says that the Act is meant "to protect artists, venues, and consumers in the District." RESALE Act, preamble. According to the District, that intent supports adding "events in D.C." as a limit on the Price Cap's scope. But it's unclear why. The Council could "protect consumers in the District," for example, by applying the Price Cap to transactions involving D.C. buyers rather than events—or D.C. buyers and sellers, or D.C. buyers, sellers, and events, or D.C. buyers, sellers, events, and marketplaces, or any combination of those. Plaintiffs need fair notice of *how* the Council legislated to further its stated goal of protecting these three local interests. Due process does not settle for notice merely of legislative aspiration.

Finally, the District seems to suggest (at 22–23) that because the Act designates violations as unfair trade practices under the D.C. Consumer Protection Procedures Act, *see* D.C. Code § 28-3904, a legislative-intent provision from that separate statute provides the geographic limitation missing from the Act. But a cross-reference saying what happens if the Price Cap is violated is not the same as a cross-reference defining what counts as a violation. And this provision would not help the District anyway. It explains that the Consumer Protection Procedures Act establishes rights regarding "consumer goods and services that are or would be purchased, leased, or received in the District." D.C. Code § 28-3901(c). But a ticket can be—and often is—"purchased" or "received" *outside* the District, even for events that are located *within* the District. So this cross-reference hardly supports the District's effort to transplant the language it needs to cure the Price Cap's vagueness.

**iii. Implausibility and Avoidance**

The District (at 24–25) falls back on the "implausible and potentially unconstitutional results" that would follow if the Act were not construed as it wishes. To the extent that the District

is invoking the absurdity canon (without saying as much), it downplays how narrow that "canon of last resort" is. *United States v. Cook*, 594 F.3d 883, 890 (D.C. Cir. 2010). Indeed, "the absurdity must be so gross as to shock the general moral or common sense." *Crooks v. Harrelson*, 282 U.S. 55, 60 (1930). And judicially rewriting statutes whenever the government says that a result is implausible or unlikely "does not pass muster as statutory interpretation" even if the proposed revision is "a good prescription for legislative action." *Hood v. United States*, 28 A.3d 553, 560 (D.C. 2011). That is especially so when the legislature could have easily "used th[e] terms in the text of the statute" but did not. *Browne v. United States*, 332 A.3d 512, 517 (D.C. 2025).

The District doesn't come close to that standard. It is "implausible," the District says (at 24), that the D.C. Council intended to regulate extraterritorially by applying the Price Cap to events in other jurisdictions. But it's hardly implausible to think that legislatures sometimes regulate beyond their borders; Dormant Commerce Clause litigation would look much different if they didn't. For example, California enacted a statute "regulating [art] sales outside the state"—including the sale of a sculpture purchased in New York and sold to a New Yorker. *Sam Francis Found. v. Christie's, Inc.*, 784 F.3d 1320, 1322–23 (9th Cir. 2015) (en banc). Minnesota regulated transactions occurring "anywhere in the world between a bullion trader and a Minnesota resident." *Styczinski v. Arnold*, 46 F.4th 907, 913 (8th Cir. 2022). And the District itself regulated drug sales that "occur[red] wholly out of state." *Pharm. Rsch. & Mfrs. of Am. v. District of Columbia*, 406 F. Supp. 2d 56, 68 (D.D.C. 2005). All of those statutes were held to violate the Dormant Commerce Clause. And they show that legislatures sometimes do enact laws that reach too far.

Yet the biggest problem for the District's argument is its flawed premise that a legislative intent to protect D.C. consumers, artists, and venues can be implemented *only* by regulating events in D.C.—and that the Price Cap therefore *must* be interpreted as applying only to such transactions.

As explained above, the Council could have fulfilled that intent—*i.e.*, it could have "legislate[d] for *the District*" (at 24)—in several ways. For example, it could have specified a Price Cap that applies to live-event transactions involving a D.C. buyer. But what the Council cannot do is leave unclear which transactions trigger the Price Cap that it enacted to protect those D.C. interests.

The District fares no better invoking constitutional avoidance. The Supreme Court has repeatedly cautioned that "[c]onstitutional avoidance is not a license to rewrite [the legislature's] work to say whatever the Constitution needs it to say in a given situation." *Seila Law LLC v. CFPB*, 591 U.S. 197, 230 (2020). A court thus "misapplie[s] the canon" if it adopts an "implausible" interpretation to avoid constitutional issues. *Jennings v. Rodriguez*, 583 U.S. 281, 296 (2018). The "proffered interpretation" must instead be "rooted in the statutory text and structure." *Seila Law*, 591 U.S. at 230. For all the reasons above, the District's is anything but. It runs roughshod over settled rules of statutory construction, jamming new words into the Act, disregarding presumptively intentional omissions, and injecting superfluity. This Court therefore "cannot accept the [District's] proposal, because the statute says something markedly different." *Iancu v. Brunetti*, 588 U.S. 388, 397 (2019); *see also, e.g.*, *State v. Zurawski*, 690 S.W.3d 644, 676 n.7 (Tex. 2024) (Busby, J., concurring) ("[I]t is important to recognize that using [constitutional avoidance] to rewrite a vague statute is improper.").

**iv. Atmospherics**

Striking out on substance, the District concludes with distractions. It notes (at 24–25) that different companies in a different case did not challenge the Price Cap's scope as vague, so they apparently "can understand the scope of the conduct that the Act prohibits." That is irrelevant. The District understandably wants to avoid "the application of traditional rules for statutory interpretation," but that analysis—not the "'*ad hoc* appraisal of the subjective expectations of'"

litigants—determines "a statute's vagueness." *United States v. Bronstein*, 849 F.3d 1101, 1106 (D.C. Cir. 2017) (quoting *Bouie v. City of Columbia*, 378 U.S. 347, 355 n.5 (1964)).

The same is true for the District's reliance on agency guidance. For one thing, future rulemaking (on unspecified topics and an unspecified timeline) after the Price Cap begins applying hardly mitigates vagueness concerns. *See* Opp. at 28. That unclear regulatory process is miles from a formal agency process allowing "regulated entities to ask for a ruling about whether statements . . . would violate [agency] regulations." *Bellion Spirits, LLC v. United States*, 7 F.4th 1201, 1214 (D.C. Cir. 2021). For another, it doesn't matter whether resellers have asked the Department for guidance on the Act. DLCP Decl. ¶ 12. Subjective understandings are irrelevant. The Act says what it says, and the advisory opinion of an agency official would not bind the Department, the D.C. Attorney General, or future iterations of those offices.

### 3. Other Aspects of the Price Cap Are Unconstitutionally Vague.

#### i. The Sports Exemption

The District offers another purportedly clarifying interpretation to salvage the second half of the "ticket" definition. In its view (at 25), the Act "exempts tickets for events located in the District" that professional or college sports teams (or professional athletic associations) organize. But this interpretation is not "rooted in the statutory text and structure," *Seila Law*, 591 U.S. at 230, so this attempt to mitigate vagueness fails too.

To begin with, the District's position on the sports exemption chafes against its view of the Price Cap's scope. If the Price Cap applies only to tickets for events in the District, then specifying the event location for exempted tickets makes no sense. The District's interpretation also requires moving the phrase "located in the District" from its natural home—*i.e.*, right after "professional or intercollegiate sports team"—to follow a noun on the other side of that clause—"a sporting event." D.C. Code § 28-5501(6). That move is unnatural. And the "rule of the last antecedent"

recognizes as much: "a limiting clause or phrase . . . should ordinarily be read as modifying only the noun or phrase that it immediately follows." *Grecian Magnesite Mining, Indus. & Shipping Co., SA v. Comm'r of IRS*, 926 F.3d 819, 824 (D.C. Cir. 2019) (quoting *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003)).

This part of the Act's "ticket" definition thus remains indiscernible. Statutory clues suggest that the location of the team matters, but the District says otherwise in litigation. And the District does not contest Plaintiffs' argument that "located in the District" is vague if it applies to the team because the Act does not provide fair notice of what it means for a team to be "located in the District." *See* Dkt. 9-1 ("PI Mem.") at 21–22. Nor does the District dispute that "organized by a [qualifying] team" suffers from the same flaw. *See id.*

**ii. Initial Ticket Price**

Plaintiffs showed that resellers often do not know—and sometimes cannot know—the initial purchase price of a ticket. *See* PI Mem. at 22–23. They also established that even when they can find *some* information on that price, verifying that number is not always possible. *Id.* The District does not contend otherwise. Instead, the District responds (at 27) that this dilemma is no big deal: "Nothing in the statute suggests that the District would hold a reseller liable for using an initial ticket price that it reasonably thought to be true."

But nothing in the statute suggests that the District *would not* (never mind *could not*) hold the reseller liable for failing to pin down this frequently unknowable benchmark. The Council could have easily added a scienter requirement. It could have said that resellers "shall not *knowingly* sell or offer to sell a ticket that exceeds the total price of the initial ticket" plus 10%. *Cf.* D.C. Code § 28-5506(b). Or it could have said that a "*knowing* violation of this chapter shall be a Class 2 civil infraction and subject to fines." *Cf. id.* § 28-5508(a). It did neither. And when a statute "does not include" a particular "state of mind requirement," courts typically heed the rule

against "reading words or elements into a statute that do not appear." *Bates v. United States*, 522 U.S. 23, 29 (1997).

Returning to a familiar well, the District also notes that the Department's declarant said that the Department does not interpret the Act to create liability for resellers who "us[e] an initial ticket price that they reasonably believed to be true." DLCP Decl. ¶ 10. But for familiar reasons, that statement does not solve the vagueness problem. The Price Cap's often unknowable benchmark remains operative despite this mid-litigation description of the Department's intent. The D.C. Attorney General (present or future) could still punish resellers under a different interpretation. So could a Department under different leadership—or even current leadership that changes its mind, since nothing in this declaration binds the Department moving forward.

The District also contends (at 27) that Plaintiffs can simply decline transactions if they cannot ascertain the initial ticket price, noting that the D.C. Council could have banned resales. But the Council did not do that. And the power to ban does not include the power to regulate without fair notice.

**4. Plaintiffs Have Met Their Burden.**

The District also errs in contending (at 21) that Plaintiffs must satisfy a more stringent vagueness standard because the Price Cap is an economic regulation. "[W]hether labeled 'penal' or not"—or criminal or civil—the Price Cap "must meet the challenge that it is unconstitutionally vague." *Giaccio v. Pennsylvania*, 382 U.S. 399, 402 (1966). And the "nature of the enactment" here does not relax the District's obligations to provide fair notice of legislatively prohibited conduct. *Cf. Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982). The Price Cap exposes resellers to potentially ruinous penalties: it deems violations "serious infractions"; provides for fines of up to $8,000 per offense; and subjects resellers to enforcement proceedings, license revocation, consumer lawsuits, and D.C. Attorney General lawsuits that can

seek dissolution of the violating entity. *See* 16 DCMR §§ 3200.1(b), 3201.1(b); D.C. Code §§ 28-5508, 28-3905, 28-3909, 47-2890.05.

But this debate is academic. The District never suggests how the standard would make a difference. Rather, whether the Price Cap is unconstitutionally vague depends on whether the Act can support the District's limiting construction. As explained above, it cannot under any standard.

### B. The Price Cap Violates the Dormant Commerce Clause by Directly Regulating Out-of-State Transactions.

The District contends that the Price Cap passes muster under the Dormant Commerce Clause's extraterritoriality principle for two reasons. It first says that there is no such thing after *National Pork Producers Council v. Ross*, 598 U.S. 356 (2023). But even if there is, the District asserts, the principle would not apply to the Price Cap. The District misses both marks. As the District seemingly acknowledges, the Constitution does not allow states to directly regulate transactions beyond their borders. And even if the Price Cap applies only to resales involving tickets for events in D.C., that limited nexus cannot justify this extraterritorial regulation.

#### 1. The Dormant Commerce Clause Prohibits States from Directly Regulating Out-of-State Conduct Lacking a Sufficient Nexus to the Regulating State.

*Pork Producers* did not eliminate the rule against directly regulating out-of-state transactions lacking a sufficient connection to the regulating state. It would have been odd for the Court to do so in that case, which dealt with California's regulation of *in-state* sales. 598 U.S. at 363. Instead, the Court recognized the principle that a state may not "directly regulate[] out-of-state transactions by those with no connection to the [s]tate," while distinguishing the challenged law as one that "regulates only products that companies choose to sell '*within*'" the regulating state. *Id.* at 376 n.1 (emphases omitted and added) (discussing *Edgar v. MITE Corp.*, 457 U.S. 624,

643 (1982) (plurality op.)). And in doing so, the Court refused to "trivialize the role territory and sovereign boundaries play in our federal system." *Id.* at 375.

Subsequent decisions confirm that the Dormant Commerce Clause prohibits states from "directly regulating . . . out-of-state transactions absent a sufficiently strong 'in-state nexus.'" *R.I. Truck Ctr., LLC v. Daimler Trucks N. Am., LLC*, 180 F.4th 365, 379 (1st Cir. 2026) (citation omitted); *see also* PI Mem. at 24 (discussing other post-*Pork Producers* precedent). The District doesn't suggest the First Circuit erred in holding as much. Instead, it says (at 31) only that the First Circuit reached that conclusion by relying "on prior precedent" because *Pork Producers* didn't resolve how to address direct extraterritorial regulation. Prior precedent, however, confirms that the District cannot regulate "transactions that occur wholly out of state," even if it uses some "in-state hook." *Pharm. Rsch. & Mfrs. of Am.*, 406 F. Supp. 2d at 68–69; *see also, e.g.*, *Ass'n for Accessible Meds. v. Frosh*, 887 F.3d 664, 672–73 (4th Cir. 2018).

In the end, the District doesn't seem to really contend that the Constitution allows a state or D.C. to directly regulate entirely out-of-state transactions. Quite the opposite. It concedes (at 24) that "[i]f the Council were to reach beyond the District" by regulating transactions involving "events in Nashville and Las Vegas," "that would create constitutional problems." So the only question is whether the Price Cap crosses this line by directly regulating out-of-state transactions without a sufficiently strong in-state nexus. *R.I. Truck Ctr.*, 180 F.4th at 379.

### 2. The Price Cap Violates the Extraterritoriality Principle.

To start, the District does not dispute that if the Price Cap applies to transactions between buyers and sellers from any state for tickets to any venue, that nationwide price control would flout the Dormant Commerce Clause—and likely other constitutional principles such as due process and the horizontal separation of powers. *See Pork Producers*, 598 U.S. at 376.

But even under the District's atextual interpretation—*i.e.*, that the Price Cap applies only to resales of tickets for events in D.C.—the Price Cap still violates the Dormant Commerce Clause. Rather than regulate events occurring in the District, it is "fixated on" upstream transactions—a buyer and seller (anywhere in the country) exchanging money for a ticket (almost always on an online marketplace based outside the District). *Frosh*, 887 F.3d at 671. That *transaction*—regardless of what the buyer (or a subsequent buyer) does with the ticket—has no inherent connection to the District. It instead sweeps in transactions involving individuals in states all over the country. And overwhelmingly so: although the District faults Plaintiffs (at 53) for citing relevant information from a public filing, it tellingly does not dispute that about 85–90% of transactions involving events in D.C. occur between an out-of-state buyer and an out-of-state seller.

The District fails to link those transactions to D.C. in a way that would justify this direct regulation of out-of-state sales. Such regulation can violate the Dormant Commerce Clause even if a state identifies *some* in-state connection. "All of the out-of-state transactions regulated by th[e] law" in *Edgar* "concerned shares in a company that itself had some ties to Illinois." *R.I. Truck Ctr.*, 180 F.4th at 374–75 & n.10. And the law held unconstitutional in *Rhode Island Truck Center* "applie[d] only once a manufacturer ha[d] entered into a franchise agreement with a Rhode Island dealer." *Id.* at 374; *see also, e.g.*, *Pharm. Rsch. & Mfrs. of Am.*, 406 F. Supp. 2d at 68–69 (price control on out-of-state transactions unconstitutional despite being "triggered by an in-state sale").

None of the District's suggested connections satisfies the Dormant Commerce Clause. It insists (at 31) that "District events certainly have a connection to the District." True, but the Price Cap directly regulates *transactions* involving resold tickets, not events, and "*a* connection" is not enough. Nor does the District's "ticket lifecycle" theory (at 32) move the needle. The transaction

between an out-of-state seller and an out-of-state buyer does not "start and end" in the District; it starts and ends with two out-of-state individuals making an out-of-state deal for a ticket, and that deal does not depend on whether the buyer (or perhaps another buyer down the road) goes to the District for a show. And the District is wrong (at 32) that the buyer "take[s] title to" the ticket in D.C. An out-of-state individual who buys a ticket has the right to use it and can sell that right without ever entering the District. Finally, the Council's professed goal of protecting D.C. interests cannot insulate a law from Dormant Commerce Clause scrutiny. The "harms sought to be prevented are not harms occurring only within [the District's] borders," *R.I. Truck Ctr.*, 180 F.4th at 379, because a Price Cap tied to events in D.C. would still cover transactions involving ticket buyers outside the District. Indeed, states can always point to in-state interests to justify legislation, but the very purpose of the Dormant Commerce Clause is to prevent them from going too far in those efforts.

The District also sets fire to straw men. Plaintiffs' theory, the District says (at 33), is that the Price Cap "is suddenly unconstitutional because it applies to online transactions." Far from it. Plaintiffs challenge the Price Cap because the District imposes its price preferences on out-of-state transactions—whether finalized online or by an in-person hand-off—without a sufficient D.C. nexus. This case does not involve a statute tying consumer protections to transactions involving in-state residents. *Cf. SPGGC, LLC v. Blumenthal*, 505 F.3d 183, 195 (2d Cir. 2007) (upholding law where there was "no risk that [it] will control sales . . . to anyone other than Connecticut consumers"). Nor would Plaintiffs' theory sound a death knell for sales taxes. Those taxes involve a state collecting revenue based on goods that its *own consumers* buy, *see South Dakota v. Wayfair*, 585 U.S. 162, 167 (2018), which is not true of the Price Cap under the District's reading.

Finally, the District targets the purported novelty of Plaintiffs' argument. It says (at 34) that Plaintiffs seek to extend the Dormant Commerce Clause, so a likelihood of success is "missing." Not so. Plaintiffs rely on constitutional principles that courts have used to find Dormant Commerce Clause violations before and after *Pork Producers*. Applying those principles to new factual contexts is the classic task of this Court—not some artificial barrier to injunctive relief.

### C. The Price Cap Violates the Home Rule Act.

This Court should exercise supplemental jurisdiction over Plaintiffs' Home Rule Act claim. The District's only contrary reason (at 36) is that the claim raises a "novel or complex issue of [District] law." But the claim is simple: the Home Rule Act bars the Council from enacting a law that "is not restricted in its application exclusively in or to the District," D.C. Code § 1-206.02(a)(3), and the Price Cap is not so restricted for the reasons above. Applying straightforward statutory text to a new "factual scenario" does not warrant declining jurisdiction. *Phillips v. Del Toro*, 2022 WL 1597583, at *4 (D.D.C. May 19, 2022). The District also faults (at 37) Plaintiffs for not identifying on-point D.C. precedent. But a federal court can interpret a D.C. statute even where no D.C. court has applied that statute to a particular set of facts by "giv[ing] effect to the [statute's] plain meaning." *Browne*, 332 A.3d at 516 (citation omitted).

### D. The Price Cap Violates the Dormant Commerce Clause's Anti-Discrimination Rule.

As Plaintiffs explained, the Price Cap burdens resellers—an overwhelmingly out-of-District group—while leaving local venues and primary issuers free to charge any price. PI Mem. at 28–31. The District does not dispute that. Instead, it says that Plaintiffs have not shown discrimination. In doing so, the District first suggests (at 38) that the Price Cap must be facially discriminatory before admitting (at 39) that courts consider "discriminatory purpose" and the "practical operation of the statute" in evaluating claims of unlawful protectionism.

Yet Plaintiffs showed discriminatory purpose and operation, and the District's counters don't suggest otherwise. That the Council was not clumsy enough to unveil its discriminatory purpose in the Act's preamble says little about whether the Act's structure—which divides ticket sellers into resellers (a predominantly out-of-District group) and primary issuers (including local venues) and imposes burdens only on the former—reveals protectionism.

The District also errs in contending (at 38) that "resellers and issuers are not similarly situated." To the contrary, there is "actual or prospective competition between" those market participants. *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 300 (1997). While the District relies (at 38) on shorthand labels for the ticketing industry, Plaintiffs explained how this competition works: a reseller can undercut a primary issuer's elevated price, giving consumers cheaper ticket options for the same event. *See* PI Mem. at 28–29. Any industry differences "go only to the extent of such competition." *Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 269 (1984).

**E. The Price Cap Violates Equal Protection.**

Plaintiffs explained that the Price Cap treats two groups that provide tickets differently. PI Mem. at 32. The District does not dispute that premise. Rather, it says (at 44) that this legislative distinction is rational because primary issuers do something different: they "are not *reselling* tickets, so there is no markup to cap."

That justification is illusory. When capping ticket prices, what matters is what consumers pay—not whether they are paying for a resold ticket or for an original ticket. So a one-sided price control is irrational. Consider a concert seat for which the primary issuer charges $100 when tickets are released. Someone buys at that price but wants to sell two months later. He could not offer that ticket for $140 even if the primary issuer has increased prices to $250. The only reason is that the District labels his increase—but not the primary issuer's—a "markup." This Court need not "accept nonsensical explanations" on rational-basis review. *St. Joseph Abbey v. Castille*, 712 F.3d

215, 226 (5th Cir. 2013). And applying the Price Cap based on *who* increases the ticket price lays bare the Council's preference to "protect[] a discrete interest group from economic competition" by allowing it—but not its competitor—to raise prices. *Craigmiles v. Giles*, 312 F.3d 220, 224 (6th Cir. 2002). That is "not a legitimate governmental purpose." *Id.*

### F. Plaintiffs Bring Facial and As-Applied Claims.

Plaintiffs are likely to succeed on the merits of these claims. But because the District asserts (at 20) that Plaintiffs "bring a facial challenge" and therefore must meet a heightened standard, Plaintiffs underscore that they bring facial *and* as-applied claims. *See* Compl. ¶¶ 21, 72, 80, 88, 102, 106. "[T]he distinction between facial and as-applied challenges . . . goes to the breadth of the remedy employed by the Court." *Gross v. United States*, 771 F.3d 10, 14–15 (D.C. Cir. 2014). And tracking the relief sought in their complaint, the preliminary injunction Plaintiffs request would prohibit the District from implementing or enforcing the Price Cap only against Plaintiffs and NATP's members based on their ticket-resale conduct. *See* Dkt. 9-16 at 1–2. So this Court may grant that relief without finding that Plaintiffs meet any heightened standard. And this Court should follow "the normal rule" of "declar[ing] [the statute] invalid to the extent it reaches too far," *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 329 (2006) (citation omitted), and tailoring the relief accordingly.

Even if the Court construes these challenges as exclusively facial despite Plaintiffs' complaint and requested relief, the Price Cap would still be unconstitutionally vague. The constitutional flaw is that neither Plaintiffs nor other resellers can identify the facts that determine when it applies. That is true in all applications because the Act provides no fair notice as to which of the many combinations of potentially relevant facts dictates the Price Cap's reach. And even if there were "some conduct that clearly falls within [the Price Cap's] grasp," that does not make "a vague provision . . . constitutional." *Sessions v. Dimaya*, 584 U.S. 148, 159 n.3 (2018).

## II. A Preliminary Injunction Is Necessary to Prevent Irreparable Harm.

### A. Plaintiffs Will Suffer Irreparable Harm Tied to Constitutional Injuries.

The D.C. Circuit has held that a plaintiff who is likely to suffer constitutional injury has established irreparable harm. Indeed, "the loss of constitutional freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Archdiocese of Wash. v. WMATA*, 897 F.3d 314, 334 (D.C. Cir. 2018) (quoting *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009)). A "'prospective violation of a constitutional right'"—including "a violation of Fifth Amendment due process rights"—thus "supports injunctive relief." *Karem v. Trump*, 960 F.3d 656, 667–68 (D.C. Cir. 2020) (quoting *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013)). Courts in this District have followed suit: "When a party makes it apparent that its constitutional rights are violated, it easily clears the irreparable-harm requirement." *Endocrine Soc'y v. FTC*, 832 F. Supp. 3d 1, 20 (D.D.C. 2026) (Boasberg, C.J.) (citation omitted).

No doubt, courts "do not axiomatically find that a plaintiff will suffer irreparable harm simply because it *alleges* a violation of its [constitutional] rights." *Hanson v. District of Columbia*, 120 F.4th 223, 244 (D.C. Cir. 2024) (emphasis added) (citation omitted). And "the deprivation of constitutional rights constitutes irreparable injury only to the extent such deprivation is shown to be likely." *Archdiocese of Wash.*, 897 F.3d at 334. But Plaintiffs have cleared that bar because the Price Cap would likely deprive them of their constitutional rights.

No more is required. *Hanson* did not overrule the litany of precedent establishing that a likely and imminent constitutional injury suffices for irreparable harm. In *Gordon v. Holder*, for example, the Circuit explained that a "prospective violation of a constitutional right constitutes irreparable injury" even where "the underlying constitutional questions" about due process were "close." 721 F.3d 638, 645, 653 (2013). And a few months ago, the Circuit reiterated that because plaintiffs "have demonstrated a likelihood of success on the merits" of their constitutional claim,

"it follows that they have been irreparably harmed." *Talbott v. United States*, 176 F.4th 720, 747 (D.C. Cir. 2026). For good reason: "Constitutional violations inflict irreparable harm" because "dollars and cents cannot capture the damage that the government inflicts when it deprives rights that it exists to defend." *Braidwood Mgmt., Inc. v. EEOC*, 70 F.4th 914, 932 n.33 (5th Cir. 2023) (cleaned up).

In all events, Plaintiffs will—absent preliminary relief—suffer the kind of imminent harm that was missing in *Hanson*. The plaintiff there could not explain how his "self-defense interest" would be irreparably harmed if he had "the ability to fire 11, but not 18, rounds" of ammunition "during the pendency of th[e] litigation." 120 F.4th at 244. He also affirmatively conceded that it would be "rare and unusual" for him to need those extra rounds, so "in [his] own words" he "raised only remote conjecture" of future injury. *Id.* at 245 (cleaned up). And he impliedly conceded that he would not suffer irreparable harm by "consent[ing] to a stay of district court proceedings" and "failing to seek expedited review" of the denied preliminary-injunction motion. *Id.* at 245–46.

Plaintiffs' case is different. If the Price Cap begins applying, their constitutional interests will be immediately and irreparably harmed. They will not have fair notice of the scope of a law that restricts their conduct and threatens ruinous penalties; their business transactions will be subject to the District's burdensome extraterritorial regulation that the Constitution prohibits; and they will endure arbitrary and unequal treatment while conducting that business. Plaintiffs' vagueness claim illustrates the point. Fair notice is either present or lacking; Plaintiffs will not have the due-process equivalent of 11 rounds rather than 18. And a merits win down the road could not restore the constitutionally guaranteed notice that the District deprived Plaintiffs of during litigation. Plaintiffs would instead be subjected to a constitutionally forbidden guessing game regarding what they can and cannot do each day the Price Cap is in effect.

**B. Plaintiffs Will Suffer Irreparable Harm Tied to Irrecoverable Financial Loss.**

Plaintiffs have also established irreparable harm because they will suffer irremediable financial losses. The District faults Plaintiffs (at 51) for not proving a negative—*i.e.*, that they could not reasonably model losses if the Price Cap begins applying. But Plaintiffs explained that if the Price Cap restricts certain transactions, they would not know what a passed-on ticket would have sold for in an uncapped market. Dkt. 9-2 ¶ 21; Dkt. 9-3 ¶ 29. That Plaintiff ASC Ticket Company can review *past* sales data to show "millions of dollars in revenue" in a pre-Price Cap market does not mean that it could recover damages based on future (forgone) sales in a post-Price Cap market in which it can no longer regularly participate. Dkt. 9-3 ¶ 11. Showing which transactions it "would have" engaged in and the "profit it would have made on each" in "the absence of" the Price Cap remains "inherently speculative" and thus "weighs heavily in favor of granting the injunction." *O'Donnell Constr. Co. v. District of Columbia*, 963 F.2d 420, 428 (D.C. Cir. 1992).

The District responds (at 52) that it is "possible that Plaintiffs will be able to estimate losses" in a "damages phase." But the plaintiff in *O'Donnell* could have *possibly* estimated damages too. Still, the D.C. Circuit found that the "inherently speculative" task of doing so satisfied the irreparable-harm requirement. 963 F.2d at 428. Trying to dodge that binding decision, the District cites (at 51) a non-binding one about the admissibility of expert evidence rather than irreparable harm. *See In re Nat'l Football League's "Sunday Ticket" Antitrust Litig.*, 2026 WL 3266788 (9th Cir. Oct. 30, 2026). But that decision underscores how shaky damages relief would be: "Modeling the difference between the real world . . . and the but-for world," it observes, is "an exceedingly difficult task." *Id.* at *5 (citation omitted).

The District also says (at 52) that any irrecoverable harm would not be severe enough. But "a lesser showing is permissible when the economic injury . . . is unrecoverable," which can suffice

"even if it would not wipe the business out." *Whitman-Walker Clinic, Inc. v. HHS*, 485 F. Supp. 3d 1, 58 (D.D.C. 2020). And "unrecoverable losses" can be "sufficient without . . . a percentage-of-revenue analysis." *Wuxi Apptec Co. v. Dep't of Def.*, 2026 WL 2279624, at *12 (D.D.C. Aug. 7, 2026). As mentioned, ASC Ticket Company's "revenue stream" over the past three years for events in D.C. is in the "millions of dollars," Dkt. 9-3 ¶ 11, which is significant. *See In re NTE Conn., LLC*, 26 F.4th 980, 990 (D.C. Cir. 2022).

**C. The District's Other Arguments Fall Short.**

The District takes several other unsuccessful jabs at irreparable harm.

The District contends (at 46–47) that because consumers could sue Plaintiffs even if this Court enjoins the District, Plaintiffs have no need for preliminary relief since they will suffer harm even with it. This argument is stunning. If correct, any state or federal government could pass a brazenly unconstitutional law and—by tacking on a private right of action—preclude *any* injunctive relief, even against government enforcement.

Unsurprisingly, the District cites no authority suggesting that this is the law. And it isn't. A plaintiff "seeking preliminary relief" need only show "that irreparable injury is likely in the absence of an injunction." *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (emphasis omitted). That can of course be true if the injunction would prevent *most* (or even *some*), but not all, irreparable injury. Because a plaintiff "need not further show that the action sought to be enjoined is the exclusive cause of the injury," this Court may "issue an injunction that does not *completely* prevent the irreparable harm that it identifies." *Nat'l Wildlife Fed. v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 823 (9th Cir. 2018) (emphasis added) (citation omitted). Notably, the Supreme Court held that plaintiffs could pursue injunctive relief against some government officials without suggesting that enforcement "through private civil actions" would preclude such relief. *Whole Woman's Health v. Jackson*, 595 U.S. 30, 35–37, 45–47 (2021); *see also Imperial*

*Sovereign Ct. of Mont. v. Knudsen*, 170 F.4th 820, 841, 876 (9th Cir. 2026) (affirming preliminary injunction against some government officials even though county attorneys "remain[ed] free to prosecute" under the challenged law).

Enjoining the District from enforcing the Price Cap against Plaintiffs would prevent irreparable injury. The constitutional injuries are harms that the District inflicts. An order prohibiting its officials from enforcing an unconstitutionally vague law, for instance, prevents the District from punishing individuals without fair notice. Nor would the District be able to leverage its significant enforcement authority to inflict constitutional injuries flowing from laws that are unclear or extraterritorial. The Department may impose fines of up to $8,000 per offense. D.C. Code § 28-5508(a); 16 DCMR § 3201.1(b). And District officials can seek penalties under an unconstitutional Price Cap in ways that consumers cannot: the D.C. Attorney General can pursue injunctive relief freezing assets or even "[d]issolving an entity," D.C. Code § 28-3909(a)(3), (5), and the Department can bar resellers from operating in the District by revoking licenses, *id.* § 47-2890.05(a). The requested relief takes these injuries off the table. And it makes the prospect of any consumer lawsuits less likely. Consumers would naturally be less likely to sue under a law their government has been enjoined from enforcing because it is likely unconstitutional. Plaintiffs could also more effectively defend any lawsuits that do emerge by pointing to this Court's ruling.

The District's remaining arguments fail in short order. It says (at 47) that enforcement is not "imminent" because "the Department will engage in rulemaking, and Plaintiffs can seek guidance then or even before." To be clear, the Price Cap applies beginning on January 1, 2027, and the District has not said it will stay enforcement pending the Mayor's rulemaking, which is uncertain both as to content and timing. So that regulatory process, whatever it entails and whenever it happens, does nothing to ameliorate Plaintiffs' injury. And the District's observation

(at 52) that Plaintiffs have not challenged other (unspecified) states' ticketing legislation says nothing about whether this one unlawfully inflicts irreparable injury, whether those (unidentified) other laws create the same threat to Plaintiffs, or whether those laws are similarly unconstitutional.[1]

Finally, the District asserts (at 52–53) that Plaintiffs delayed moving for preliminary relief because they filed their motion three weeks after the congressional review period expired. But Plaintiffs diligently analyzed the Act, evaluated claims, and moved for relief well before the Price Cap begins applying in January. Indeed, moving for relief in mid-October allows ample time to brief the issues—even with the District's multi-week extension for its opposition—and for the Court to decide Plaintiffs' motion before irreparable injury sets in. It is unserious to compare (at 53) this situation to a case where the plaintiffs moved for relief *five days* before the event they sought to enjoin despite that event being publicly known for *eleven months*. *See Douglas v. Nat'l Park Serv.*, 835 F. Supp. 3d 159, 169 (D.D.C. 2026).

## III. The Balance of the Equities and the Public Interest Favor Preliminary Relief.

The District insists (at 54–55) that a preliminary injunction would disrespect the legislative process by, among other things, preventing the District from serving as a laboratory for democracy. This argument fails across the board, but it has no purchase whatsoever against Plaintiffs' vagueness challenge. A preliminary injunction tied to that claim would not suggest either way whether the Council *could* enact ticket-resale legislation. It would simply *respect* the Council by declining the District's invitation to rewrite its statute.

---

[1] Elsewhere (at 17), the District cites statutes from Maine, Vermont, and Rhode Island. The first applies to marketplace fees, not resale prices. 8 Me. Rev. Stat. Ann. § 1301(2-A)(G). The second has been repealed effective in 2028 and applies only to tickets for events at small independent venues. 9 Vt. Stat. Ann. § 2479f(c). The third allows venue owners to waive the price restriction, *see* 5 R.I. Gen. Laws Ann. § 5-22-26, and the District does not discuss whether it is widely enforced or whether Plaintiffs have much business there.

But the equities favor Plaintiffs on all claims because the District has no legitimate interest in cooking up unconstitutional statutes in the democracy laboratory. It is "obvious," the D.C. Circuit has held, that "enforcement of an unconstitutional law is always contrary to the public interest." *Gordon*, 721 F.3d at 653. That holds true no matter the policy stakes; the "Constitution" does not allow the District "to prioritize any policy goal over the Due Process Clause" or other constitutional provisions. *Karem*, 960 F.3d at 668.

If the District suggests that it retains an interest in enforcing an unconstitutional law in some cases, this isn't one of them. An injunction will not halt state legislation. As the District notes (at 57), a preliminary injunction is not a final merits determination, and it would not bind other legislatures even if it were. Those legislatures may ignore this Court's decision or, if persuaded, revise their laws—hardly a frightening result in our constitutional system. Finally, this preliminary injunction would not freeze a longstanding law. The Price Cap has not started applying, so the only reliance interests in play are Plaintiffs'. And they would be served by preservation of the status quo.

Consumer interests favor preliminary relief too. While dismissing (at 58) evidence of consumer savings as "a few studies," the District fails to grapple with the harm to the public that will result from the Price Cap driving consumers to unregulated resale markets. *See* PI Mem. at 14. The Mayor's office warned of this outcome. *See* Dkt. 9-9 at 4. And the District's cited GAO report identified "underground" resale activity as a "[k]ey disadvantage[]" of price caps. Dkt. 17-2 at 41.

## CONCLUSION

For these reasons, this Court should grant Plaintiffs' motion and preliminarily enjoin Defendant from enforcing the Price Cap against Plaintiffs and NATP's members.

Dated: November 16, 2026

Respectfully submitted,

/s/ *Jessie K. Liu*

Jessie K. Liu (D.C. Bar No. 472845)
Justin V. Shur (D.C. Bar No. 973855)
Richard H. Poulson (D.C. Bar No. 90015456)

**LIU SHUR KRAVIS LLP**
607 Fourteenth Street, N.W.
Suite 625
Washington, D.C. 20005
Phone: (202) 240-7100
jessie.liu@lskllp.com
justin.shur@lskllp.com
hundley.poulson@lskllp.com

*Attorneys for Plaintiffs National Association of Ticketing Professionals, ASC Ticket Company, and Stage Front Tickets, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that, on November 16, 2026, the foregoing was filed with the Court's electronic filing system, which will send electronic notice of this filing to all counsel of record.

*/s/ Jessie K. Liu*
Jessie K. Liu
*Attorney for Plaintiffs*